**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MALLINCKRODT ARD LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-1471 |
| | ) | |
| SEEMA VERMA, | ) | |
| in her official capacity as | ) | |
| ADMINISTRATOR, CENTERS FOR | ) | |
| MEDICARE & MEDICAID SERVICES, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALEX M. AZAR II, | ) | |
| in his official capacity as SECRETARY, | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES, | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Catherine E. Stetson (D.C. Bar No. 453221)
Susan M. Cook (D.C. Bar No. 462978)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004

*Counsel for Mallinckrodt ARD LLC*

Dated:  May 22, 2019

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................. 3

    The Medicaid Drug Rebate Program .................................................................. 3

    The FDA Drug Approval Process........................................................................ 5

    CMS Regulations and Guidance Governing "Single Source Drug" ................... 7

    Acthar's Approval Under a New NDA ............................................................... 8

    CMS Determines in 2012 that Acthar is a Single Source Drug Entitled to Its Own
    Base Date AMP ...............................................................................................13

    CMS Begins to Question Its Own 2012 Statements..........................................16

ARGUMENT .......................................................................................................20

    I.       MALLINCKRODT IS LIKELY TO PREVAIL ON THE MERITS. ....................20

           A.     CMS's Determination That Acthar Is Not A "Single Source
                 Drug" Cannot Be Reconciled With The Medicaid Drug Rebate
                 Statute .......................................................................................21

           B.     CMS's Determination Violates The Agency's Own
                 Regulations. ..............................................................................26

           C.     CMS's Determination Is Arbitrary And Capricious Because
                 The Agency Failed To Explain Its Change In Position. ................28

           D.     CMS's Determination Violates Principles Of Fair Notice And
                 Retroactivity..............................................................................29

                1.    CMS's Effort to Impose Its New Policy Retroactively
                      Violates Principles of Fair Notice and Due Process. ........................30

                 2.    CMS's Decision Is Impermissibly Retroactive. ...............................32

    II.     MALLINCKRODT WILL SUFFER IRREPARABLE HARM ABSENT
           PRELIMINARY INJUNCTIVE RELIEF. ..........................................................37

III.    GRANTING PRELIMINARY INJUNCTIVE RELIEF WOULD
         ADVANCE THE PUBLIC INTEREST. ................................................................40

IV.    THE BALANCE OF THE EQUITIES FAVORS PRELIMINARY
         INJUNCTIVE RELIEF..........................................................................................41

CONCLUSION.........................................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017) ...................................................................................29

*Amarin Pharm. Ireland Ltd. v. FDA*,
    106 F. Supp. 3d 196 (D.D.C. 2015) ...................................................................25, 26

*Atlas Air, Inc. v. International Bhd. of Teamsters*,
    280 F. Supp. 3d 59 (D.D.C. 2017) ...........................................................................39

*Auer v. Robbins*,
    519 U.S. 452 (1997) ..................................................................................................27

*Bontrager v. Indiana Family & Soc. Servs. Admin.*,
    697 F.3d 604 (7th Cir. 2012) ....................................................................................47

*California Pharmacists Ass'n v. Maxwell-Jolly*,
    No. CV-09-8200 CAS, 2010 WL 11507584 (C.D. Cal. May 5, 2010) ...................38

*Christensen v. Harris Cty.*,
    529 U.S. 576 (2000)..................................................................................................25

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012)............................................................................................31, 32

*City of Arlington, Tex. v. FCC*,
    569 U.S. 290 (2013)..................................................................................................21

* *Clark-Cowlitz Joint Operating Agency v. FERC*,
    826 F.2d 1074 (D.C. Cir. 1987) (en banc) ...................................................32, 33, 34

*Clean Air Council v. Pruitt*,
    862 F.3d 1 (D.C. Cir. 2017) ......................................................................................26

*Council on American-Islamic Relations v. Gaubatz*,
    667 F. Supp. 2d 67 (D.D.C. 2009) ...........................................................................20

*Dillmon v. Nat'l Transp. Safety Bd.*,
    588 F.3d 1085 (D.C. Cir. 2009)................................................................................28

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016)..............................................................................................25

*FBME Bank Ltd. v. Lew*,
   125 F. Supp. 3d 109 (D.D.C. 2015) ..................................................................................42

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)..........................................................................................................29

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012)..........................................................................................................30

*Foothill Hosp.–Morris L. Johnston Mem'l v. Leavitt*,
   558 F. Supp. 2d 1 (D.D.C. 2008) ......................................................................................25

*Fox v. Clinton*,
   684 F.3d 67 (D.C. Cir. 2012) ............................................................................................20

*Friedman v. Sebelius*,
   686 F.3d 813 (D.C. Cir. 2012) ..........................................................................................28

*General Elec. Co. v. EPA*,
   53 F.3d 1324 (D.C. Cir. 1995) ...............................................................................30, 31, 32

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ..........................................................................................39

*Independent Living Ctr. v. Maxwell–Jolly*,
   572 F.3d 644 (9th Cir. 2009) ............................................................................................40

*International Exports, Inc. v. Mattis*,
   265 F. Supp. 3d 35 (D.D.C. 2017)......................................................................................26

*Ipsen Biopharmaceuticals v. Price*,
   Civil Action No. 1:16-cv-02372-DLF, ECF 24 (D.D.C. Sept. 24, 2018)................................5

*Iyengar v. Barnhart*,
   233 F. Supp. 2d 5 (D.D.C. 2002) ......................................................................................38

*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*,
   88 F.3d 1191 (D.C. Cir. 1996) ..........................................................................................27

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ..............................................................................................41

*Libbie Rehab. Ctr., Inc. v. Shalala*,
   26 F. Supp. 2d 128 (D.D.C. 1998) ....................................................................................41

*Lone Mountain Processing, Inc. v. Secretary of Labor*,
   709 F.3d 1161 (D.C. Cir. 2013) ........................................................................................29

*McDonald v. Watt*,
653 F.2d 1035 (5th Cir. Unit A Aug. 1981) ..........................................................33

*Mova Pharm. Corp. v. Shalala*,
140 F.3d 1060 (D.C. Cir. 1998) ...........................................................................41

*N. Mariana Islands v. United States*,
686 F. Supp. 2d 7 (D.D.C. 2009) ........................................................................41

*Nat'l Med. Care, Inc. v. Shalala*,
No. 95-0860 (WBB), 1995 WL 465650 (D.D.C. June 6, 1995)......................38, 42

*New York Cross Harbor R.R. v. Surface Transp. Bd.*,
374 F.3d 1177 (D.C. Cir. 2004) ...........................................................................21

*Northeast Hosp. Corp. v. Sebelius*,
657 F.3d 1 (D.C. Cir. 2011) .................................................................................35

*Pashby v. Delia*,
709 F.3d 307 (4th Cir. 2013) ..........................................................................40, 41

*Patriot, Inc. v. HUD*,
963 F. Supp. 1 (D.D.C. 1997) ..............................................................................39

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
839 F.3d 1 (D.C. Cir. 2016), *reh'g en banc granted, order vacated* (Feb. 16,
2017), *on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018) .........................................36

*Planned Parenthood of Gulf Coast, Inc. v. Gee*,
862 F.3d 445 (5th Cir. 2017) ...............................................................................40

*Prevor v. FDA*,
895 F. Supp. 2d 90 (D.D.C. 2012) .......................................................................25

*Ramaprakash v. FAA*,
346 F.3d 1121 (D.C. Cir. 2003) ...........................................................................28

* *Retail, Wholesale and Dep't Store Union, AFL-CIO v. NLRB*,
466 F.2d 380 (D.C. Cir. 1972) .................................................................21, 33, 34

*Reuters Ltd. v. FCC*,
781 F.2d 946 (D.C. Cir. 1986) .................................................................20, 21, 26

*SEC v. Sec. Inv'r Prot. Corp.*,
872 F. Supp. 2d 1 (D.D.C. 2012) .........................................................................25

* *SNR Wireless LicenseCo, LLC v. FCC*,
868 F.3d 1021 (D.C. Cir. 2017) .....................................................................21, 31

\* *Texas Children's Hosp. v. Burwell*,
   76 F. Supp. 3d 224 (D.D.C. 2014) ............................................................38, 40

*United States v. Chrysler Corp.*,
   158 F.3d 1350 (D.C. Cir. 1998) ......................................................................31

*United Steelworkers of Amer., AFL-CIO-CLC v. Marshall*,
   647 F.2d 1189 (D.C. Cir. 1980) ......................................................................27

*Util. Air Regulatory Grp. v. EPA*,
   134 S. Ct. 2427 (2014) ..............................................................................21, 22

*Verizon Tel. Cos. v. FCC*,
   269 F.3d 1098 (D.C. Cir. 2001) ......................................................................34

*Village of Barrington, Ill. v. Surface Transp. Bd.*,
   636 F.3d 650 (D.C. Cir. 2011) ........................................................................26

*Williams Nat. Gas Co. v. FERC*,
   3 F.3d 1544 (D.C. Cir. 1993) ....................................................................33, 34

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................20

**Statutes**

\* 5 U.S.C. § 706(2)(A) .........................................................................................20

21 U.S.C. § 321(p) ...........................................................................................5, 6

21 U.S.C. § 331(a) .........................................................................................5, 10

21 U.S.C. § 331(d) .........................................................................................5, 10

21 U.S.C. § 352(f)(1) ........................................................................................10

21 U.S.C. § 355(a) ..................................................................................5, 10, 22

21 U.S.C. § 355(b) ...............................................................................................5

21 U.S.C. § 355(c)(3)(C) .....................................................................................7

21 U.S.C. § 355(c)(3)(E) .....................................................................................7

21 U.S.C. § 355(j) ................................................................................................5

21 U.S.C. § 355(j)(5)(B) ......................................................................................7

21 U.S.C. § 355(j)(5)(F) ......................................................................................7

21 U.S.C. § 360cc(a) ....................................................................................................7

42 U.S.C. § 262(a) .......................................................................................................5

42 U.S.C. § 262(k)(7) ..................................................................................................7

42 U.S.C. § 1396r–8(b) ...............................................................................................3

* 42 U.S.C. § 1396r-8(b)(3)(C)(i) ..................................................................2, 19, 37, 40

42 U.S.C. § 1396r-8(c) .............................................................................................3, 4

42 U.S.C. § 1396r-8(c)(1) .........................................................................................4, 5

42 U.S.C. § 1396r-8(c)(2) ............................................................................................4

42 U.S.C. § 1396r-8(d) ..............................................................................................37

42 U.S.C. § 1396r-8(k)(1)(B) .......................................................................................4

* 42 U.S.C. § 1396r-8(k)(7)(iv) ............................................................................5, 22, 23

42 U.S.C. § 1905(r) ....................................................................................................14

**Other Authorities**

* 42 C.F.R. § 447.502 .........................................................................................7, 26, 27

81 Fed. Reg. 5170-01, 5192 (Feb. 1, 2016) .......................................................7, 8, 27

Fed. R. Civ. P. 65(d)(2)(C) ..........................................................................................3

## INTRODUCTION

This case is about an agency "Yes" that abruptly and inexplicably became an agency "No"—accompanied by a bill for hundreds of millions of dollars.

Years ago, Mallinckrodt's predecessor approached the Centers for Medicare & Medicaid Services (CMS) about updating the base date average manufacturer price (AMP) of its primary product, Acthar Gel® (repository corticotropin) injection, following Acthar's approval for treatment of a new indication and a corresponding award of seven years' marketing exclusivity. A drug's "base date AMP" is used to calculate the Medicaid rebate amount a manufacturer remits to state Medicaid agencies. Because the base date AMP, once set, is generally used across the life of the drug product, it is important to get it right.

CMS agreed in 2012 that Acthar[1] was eligible for a new base date AMP. In fact, CMS agreed twice. In reliance upon the agency's confirmations, Questcor began reporting a new base date AMP for Acthar in 2013. Mallinckrodt continued that practice when it acquired Questcor the following year.

CMS has notified Mallinckrodt that it now believes Acthar is *not* eligible for the new base date AMP Mallinckrodt has been reporting for years. It has not explained why. Mallinckrodt has repeatedly sought that explanation, and for its part has repeatedly explained to CMS that the agency's about-face is unlawful. CMS's new position conflicts with the plain language of the Medicaid drug rebate statute. It violates CMS's binding regulations. And it deviates from the agency's 2012 express statements to Questcor without adequate

---

[1] There are two Acthars in this case: One approved in 2010, and one in 1952. More detail on each will come later. For simplicity's sake, we will refer to the 2010 Acthar as "Acthar" and the 1952 Acthar as "H.P. Acthar Gel."

1

explanation or notice.  For all of these reasons, CMS's current position violates the

Administrative Procedure Act (APA).

　　To make matters worse, CMS has insisted that Mallinckrodt "correct" Acthar's base date

AMP in the Drug Data Reporting for Medicaid (DDR) system.  That "correction" is not any

mere formality.  It would automatically trigger adjustments to the Acthar drug rebate

calculations—not just prospectively, but *retroactively*, all the way back to 2013, resulting in

losses totaling in the hundreds of millions of dollars for Mallinckrodt.  Mallinckrodt—and

Questcor before it—relied in good faith on the agency's (twice repeated) 2012 statements that

Acthar is entitled to its own base date AMP.  CMS did not even begin to question its own 2012

pronouncements until 2016; and to this date, the agency still has not given an adequate

explanation for its complete reversal on Acthar's base date AMP.  That violates basic notions of

fair notice, due process, and the prohibition on retroactive rulemaking.  An agency is entitled to

change its mind.  But not like this.

　　All of this background forms the basis of Mallinckrodt's complaint.  This preliminary

injunction motion is necessitated by recent events.  On May 10, 2019, CMS notified

Mallinckrodt that unless it reverts to the old base date AMP within fourteen days—by **May 24,**

**2019**—CMS will identify Mallinckrodt as being "out of compliance" with its Medicaid Drug

Rebate Program reporting requirements.  An "out of compliance" finding has automatic

repercussions:  A company deemed out of compliance is barred from submitting pricing data to

CMS.  But Mallinckrodt is *required* to submit monthly pricing data to CMS.  And the statute

imposes a harsh and automatic penalty for missing a reporting deadline:  90 days after a missed

deadline, Mallinckrodt will be suspended from the Medicaid Drug Rebate Program.  *See* 42

U.S.C. § 1396r-8(b)(3)(C)(i).  Mallinckrodt's next reporting deadline is May 30, 2019.  Ninety

days from May 30—the day the suspension will take effect—is August 28.  Mallinckrodt's

suspension at that time will last until this dispute is resolved.  That will mean no federal

payment—and no guaranteed Medicaid utilization coverage—for Acthar, which in turn will

threaten Medicaid patients' access to the drug product.

Both before and after filing suit, Mallinckrodt attempted to work with CMS—and then

with the Department of Justice—to try to come up with an interim solution that would obviate

the need for a preliminary injunction.  Those efforts have been unsuccessful.

Mallinckrodt therefore seeks issuance of a preliminary injunction as soon as possible—

but in any event before **August 14, 2019**—barring Defendants and those who "are in active

concert or participation" with them under Federal Rule of Civil Procedure 65(d)(2)(C) from

suspending Mallinckrodt from the Medicaid Drug Rebate Program and/or taking any other

enforcement action against Mallinckrodt until this Court has had the chance to consider the

agency's conduct on the merits.

## FACTUAL BACKGROUND

## The Medicaid Drug Rebate Program

Congress established the Medicaid Drug Rebate Program in 1990, with the aim of

minimizing the price Medicaid pays for prescription drugs.  *See* 42 U.S.C. § 1396r–8.  In a

nutshell:  for a covered outpatient drug to remain eligible for federal payment under Medicaid,

the drug's manufacturer must (among other things) provide rebates to state Medicaid agencies

based on each state's Medicaid beneficiaries' utilization of the manufacturer's covered outpatient

drugs during each calendar quarter.  *Id*. § 1396r-8(b), (c).  The rebates are then shared with the

federal government.

The unit rebate amount (URA) for a single source drug[2] consists of the sum of two components:  the basic rebate and the additional rebate.  *Id.* § 1396r-8(c).  The *basic rebate* is the greater of (i) the difference between the drug's AMP and its best price, as defined by the statute and CMS regulations,[3] or (ii) a statutorily specified minimum rebate percentage of the drug's AMP.  *Id.* § 1396r-8(c)(1)(A)(ii).  The *additional rebate* is the amount, if any, by which the drug's AMP for the relevant quarter exceeds the "base date AMP," a baseline measure related to the drug's price during a statutorily specified window of time,[4] as adjusted by an inflation factor.  *Id.* § 1396r-8(c)(2)(A)(ii).  The additional rebate thus requires drug manufacturers to pay greater rebate amounts where price increases, as reflected in the current quarter's AMP, outpace the rate of inflation, as reflected in the inflation-adjusted base date AMP.  So, for example, if (1) a drug's base date AMP was $100, (2) that base date AMP, when adjusted for inflation, is $110, and (3) the drug's AMP for the reporting quarter is $120, the drug's price increase has outpaced the rate of inflation, and the additional rebate amount is $120 - $110 = $10 (i.e., the difference between the drug's AMP for the relevant quarter and the base date AMP adjusted for inflation).  The URA is therefore increased by $10 (i.e., the additional rebate is added to the basic rebate).

The statute requires drug manufacturers to calculate a distinct AMP and URA—and thus a distinct base date AMP—for "each dosage form and strength of a single source drug."  42

---

[2]  We discuss the statutory and regulatory definitions of a "single source drug" on the next two pages.

[3]  The AMP is the *average* price paid in the United States by wholesalers and retail pharmacies, and in some cases other commercial customers, including any discounts or rebates.  42 U.S.C. § 1396r-8(k)(1)(B).  The best price is the *lowest* price paid by wholesalers, retailers, HMOs, non-profits, or government entities, including discounts and rebates.  *Id.* § 1396r-8(c)(1)(C).

[4]  For a covered outpatient drug approved on or before October 1, 1990, base date AMP is the AMP for the third quarter of 1990.  42 U.S.C. § 1396r-8(c)(2)(A)(ii)(II).  For a covered outpatient drug approved after October 1, 1990, base date AMP is the AMP for the first full calendar quarter of sales.  *Id.* § 1396r-8(c)(2)(B).

U.S.C. § 1396r-8(c)(1)(A).  In other words, a drug manufacturer must calculate a new base date AMP if either (a) the product in question is a *different single source drug*, or (b) the product is a *different dosage form or strength* of an existing single source drug.[5]

Until April 18, 2019, Congress defined the term "single source drug" to mean "a covered outpatient drug which is produced or distributed under an original new drug application approved by the Food and Drug Administration."  *Id.* § 1396r-8(k)(7)(iv) (Nov. 5, 1990).  More recently, Congress has clarified that definition by deleting the word "original," making clear that all that matters is whether a drug is produced or distributed under a new drug application, unless a "narrow exception" spelled out in CMS's regulations applies.  *Id.* (Apr. 18, 2019).

**The FDA Drug Approval Process**

Under the Food, Drug, and Cosmetic Act (FDCA), all "new drugs" must be approved by FDA before being introduced or delivered for introduction into interstate commerce.  21 U.S.C. §§ 355(a), 331(d).  Generally, a "new drug" is one that has not previously been recognized by appropriate experts "as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof."  21 U.S.C. § 321(p).  Approval is sought through one of three types of applications:  a new drug application (NDA), an abbreviated new drug application (ANDA), or a biologics license application (BLA).  *See* 21 U.S.C. §§ 355(b) (governing NDAs), 355(j) (governing ANDAs); 42 U.S.C. § 262(a) (governing BLAs).

A "new drug" may be a drug product that has never been approved, or it may be an approved product with a change, such as a new intended use or indication, or a different strength or dosage form.  That is because such changes represent a change to the product itself and/or the

---

[5]  *See, e.g., Ipsen Biopharmaceuticals v. Price*, Civil Action No. 1:16-cv-02372-DLF, ECF 24 (D.D.C. Sept. 24, 2018) at 2 ("If Somatuline ED is a new drug, Ipsen can calculate and report a new base date AMP for it.  If not, Ipsen must continue to use the AMP for the 'old' version of Somatuline Depot Injection.").

"conditions prescribed, recommended, or suggested in the [product's] labeling."  21 U.S.C. § 321(p).  Therefore, the sponsor must obtain FDA approval before marketing and distributing the product with the change.  Depending on the nature of the change, approval is sought by submitting a new NDA, ANDA, or BLA, or a supplement to the already-approved application. *See, e.g.,* FDA, "Guidance for Industry:  Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees" (Dec. 2004).[6]

For internal tracking purposes, FDA assigns each NDA a six-digit number, referred to as the "NDA number."  *See* Drugs@FDA Glossary of Terms (defining "New Drug Application (NDA)" and "New Drug Application (NDA) Number").[7]

FDA also assigns an "NDA Classification Code" to each NDA, which "describe[s] FDA's assessment of the relationship of the drug product in the application to its active moieties and to drug products already marketed or approved in the United States."  FDA Center for Drug Evaluation and Research Manual of Policies and Procedures, MAPP 5018.2, "NDA Classification Codes" at 9.[8]

---

[6] *Available at* https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM079320.pdf.

[7] *Available at* https://www.fda.gov/drugs/informationondrugs/ucm079436.htm.

[8] *Available at* https://www.fda.gov/downloads/aboutfda/centersoffices/officeofmedicalproductsandtobacco/cder/manualofpoliciesprocedures/ucm470773.pdf.  By way of example, a Type 1 NDA is an application seeking approval of a drug that contains a new molecular entity (NME) (i.e., an active ingredient that contains no active moiety that has previously been approved by FDA or marketed in the United States), and a Type 3 NDA is for a new dosage form of an active ingredient that has previously been approved or marketed.  *Id.* at 2–3.

6

**CMS Regulations and Guidance Governing "Single Source Drug"**

      In February 2016, CMS finalized a rule relating to the Medicaid Drug Rebate Program. The resulting regulations explain that a "single source drug," for purposes of the agency's regulations and the Medicaid Drug Rebate Program, means:

> [A] covered outpatient drug that is produced or distributed under an original NDA approved by FDA and has an approved NDA number issued by FDA . . . .
>
> For purposes of this definition and the [Medicaid Drug Rebate Program], *an original NDA means an NDA, other than an ANDA, approved by the FDA for marketing*, unless CMS determines that a narrow exception applies.

42 C.F.R. § 447.502 (definition of "single source drug") (emphasis added).

      In the preamble to the Final Rule adopting this regulation (and again in subsequent guidance), CMS confirmed that the "narrow exception" to which the regulation refers is indeed "very narrow." More pointedly, CMS explained that the exception "will not be considered applicable" to drugs "that received patent protection or statutory exclusivity."[9] Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170-01, 5192 (Feb. 1, 2016); *accord* CMS, Mfr. Release No. 98, *Drug Category Narrow Exception Guidance* (May 2, 2016) ("The narrow exception will not be granted under the following circumstances: . . . Drugs that received patent protection or statutory exclusivity, regardless of whether the protection or exclusivity is currently

---

[9]  The FDCA provides a number of incentives to encourage companies to develop and seek approval of new drugs, including periods of marketing exclusivity (during which certain competing products may not be brought to market) and certain patent-related benefits. *See, e.g.*, 21 U.S.C. §§ 355(c)(3)(C), (E), 355(j)(5)(B), (F); 42 U.S.C. § 262(k)(7). One such incentive is designed to encourage manufacturers to develop and test drugs to treat rare diseases or conditions. Approved "orphan drugs" can receive seven years of marketing exclusivity, during which FDA generally is precluded from approving another application for a product that is the same drug and intended to treat the same rare disease or condition. 21 U.S.C. § 360cc(a).

in effect.").[10]  The "narrow exception" also "requires" both "the manufacturer's written

submission to CMS" and "CMS's response confirming whether or not the exception applies."  81

Fed. Reg. at 5194.

The Final Rule was published in February 2016 and became effective two months later.

But what it said was nothing new:  CMS made clear during the rulemaking process that the

regulatory definition of "single source drug" did not reflect a new agency policy, but instead

merely was "designed to clarify existing policy regarding the definitions of original NDA and

single source drugs."  81 Fed. Reg. at 5193; *see also id.* at 5196 ("Our proposed language was

not designed to change CMS policy, but rather to provide further clarification that an 'original

NDA' means an NDA, other than an ANDA, approved by the FDA for marketing, unless the

narrow exception discussed above applies.").

**Acthar's Approval Under a New NDA**

H.P. Acthar Gel  (as it was known at the time) was first approved by FDA in 1952 under

NDA 008372.[11]  Verified Complaint ¶ 27.  H.P. Acthar Gel is an injection that contains a

naturally occurring hormone, adrenocorticotropic hormone (ACTH).  *Id.*  It has been approved

by FDA for use in treating more than 50 diseases over the years, including multiple sclerosis and

nephrotic syndrome.  *Id*.

One of the diseases for which doctors gravitated over time to Acthar was infantile

spasms, or IS.  IS is a rare but devastating seizure disorder occurring in infants and children

---

[10] *Available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/downloads/rx-releases/mfr-releases/mfr-rel-098.pdf.

[11] *See* FDA, Drugs@FDA (Approval Date(s) and History, Letters, Labels, Reviews for NDA 008372), *available at* https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=008372.

under the age of two; left untreated, it greatly increases the risk of developmental disability.  *Id.* ¶ 28.  Although H.P. Acthar Gel was not at first approved to treat IS, physicians started using the product "off label" for that purpose, because a growing body of evidence, including from published clinical studies, indicated that H.P. Acthar Gel was useful in treating IS.  *Id.*  Over time, H.P. Acthar Gel became the treatment of choice for IS.  *See, e.g.*, NDA 022432 Summary Review at 1.[12]

In 1995, FDA identified manufacturing problems at the facility making H.P. Acthar Gel, causing the then-manufacturer to suspend production of the drug product, which in turn led to a supply shortage.  *See* Warren E. Leary, A Company Stops Making a Child Drug, New York Times Feb. 24, 1996.[13]  That caused an outcry by physicians and patients seeking continued access to the drug product.  *Id.*  The manufacturer eventually agreed to continue to produce a limited number of doses, which were rationed to critical patients through a tightly controlled access program administered by the National Organization for Rare Disorders.[14]  At the time Questcor acquired H.P. Acthar Gel in 2001, the previous owner was losing millions of dollars a year on the drug product.[15]

Upon acquisition of the drug product, Questcor now faced the challenge of making H.P. Acthar Gel profitable.  In 2006, Questcor sought to have the product approved by FDA for the

---

[12] *Available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432Orig1s0900SumR.pdf (PDF p.2).

[13] *Available at* https://www.nytimes.com/1996/02/24/us/a-company-stops-making-a-child-drug.html.

[14] *See id.; see also* Questcor 10-K (Mar. 14, 2002), *available at* https://www.sec.gov/Archives/edgar/data/891288/000089161802001283/f79414e10-k.htm.

[15] Burnham, *et al.*, *Pricing for Survival in the Biopharma Industry: A Case Study of Acthar Gel and Questcor Pharmaceuticals*, 15(4) J. of Inv. Mgmt. 69, 72 (2017).

treatment of IS.  Verified Complaint ¶ 29; *see also* FDA Approval Package for Questcor.[16]  In

general, drug manufacturers are prohibited from advertising or marketing drugs for off-label

use[17]; FDA approval of the IS indication thus would free Questcor to market H.P. Acthar Gel for

treating IS.  Questcor submitted its request for approval, which presented information and data

from published literature on the use of H.P. Acthar Gel for IS, to FDA as a supplement to the

existing NDA (sNDA).  Verified Complaint ¶ 29.  In May 2007, FDA issued what is now called

a "Complete Response Letter," in which the agency declined to approve Questcor's sNDA,

explaining that the company had not shown a sufficient nexus between the product and the

relied-upon studies to meet the standards for approval.  *Id.*

    Consistent with FDA procedure, the sNDA remained pending while Questcor and FDA

reached agreement on how to address the asserted inadequacy, and the company set about

developing the necessary data.  *Id.* ¶ 30.  During this period, FDA unilaterally converted the

sNDA to a new, separate NDA, to which (consistent with standard procedures) the agency

assigned a distinct NDA number:  NDA 022432.  *Id.*; *see also* August 8, 2008 FDA

---

[16] *Available at*
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432_hp_acthar_gel_toc.cfm.

[17] This prohibition is grounded in the requirement that FDA approve a drug product for its
intended use; if a drug lacks FDA-approved directions for the intended use, it is considered
misbranded.  *See, e.g.*, 21 U.S.C. §§ 331(d), 355(a) (FDA approval); *id.* §§ 331(a), 352(f)(1)
(misbranding, adequate directions for use); *see also, e.g.,* FDA Memorandum, Public Health
Interests and First Amendment Considerations Related to Manufacturer Communications
Regarding Unapproved Uses of Approved or Cleared Medical Products at 35–38 (Jan. 2017),
*available at* https://www.regulations.gov/document?D=FDA-2016-N-1149-0040; FDA
Guidance for Industry*: Medical Product Communications That Are Consistent with the FDA-
Required Labeling—Questions and Answers* (June 2018), *available at*
https://www.fda.gov/media/102575/download; Nathan Cortez, *The Statutory Case Against Off-
Label Promotion,* U. Chi. L. Rev. Online (2016)*, available at* https://ssrn.com/abstract=3035413.

Memorandum Re Creating Type 6 NDA.[18]  The agency took this action because it concluded the

IS indication was fundamentally different from the other uses for which the product had been

approved, and required review by a different component within FDA than had to date been

responsible for the drug.  FDA Memorandum (August 8, 2008).[19]  The new NDA was classified

as a "Type 6" NDA, which was used for drug products that had already been approved or

marketed by the same applicant, but were intended for a new indication or claim.[20]

      While it was seeking FDA approval for the IS indication, Questcor also invested in

modernizing Acthar's complex manufacturing process to assure continued compliance with FDA

standards.  *See* Press Release, Questcor Pharmaceuticals, Inc., Questcor Board Approves New

Strategy and Business Model for H.P. Acthar Gel (Aug. 27, 2007).[21]  Questcor's net losses on

Acthar were $10.1 million in 2006 and $5.5 million in 2007.  *Id.*  In August 2007, Questcor

announced a new pricing model in order to "create an economic model that will allow Questcor

to support ongoing efforts to manufacture and distribute Acthar, to conduct any FDA-required

---

[18] *Available at*
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432Orig1s000AdminCorres.pdf
(PDF p.69) (explaining that IS indication required review by Division of Neurology Products,
not Division of Metabolic and Endocrine Products).

[19] *Available at*
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432Orig1s000AdminCorres.pdf
(PDF p.69) (explaining that IS indication required review by Division of Neurology Products,
not Division of Metabolic and Endocrine Products).

[20] *Id.*; *see, e.g.*, MAPP 5018.2 at 5.  FDA no longer uses Type 6, instead classifying NDAs that
would have fallen into that category as either Type 9 or Type 10.  *Id.*

[21] *Available at* http://phx.corporate-ir.net/phoenix.zhtml?c=89528&p=irol-
newsArticle&ID=1044912&highlight.

studies, to continue development of QSC-001, and to develop or acquire other drugs or drug candidates for neurological disorders or for rare diseases." *Id.*[22]

In December 2009, Questcor provided the information, data, and analysis FDA had identified as necessary for approval.  It submitted that material under the new, separate NDA 022432 that FDA had created for Questcor's use in seeking approval to market H.P. Acthar Gel to treat IS.  Verified Complaint ¶ 31.

FDA approved NDA 022432 in October 2010, permitting Acthar to be marketed and distributed for the treatment of IS.  *Id.* ¶ 32; October 15, 2010 FDA Approval Letter for Acthar.[23] In addition to approving the new IS indication, FDA required multiple significant changes to Acthar's labeling as a condition of approval.  These changes included removing more than 30 previously approved indications, requiring a "risk evaluation and mitigation strategy" (REMS) and a "Medication Guide" for the IS indication, revising certain "Dosage and Administration" information, and adding a new section on pediatric indications.[24]

With approval of NDA 022432, FDA also granted Questcor seven years of orphan drug exclusivity, a form of statutory marketing exclusivity, precluding approval of any other entity's NDA, ANDA, or BLA for repository corticotropin to treat IS.  Exhibit 1 (Letter from FDA dated Nov. 17, 2011).[25]

---

[22] A subsequent case study found that without this new pricing model, Questcor would have become insolvent between 2008 and 2010.  Burnham *et al.*, *Pricing for Survival in the Biopharma Industry*, *supra* at 69–91.

[23] *Available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432Orig1s000Approv.pdf.

[24] FDA, Acthar Summary Review and Risk Evaluation and Mitigation Strategy, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432Orig1s0900SumR.pdf; https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432Orig1s000REMS.pdf.

[25] All referenced Exhibits are attached to the Verified Complaint.

FDA acknowledged the grant of orphan exclusivity in a letter dated November 17, 2011, which specifically tied the statutory exclusivity to the new NDA, both by number and by date: "The seven year exclusive approval began on *October 15, 2010, the date of approval of your New Drug Application (22-432)*."  Exhibit 1 (emphasis added).

Acthar's orphan exclusivity continued until October 2017.  Verified Complaint ¶ 35.

**CMS Determines in 2012 That Acthar Is a Single Source Drug Entitled to Its Own Base Date AMP**

In early 2012, following FDA's approval of Acthar for IS and grant of orphan drug statutory exclusivity, Questcor requested permission from CMS to establish a new base date AMP for Acthar.  Exhibit 2 (Letter from Questcor to CMS dated May 8, 2012).

In that letter, Questcor explained that, because the company was still using the 1990 base date AMP for Acthar, the company's Medicaid rebate liability actually exceeded its Medicaid revenue for the drug.  *Id.*  Because a significant percentage of IS patients are covered by Medicaid, the financial impact on the company from the upside-down rebate-to-revenue delta was significant.  And because Questcor effectively was a single-product company, it had no other product revenue to offset those losses.  *Id.*

Questcor also acknowledged that the agency might decline to grant Questcor's request to establish the new base date AMP.  But Questcor explained that, without a new base date AMP, "Questcor's continued participation in the [Medicaid Drug Rebate Program] may simply be untenable because that participation generates greater rebate liability and negative revenue for the company."  *Id.* at 2.  Questcor also noted its belief that "state Medicaid programs likely still will be required to cover Acthar's use for infantile spasms even if Questcor does exit the

program." *Id.* In other words, if Questcor exited the MDRP, the Medicaid program would still

have to cover Acthar, and Questcor would not have to pay any rebate at all.[26]

In laying out its request for a new base date AMP, Questcor noted that FDA had said it

would be taking steps to associate NDA 022432 with the other NDA, number 008372.

Specifically, Questcor advised CMS:

> The FDA has informed Questcor that the agency intends to revise its record so
> that the approval for infantile spasms is reflected as part of the product's original
> NDA, No. 08-372.  That has not yet occurred.

*Id.* at 3 n.4.

CMS responded to Questcor's May 2012 letter several months later.  Exhibit 3 (August 6,

2012 Letter from CMS to Questcor).  In its response, CMS concluded that Acthar with the IS

indication is a distinct single source drug that qualifies for a new base date AMP, specifically

citing the FDA approval under NDA 022432 as the legal basis for the new base date AMP.  In

doing so, the agency made clear its position that, if a drug product was "approved under" an

original NDA, it is treated as a distinct single source drug entitled to its own base date AMP.

The agency explained its reasoning as follows:

> Section 1927(c)(2)(A) defines the base date AMP, in part, for each single source
> or innovator multiple source drug approved by the FDA before or after October 1,
> 1990.  In accordance with that provision, the base date AMP is calculated based
> on the new drug application which is approved by the FDA, not the national drug
> code (NDC).  Therefore, given that the recently approved Acthar Gel was
> *approved under a different ND[A]*[27] from the original product, Questcor may set a
> new base date AMP for this drug.

---

[26]  The Medicaid statute requires states to cover drugs prescribed for pediatric beneficiaries under
the Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) benefit, defined at 42
U.S.C. § 1905(r), without regard to whether a drug's manufacturer is a participant in the MDRP.
EPSDT is a Medicaid benefit that provides all beneficiaries under age 21 with coverage of a
comprehensive set of prevention, screening, diagnostic, and treatment services.  Acthar likely
would have been covered for this population under the EPSDT benefit.

[27]  While the agency referred to an "NDC" here, instead of an "NDA," that was a scrivener's
error, as its subsequent letter (Exhibit 4) confirmed.

Exhibit 3 (emphasis added).

In September 2012, CMS reiterated its approval—and corrected an error in its prior communication.  Exhibit 4 (Sept. 19, 2012 Letter from CMS to Questcor).  As the agency explained there, its August letter had "noted that, given that Acthar Gel was approved under a different National Drug Code (NDC) from the original product, Questcor Pharmaceuticals may set a new base date AMP for this drug.  This was a misstatement on our part."  *Id.*  The agency further explained:

> As noted in your letter of May 8, 2012, the FDA approved Acthar Gel through a New Drug Application (NDA) for use in treating the orphan condition of infantile spasms.  Accordingly, we would like to correct our earlier reply to note that *because Acthar was approved under a new NDA, Questcor may set a new base date AMP*.  We apologize for any confusion.

Exhibit 4 (emphasis added).

Acting in reliance on CMS's statements, Questcor in 2013 began reporting the new Acthar base date AMP.  Verified Complaint ¶ 42.

In August 2014, Mallinckrodt acquired Questcor for $5.8 billion, also in reliance on CMS's stated position regarding Acthar's base date AMP.  *Id.* ¶ 43.  Since then, Mallinckrodt has invested more than $500 million in Acthar, including investment into health economic and outcomes research and well-controlled clinical trials.  *Id.*[28]

In March 2015, FDA granted Questcor's request—made prior to the Mallinckrodt acquisition—for the IS indication to be "associated with the parent NDA number 008372, since

---

[28] *See also* http://www.mallinckrodt.com/about/acthar/.

15

the tracking NDA number 022432 will no longer be used."  Letter from FDA to Questcor dated March 24, 2015.[29]

Nonetheless, FDA's records continue to accurately reflect that Acthar was approved under NDA 022432.  Thus, for example, FDA's on-line database Drugs@FDA—a source of "official information about FDA approved innovator and generic drugs"[30]—lists Acthar as having been approved to treat IS under the second, independent NDA number, NDA 022432.[31]  In addition, the National Drug Code Directory similarly lists Acthar's NDA number as 022432.  *See* FDA, National Drug Code Directory.[32]  That listing was updated as recently as April 2019, with FDA's knowledge and approval.  CMS encourages manufacturers to check both of these official FDA sources to confirm the accuracy of a drug's NDA number before calculating its base date AMP.  *See* CMS, Mfr. Release Nos. 80, 82.[33]

In addition, Acthar's bulk active ingredient is imported into the United States from Canada under NDA 022432.  Verified Complaint ¶ 47; Exhibit 5.

**CMS Begins to Question Its Own 2012 Statements**

In April 2016, CMS wrote to Mallinckrodt and stated:  "It has recently come to our attention that even though [Acthar] is shown to be approved under NDA 022432 on

---

[29] *Available at*
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/008372Orig1s044ltr.pdf.

[30] FDA, Drugs@FDA, Frequently Asked Questions, *available at*
https://www.fda.gov/drugs/informationondrugs/ucm075234.htm (last visited May 22, 2019).

[31] FDA, Drugs@FDA, *available at*
https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=022432 (last visited May 22, 2019).

[32] *Available at* https://www.accessdata.fda.gov/scripts/cder/ndc/index.cfm (search for "022432" under "Application Number").

[33] *Available at* https://www.medicaid.gov/medicaid/prescription-drugs/program-releases/index.html.

Drugs@FDA, [Acthar] is listed as approved under NDA 008372 on [the] FDA Online Label Repository."  Exhibit 6 (Letter from CMS to Questcor dated April 13, 2016).

In contrast to the official Drugs@FDA website, the "On-Line Label Repository" is based on information submitted by manufacturers that is not verified by FDA.  That is why it contains the following "IMPORTANT DISCLAIMER":

> The drug labels and other drug-specific information on this Web site represent the most recent drug listing information companies have submitted to the Food and Drug Administration (FDA). . . . The drug labeling and other information has been reformatted to make it easier to read but *its content has neither been altered nor verified by FDA.*

*See* FDA Online Label Repository Home Page (emphasis added).[34]

CMS's letter continued:  "As a result of this discrepancy, we have reviewed the approval status of [Acthar] and it is our understanding that [Acthar] is marketed under NDA 008372 not NDA 022432."  Exhibit 6.  CMS also noted that although Acthar's approval letter was assigned NDA number 022432, the approval letter also indicated that most future submissions "should be addressed to" NDA 008372.  *Id.*  CMS requested that Mallinckrodt "review and correct the reporting of its product data in DDR to ensure that accurate information is reported to the MDR program."  *Id.*  The letter also noted that "the baseline data of an NDC for a single source drug . . . must follow the NDA."

After receiving CMS's letter, Mallinckrodt corrected the error on the On-Line Label Repository website, so that it now correctly identifies NDA 022432 as the NDA number under which Acthar was approved.  *See* FDA Online Label Repository Home Page (emphasis added).[35]

---

[34] *Available at* https://labels.fda.gov/.

[35] *Available at* https://labels.fda.gov/.

Mallinckrodt also notified CMS that it had done so.  Exhibit 7 (Email dated July 29, 2016 from Mallinckrodt to CMS).

In June 2016, CMS again requested that Mallinckrodt update the "baseline information" for Acthar—but this time for a completely different reason.  In an email to Mallinckrodt, the agency no longer referred to the Online Label Repository or the Acthar approval letter; instead it referenced a CMS guidance document to argue that "the baseline data of a *purchased product* should be the same as the baseline data of a product marketed under the same NDA."  Exhibit 7 (Email dated June 2, 2016 from CMS to Mallinckrodt) (emphasis added).

The referenced CMS guidance (referred to as "Manufacturer Release #90") relates to treatment of baseline data when manufacturers are buying or selling drug products, including when one drug manufacturer buys a drug product from another drug manufacturer.[36]  In other words, CMS appears to have mistakenly thought in June 2016 that *Mallinckrodt's 2014 purchase of Acthar* was the basis for the 2012 new base date AMP.

Mallinckrodt explained in response that the cited CMS guidance was inapplicable:  "In your email, you indicate that the base date AMP for a 'purchased product' should not be altered. We want to note that Mallinckrodt's purchase of Acthar from Questcor in 2014 was not the basis of CMS's confirmation to Questcor of the appropriateness of a new base date AMP in the agency's letter to Questcor dated August 6, 2012, which was two years before Mallinckrodt's acquisition of Questcor."  Exhibit 7 (Email dated July 6, 2016 from Mallinckrodt to CMS).

Mallinckrodt subsequently made multiple attempts to explain to CMS—in emails and letters, and through an in-person meeting—that its new position was wrong.  CMS offered a new and conflicting view each time.  *See* Exhibits 7 through 10.  And, although discussions between

---

[36] *Available at* https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Prescription-Drugs/Downloads/Rx-Releases/MFR-Releases/mfr-rel-090.pdf.

the parties continued until recently, at no point did CMS reconcile its 2012 decision with the agency's new position, let alone even acknowledge that it had previously taken a different position. *Ibid.*

On March 27, 2019, shortly before a scheduled March 29th meeting, CMS informed Mallinckrodt—for the first time—that the agency had "concluded that the April 13, 2016 letter from CMS to Mallinckrodt constituted CMS' final decision on the relevant issue. Therefore, given that there is a final CMS decision on this issue, any meeting . . . would not and could not be productive." Exhibit 11. Although Mallinckrodt has continued to seek further dialogue with the agency since then, those efforts have been rebuffed.

On Friday, May 10, 2019, CMS informed Mallinckrodt that the company would be declared "out of compliance" in the DDR unless it updated the base date AMP for Acthar within 14 days—meaning by May 24, 2019. Exhibit 12. Once Mallinckrodt is deemed "out of compliance," "the submission of pricing records or updates to product data will not be allowed online or via file transfer." *Id.* But Mallinckrodt is *required* to submit monthly AMP data to CMS. *See* 42 C.F.R. § 447.510(d)(1) ("A manufacturer must submit a monthly AMP to CMS not later than 30 days after the last day of each prior month.") So the clock starts ticking next week: Absent judicial intervention, 90 days after the May 30 reporting deadline—meaning on August 28—Mallinckrodt will automatically be suspended from participating in the Medicaid drug rebate program, for at least a month. 42 U.S.C. § 1396r-8(b)(3)(C)(i) (providing that if information "is not reported within 90 days of the deadline imposed, the agreement *shall be suspended* for services furnished after the end of such 90-day period and until the date such information is reported (but in no case shall such suspension be for a period of less than 30 days)") (emphasis added). That would cause severe and irreparable harm not just to

19

Mallinckrodt, but also to the public at large, as Medicaid patients could be denied critical access to Acthar.

Both before and after filing this lawsuit, Mallinckrodt attempted to work with CMS—and then with the Department of Justice—to try to agree upon an interim solution that would obviate the need for a preliminary injunction.  Those efforts have been unsuccessful.  That is why Mallinckrodt seeks this preliminary injunction prohibiting Defendants from suspending Mallinckrodt's participation in the Medicaid Drug Rebate Program and/or from taking any other enforcement action against Mallinckrodt.

## ARGUMENT

To secure a preliminary injunction, a movant must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Council on American-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 74 (D.D.C. 2009).  All four factors strongly favor granting a preliminary injunction here.

## I.    MALLINCKRODT IS LIKELY TO PREVAIL ON THE MERITS.

The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  There are a number of well-trod legal principles that emerge from this statutory mandate.  As relevant here:  Agency action is routinely set aside as unlawful when it violates a statute.  *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2439 (2014) (agencies must "stay[] within the bounds of their statutory authority").  The same is true when an agency departs from its own regulations.  *Reuters Ltd. v. FCC*, 781 F.2d

946, 950 (D.C. Cir. 1986) ("it is elementary that an agency must adhere to its own rules and regulations").  Agency action is arbitrary and capricious when it reflects a want of reasoned decision-making, *see Fox v. Clinton*, 684 F.3d 67, 80 (D.C. Cir. 2012), or when an agency changes its position without offering an adequate explanation.  *New York Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177, 1183 (D.C. Cir. 2004).  Finally, agency action is unlawful when the agency fails to give regulated entities fair notice of a new policy position, *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017), or retroactively imposes new policies in an adjudication in a manner that is inequitable.  *See Retail, Wholesale and Dep't Store Union, AFL-CIO v. NLRB*, 466 F.2d 380, 390–391 (D.C. Cir. 1972).

CMS's newfound insistence that Acthar is not a distinct "single source drug" entitled to its own base date AMP violates all of these principles.  It conflicts with the plain language of the Medicaid drug rebate statute.  It violates CMS's binding regulations.  It deviates from CMS's own statements to Questcor in 2012 without adequate explanation or notice.  Finally, and most egregiously, CMS's effort to force Mallinckrodt to retroactively "correct" its base date AMP during a time period when the agency was *actively encouraging* Questcor and Mallinckrodt to use the now-disavowed base date AMP violates basic principles of fair notice and due process, as well as the prohibition on retroactive rulemaking.  It therefore should be overturned.

## A. CMS's Determination That Acthar Is Not A "Single Source Drug" Cannot Be Reconciled With The Medicaid Drug Rebate Statute.

Agencies must "stay[] within the bounds of their statutory authority."  *Util. Air Regulatory Grp.*, 134 S. Ct. at 2439.  "Both their power to act and how they are to act is authoritatively prescribed by Congress."  *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013).  CMS has failed to observe those limits here:  its determination that Acthar is not entitled to a distinct base date AMP cannot be reconciled with the governing statute.

21

Until April 18, 2019, the Medicaid Drug Rebate Program statute expressly defined "single source drug" to mean "a covered outpatient drug which is *produced or distributed under an original new drug application* approved by the Food and Drug Administration."  42 U.S.C. § 1396r-8(k)(7)(iv) (Nov. 5, 1990) (emphasis added).  Acthar was approved under an original NDA.  The term "original" has a plain and ordinary meaning in this context that requires no particular deference to the agency:  it means separate or legally distinct.  *See, e.g.*, *Original*, Oxford English Dictionary (2019) ("Having the quality of that which proceeds directly from oneself"; "such as has not been done or produced before"); Black's Law Dictionary (10th ed. 2014) (original: "bearing its own authority, and not deriving authority from an outside source; as original jurisdiction, original writ").

Lest there be any doubt, Congress clarified this point when it recently updated the definition of "single source drug" to delete the word "original."  *See* 42 U.S.C. § 1396r-8(k)(7)(iv) (Apr. 18, 2019).  As the clarified definition spells out, all that matters is whether the application is an NDA (as opposed to an ANDA), unless the "narrow exception" spelled out in CMS's regulation applies (and here it undisputedly does not).  *See* discussion *infra*.  Both before and after the amendment, then, Acthar was approved under a distinct drug application to trigger the statutory definition of "single source drug."

Acthar is also "produced or distributed" under that distinct NDA.  Acthar is a "new drug" that could not have been lawfully marketed for treatment of IS without FDA approval.  21 U.S.C. § 355(a).  That approval was obtained via NDA 022432.[37]  Consequently, when FDA recognized Acthar's statutory orphan drug exclusivity for treatment of IS in November 2011, it specifically

---

[37] Indeed, in determining that Acthar was eligible for a distinct base date AMP in 2012, CMS indicated that the inquiry of whether a drug is "produced or distributed" under an NDA is effectively coterminous with the inquiry of whether it was "approved under" that NDA.  *See, e.g.*, Exhibit 3 (August 2012 letter); Exhibit 4 (September 2012 letter).

tied the exclusivity to the new NDA, both by number and by date.  Exhibit 1 (Nov. 2011 letter

from FDA) ("The seven year exclusive approval began on *October 15, 2010, the date of*

*approval of your New Drug Application (22-432)*.") (emphasis added).  The product was

distributed under the protection of that exclusivity until 2017, when the exclusivity expired.

Verified Complaint ¶ 35.

      CMS encourages manufacturers to check Drugs@FDA—a source of "official information

about FDA approved innovator and generic drugs"[38]—and the NDC Directory maintained by

FDA to confirm the accuracy of a drug's NDA number before determining the base date AMP.

*See* CMS, Mfr. Release No. 80; CMS, Mfr. Release No. 82.[39]  Acthar is listed on both of these

official FDA sources as having been approved to treat IS under NDA 022432.[40]  And, to this

date, Mallinckrodt imports the bulk active ingredient for Acthar into the United States from

Canada under NDA 022432.  Exhibit 5.

      All of these facts point to one answer:  Acthar is both "produced" and "distributed"

(although either alone would suffice) under NDA 022432.  And because Acthar is produced or

distributed under a distinct NDA, it is a "single source drug" eligible for its own base date AMP

under the plain meaning of the statute.  42 U.S.C. § 1396r-8(k)(7)(iv).  CMS's current position

therefore is in error.

---

[38] FDA, Drugs@FDA, Frequently Asked Questions, *available at*
https://www.fda.gov/drugs/informationondrugs/ucm075234.htm.

[39]  *Available at* https://www.medicaid.gov/medicaid/prescription-drugs/program-releases/index.html.

[40] FDA, Drugs@FDA, *available at*
https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=022432; FDA, NDC Directory, *available at*
https://www.accessdata.fda.gov/scripts/cder/ndc/index.cfm (search for "022432" under
"Application Number" or "Acthar" under "Proprietary Name").

The agency has not set forth a compelling argument to the contrary.  In its April 2016 letter—which the agency now asserts was its "final decision"—CMS side-stepped the language of the statute entirely.  Exhibit 6.  Instead, the agency noted its "understanding that [Acthar] is *marketed under* NDA 008372 not NDA 022432."  *Id.* (emphasis added).  In support of this assertion, CMS merely noted that the FDA approval letter for Acthar indicated that specified future submissions to FDA "should be addressed to the original NDA 008372 for this drug product, not to this NDA [022432]."  *Id.*  Maybe so.  But the fact that FDA requested Questcor to submit certain future *regulatory submissions* to NDA 008372 does not mean that Acthar is "produced or distributed under" that NDA.  CMS has offered no explanation to the contrary.

A quick note on *Chevron* deference.  The statutory language is clear on its face.  But even if it were not, CMS's current interpretation would not be entitled to deference, particularly given the agency's ever-shifting explanation as to why Acthar is not a "single source drug."  The CliffsNotes version:  CMS first cited the fact that the wrong NDA number briefly appeared in the (self-reported) On-Line Label Repository (it was corrected), Exhibit 6 (April 13, 2016 letter); then mistakenly insisted that Acthar was a "purchased product" under CMS's Manufacturer Release Number 90 guidance document (it was not), Exhibit 7 (June 2, 2016 email); then changed course and admitted that Acthar had been *approved* under NDA 022432 but noting that that NDA was "administratively closed upon approval" such that "marketing of the drug" was under NDA 008372, *id.* (March 20, 2017 email); then shifted its explanation again and asserted that Acthar is currently being "produced or distributed" under NDA 008372, Exhibit 8 (March 12, 2019 letter).  Then, in a surprise twist, notwithstanding three years of back-and-forth, the agency asserted that its "final decision" had actually been rendered three years earlier, back with the initial (faulty) explanation.  Exhibit 11 (March 27, 2019 email).

24

In the end, the agency does not appear to have endorsed any single interpretation of the key statutory term at all in its treatment of Acthar.  Deference is inappropriate in such circumstances.  *See SEC v. Sec. Inv'r Prot. Corp.*, 872 F. Supp. 2d 1, 10 (D.D.C. 2012) (agency's more recently adopted position that is inconsistent with earlier position "is entitled to little, if any, deference"); *Foothill Hosp.–Morris L. Johnston Mem'l v. Leavitt*, 558 F. Supp. 2d 1, 6–7 (D.D.C. 2008) ("the Secretary's interpretation is entitled to less deference where it has been inconsistent over the years").  *See also Prevor v. FDA*, 895 F. Supp. 2d 90, 97 (D.D.C. 2012) (same).  Indeed, if this Court were to defer to anything, it would have to defer to the agency's interpretation as espoused in its own regulation, issued through notice-and-comment rulemaking—and that regulation makes clear that Acthar is a "single source drug," as discussed further below.  *See Christensen v. Harris Cty.,* 529 U.S. 576, 587 (2000) (agency decisions set forth in opinion letters entitled to less respect than those promulgated in notice-and-comment rulemaking).

Similarly, deference is not warranted because CMS has not even tried to explain, let alone done so adequately, why it abandoned its earlier 2012 position that Acthar is eligible for a distinct base date AMP.  In *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), the Supreme Court declined to apply *Chevron* deference to a Department of Labor rule announcing an abrupt change of agency position on whether a service advisor could constitute a "salesman" for purposes of the Fair Labor Standards Act's overtime compensation requirement.  The Court noted that the regulation "was issued without the reasoned explanation that was required in light of the Department's change in position and the significant reliance interests involved."  *Id.* at 2126.  Based on that conclusion, the Court explained, "[i]t follows that this regulation does not receive *Chevron* deference in the interpretation of the relevant statute."  *Id.* at 2127.  *See also*

*Amarin Pharm. Ireland Ltd. v. FDA*, 106 F. Supp. 3d 196, 217 (D.D.C. 2015) (*Chevron*

deference is appropriate "*only* if the agency has offered a reasoned explanation for why it chose

that interpretation.") (emphasis added) (citing *Village of Barrington, Ill. v. Surface Transp. Bd.*,

636 F.3d 650, 660 (D.C. Cir. 2011)).  The same principles apply with equal force here.  Having

failed to even try to explain its change in position, CMS is not entitled to *Chevron* deference.

### B.  CMS's Determination Violates The Agency's Own Regulations.

Separate and apart from its violation of the statute, CMS's determination also cannot be

squared with its own regulations, which make clear that a drug product produced or distributed

under an NDA is eligible for its own base date AMP, unless a "narrow exception" not available

here applies.  42 C.F.R. § 447.502.

"A precept which lies at the foundation of the modern administrative state is that agencies

must abide by their rules and regulations."  *Reuters Ltd. v. FCC*, 781 F.2d 946, 947 (D.C. Cir.

1986); *see also International Exports, Inc. v. Mattis*, 265 F. Supp. 3d 35, 50 (D.D.C. 2017) ("It is

elementary that an agency must adhere to its own rules and regulations.").  When, as here, an

agency has promulgated a regulation through notice-and-comment rulemaking, that agency "is

itself bound by the rule until that rule is amended or revoked" and "may not alter [the rule]

without notice and comment."  *See Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017).

And while courts defer to agencies in interpreting their own ambiguous regulations in certain

circumstances—at least under current law[41]— courts extend no deference when such an

---

[41] There is good reason to doubt the continuing vitality of *Auer* deference.  *See* Br. for
Respondent, *Kisor v. Wilkie*, No. 18-15 at 34–35 (U.S. Feb. 25, 2019) (explaining that the
"United States takes seriously the concerns about *Seminole Rock* [and *Auer*] deference" and
advocating the doctrine "be cabined").  Regardless, that deference does not save CMS's plainly
erroneous interpretation here.

interpretation is "plainly erroneous or inconsistent with the regulation."  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).

CMS bound itself through notice-and-comment rulemaking to the position that the statutory term "original NDA" in the earlier version of the statute means "an NDA, other than an ANDA," unless a "narrow exception" applies.  *See* 42 C.F.R. § 447.502.  In the preamble to the Final Rule, CMS explained that this "narrow exception" does not apply to "drugs that received patent protection or statutory exclusivity."  *See* 81 Fed. Reg. at 5191.[42]  In addition, the preamble to the Final Rule makes clear that the "narrow exception" does not apply without "the manufacturer's written submission to CMS, and CMS's response confirming that the exception applies."  81 Fed. Reg. at 5191–92.  Although this language appeared in the preamble rather than in the regulation itself, the agency chose language that was clear, unqualified, and categorical. As a result, that language is binding upon the agency.  *See Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1222–23 (D.C. Cir. 1996) (agency may bind itself through language in preamble that is "sufficiently clear").  At the very least, the preamble informs interpretation of otherwise-ambiguous text of the regulation.  *See United Steelworkers of Amer., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1224 (D.C. Cir. 1980) (using language in preamble to interpret ambiguous language in regulation).

CMS's current position is flagrantly inconsistent with its own regulation.  FDA approved Acthar under "an NDA, other than an ANDA."  Because Acthar received statutory orphan-drug exclusivity, Exhibit 1, it does not fall within the "narrow exception" clearly described by CMS in the preamble to the Final Rule.  *See* 81 Fed. Reg. at 5191–92.  In addition, neither Mallinckrodt

---

[42] CMS reiterated this policy in a subsequent guidance document.  CMS, Mfr. Release No. 98, *Drug Category Narrow Exception Guidance* (May 2, 2016) ("The narrow exception will not be granted under the following circumstances:  . . . Drugs that received patent protection or statutory exclusivity, regardless of whether the protection or exclusivity is currently in effect.").

nor Questcor made a written submission or received a written response confirming that the "narrow exception" applies here, as required by the agency's own articulated policy.  *Ibid.*

The agency has failed to articulate any basis for departing from the clear standard set forth in the regulation.  Indeed, CMS has never so much as indicated that it *understands* that it is departing from this clear standard.  Exhibits 7 through 12.  Rather, it has simply ignored its own regulation.  That is an administrative-procedure no-no.

### C.  CMS's Determination Is Arbitrary And Capricious Because The Agency Failed to Explain Its Change In Position.

Finally, CMS's determination that Acthar is not a distinct "single source drug" eligible for a distinct base date AMP directly reverses the agency's affirmative statements to the contrary in 2012.  In order to effect such a change in position, an agency must justify its departure by providing a "reasoned analysis."  *Ramaprakash v. FAA*, 346 F.3d 1121, 1124–25 (D.C. Cir. 2003).  *See also Friedman v. Sebelius*, 686 F.3d 813, 828 (D.C. Cir. 2012) (agency decision arbitrary and capricious because "it failed to explain its departure from the agency's own precedents").  That in turn "necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent."  *See Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089–90 (D.C. Cir. 2009).  "An agency's failure to come to grips with conflicting precedent constitutes 'an inexcusable departure from the essential requirement of reasoned decision making.'"  *Ramaprakash*, 346 F.3d at 1125.

In August and September 2012, CMS stated clearly and unequivocally that it "agree[d] that Acthar is eligible for a new base date AMP" because it was "approved under a new NDA."  Exhibit 3 (Aug. 2012 letter); Exhibit 4 (Sept. 2012 letter) (reiterating that "because Acthar was approved under a new NDA, Questcor may set a new base date AMP").  Years later, CMS changed its tune.  The agency is now asserting that Acthar is *not* eligible for a new base date

AMP, even though it still was indisputably "approved under a new NDA."  *See* Exhibit 7 (March 20, 2017 email) ("We understand and agree that the new indication for Acthar was approved under NDA 022432.").

Despite multiple requests for explanation, CMS has failed to explain its abrupt change in position.  In fact, the agency has declined to even acknowledge its contrary 2012 positions at all. Exhibits 7 through 12.  That omission renders the agency's most recent position arbitrary and capricious.  *See*, *e.g.*, *Lone Mountain Processing, Inc. v. Secretary of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (agency action unlawful when the agency "failed to even mention or discuss, let alone distinguish" prior orders); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017) ("The Service's failure even to acknowledge its past practice and formal policies regarding the Middle Section, let alone to explain its reversal of course in the 2013 decision, was arbitrary and capricious.").  After all, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.  An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

### D.  CMS's Determination Violates Principles of Fair Notice and Retroactivity.

To make matters worse, CMS's effort to force Mallinckrodt to "correct" Acthar's base date AMP in the DDR system would automatically trigger retroactive adjustments to Acthar's Medicaid drug rebates stretching all the way back to 2013—causing Mallinckrodt to lose hundreds of millions of dollars.  *See* National Drug Rebate Agreement, Section II(f); Declaration of Kathleen Schaefer ¶ 14 .

State Medicaid agencies will automatically be notified that unit rebate amounts for past periods have been changed.  The manufacturer is then responsible for making adjustments to account for any underpayments in those past periods.  As the agency put it to Mallinckrodt during the parties' discussions:  "Once Mallinckrodt certifies the corrected information, states will receive notification on the subsequent rebate file, in the form of prior period adjustments, which indicate that the [URA] has changed for the drug.  Mallinckrodt will be responsible for adjusting previous payments to the states using the Prior Quarter Adjustment Statement (PQAS) in accordance with the URA changes."  Exhibit 9 (Nov. 6, 2018 letter from CMS).

But, in 2012, the agency *actively encouraged* Questcor and Mallinckrodt—twice—to use the now-disavowed base date AMP.  Mallinckrodt relied in good faith on the agency's statements that Acthar was entitled to its own base date AMP—and remained in the Medicaid Drug Rebate Program.  CMS did not even begin to question its own pronouncements until 2016. Exhibit 6.  And, as noted above, to this date, the agency *still* has not given any explanation at all—let alone an adequate explanation—for its complete reversal.  Exhibits 7 through 10.  As such, CMS's effort to penalize Mallinckrodt for relying on CMS's firm pronouncements in 2012 violates basic principles of fair notice and the prohibition on retroactive application of new agency policies.

### 1.  CMS's Effort to Impose Its New Policy Retroactively Violates Principles of Fair Notice and Due Process.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  For that reason, an agency seeking to apply an interpretation of a statute or regulation to a regulated entity is held to a standard of "fair notice" that must be given with "ascertainable certainty."  *See General Elec. Co. v. EPA*, 53 F.3d 1324,

1328–29 (D.C. Cir. 1995).  This core principle is especially critical in the administrative-law

context.  It ensures that regulated entities need not "divine the agency's interpretations in

advance" or face the threat of being "held liable when the agency announces its interpretations

for the first time in an enforcement proceeding and demands deference."  *Christopher v.*

*SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012).

 The fair-notice rule is described this way:  "If, by reviewing the regulations and other

public statements issued by the agency, a regulated party acting in good faith would be able to

identify, with 'ascertainable certainty,' the standards with which the agency expects parties to

conform, then the agency has fairly notified a petitioner of the agency's interpretation."  *General*

*Elec.*, 53 F.3d at 1329.  But if the agency has not previously made its interpretation known with

"ascertainable certainty," the agency's conduct fails for lack of fair notice and due process.  *Id.*

*See also United States v. Chrysler Corp.,* 158 F.3d 1350, 1354–55 (D.C. Cir. 1998) (applying

"fair notice" test to administrative order requiring recall and noting "the well-established rule in

administrative law that the application of a rule may be successfully challenged if it does not

give fair warning that the allegedly violative conduct was prohibited"); *SNR Wireless LicenseCo,*

*LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017) (applying fair notice requirement to agency's

denial of a request for bidding credits).

 CMS expressly confirmed that Acthar was eligible for a distinct base date AMP in

2012—not once, but twice.  Exhibits 3 and 4 (Aug. and Sept. 2012 letters).  Questcor (and later

Mallinckrodt) relied in good faith on CMS's stated positions, reported the new base date AMP,

and continued to participate in the Medicaid Drug Rebate Program.  Exhibit 2 (Questcor letter to

CMS noting that, without a change in the base date AMP, the company's "continued

participation in the MDRP may simply be untenable because that participation generates greater

31

rebate liability and negative revenues for the company"). Now that it is too late to remove

Acthar from the Medicaid Drug Rebate Program for each of those years, CMS has worked a

quintessential "unfair surprise" by changing its position on the Acthar base date AMP and

demanding retroactive rebate adjustments. *Christopher*, 567 U.S. at 156. That is not fair notice,

and it is not permissible. *See General Elec.*, 53 F.3d at 1334 ("EPA thus may not hold GE

responsible in any way—either financially or in future enforcement proceedings—for the actions

charged in this case.").

That is true not just until April 2016, when CMS first began to question whether Acthar

was eligible for a distinct base date AMP. Exhibit 6. It also is true through today, because,

although CMS opaquely indicated in communications between April 2016 and April 2019 that it

believed that Acthar was not eligible for a distinct base date AMP, it provided vague and

inconsistent explanations that do not comport with either the facts or the statutory standard.

Exhibits 7 through 12. As noted above, CMS *still* has refused to provide even a cursory

explanation for its change in position from its 2012 letters, let alone acknowledge that it is, in

fact, changing position. The agency's failure to grapple with its 2012 statements renders its 2016

and later pronouncements inadequate to effectuate a change in agency policy. CMS may not

apply its change in policy to Mallinckrodt for any period prior to such time as it acknowledges

and adequately explains its change in position.

## 2. CMS's Decision Is Impermissibly Retroactive.

For similar but legally distinct reasons, CMS's determination also is unlawful because it

is impermissibly retroactive. "[T]he Administrative Procedure Act generally contemplates that

when an agency proceeds by adjudication, it will apply its ruling to the case at hand; when, on

the other hand, it employs rulemaking procedures, its orders ordinarily are to have only

prospective effect." *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1082 (D.C. Cir. 1987) (en banc).  There are, however, exceptions to these general principles.  In relevant part, an agency may not retroactively apply a new position in an adjudication where it would work an injustice by imposing a new rule on a regulated party without advance notice.  *See Retail Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380 (D.C. Cir. 1972) (commonly referred to as *Retail Union*).

In order to protect regulated entities from policymaking by surprise, the D.C. Circuit developed a set of five factors to assist courts in "deciding whether to grant or deny retroactive force to newly adopted administrative rules":

> (1) whether the issue is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Id.* at 390; *see also Clark-Cowlitz*, 826 F.2d at 1081 (quoting and analyzing these factors); *Williams Nat. Gas Co. v. FERC*, 3 F.3d 1544, 1553–54 (D.C. Cir. 1993) (same).

Evaluating these five factors ultimately requires a court to engage in balancing.  *Clark-Cowlitz*, 826 F.2d at 1082 n.6.  "In general, the ill effect of retroactivity is the frustration of the expectations of those who have justifiably relied on a prior rule; the ill effect of prospectivity is the partial frustration of the statutory purpose which the agency has perceived to be advanced by the new rule."  *McDonald v. Watt*, 653 F.2d 1035, 1044 (5th Cir. Unit A Aug. 1981) (citing *Retail Union*, 466 F.2d at 390).  Determining which "side of this balance preponderates is in each case a question of law, resolvable by reviewing courts with no overriding obligation of deference to the agency decision . . . ."  *Retail Union*, 466 F.2d at 390.

The first four factors all ask, essentially, whether it would be unfair to the party against whom the new rule is applied for the rule to be applied retroactively.  *See, e.g., Clark-Cowlitz*, 826 F.2d at 1097 (Mikva, Robinson, and Edwards, JJ., dissenting) (describing the first four factors as "gaug[ing] the litigants' personal interest in not being judged under a newly announced standard").  When there has been a "substitution of new law for old law that was reasonably clear," "a decision to deny retroactive effect is uncontroversial."  *Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1109 (D.C. Cir. 2001) (quoting *Williams Nat. Gas Co.*, 3 F.3d at 1554).  In such circumstances, applying a "new rule to past conduct or prior events would work a 'manifest injustice.'"  *See Clark-Cowlitz,* 826 F.2d at 1081.  In sum, "[u]nless the burden of imposing the new standard is *de minimis,* or the newly discovered statutory design compels its retroactive application, the principles which underlie the very notion of an ordered society, in which authoritatively established rules of conduct may fairly be relied upon, must preclude its retroactive effect."  *Retail Union,* 466 F.2d at 392.

Applying CMS's change in position retroactively back to 2013 would work just such a manifest injustice here:

*Factors One and Two*:  This case does not involve an agency position of first impression.  CMS previously considered this exact question—twice—and expressly came to the conclusion that Acthar was eligible for a distinct base date AMP because it was "approved under" a new NDA.  Exhibits 3 and 4.  Those statements, confirmed in writing, remained unquestioned by the agency for four years.  As a result, CMS's more recent and opposite pronouncement was not filling a void in the law; it was an abrupt change on an established agency position.

*Factor Three*:  Mallinckrodt—and Questcor before it—relied heavily on CMS's position.  Indeed, as Mallinckrodt's predecessor explained to CMS, were it not for agency's assurances

that Acthar was eligible for a distinct base date AMP, the company's participation in the

Medicaid Drug Rebate Program would not have been financially tenable.  Exhibit 2 ("If CMS

does not approve either of these alternatives, Questcor's continued participation in the MDRP

may simply be untenable because that participation generates greater rebate liability and negative

revenue for the company.").  Based on CMS's assurances that Acthar was eligible for a distinct

base date AMP, Mallinckrodt—and Questcor before it—remained in the Medicaid drug rebate

program.  That is significant reliance.  *Cf. Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 13

(D.C. Cir. 2011) (rule that altered calculation for Medicare payments impermissibly retroactive

when applied to prior fiscal years).[43]

    *Factor Four*:  The burden imposed by retroactivity here is enormous.  If allowed to take

retroactive effect back to 2013, CMS's policy reversal subjects Mallinckrodt to additional

potential enforcement action and suspension of its participation in the Medicaid drug rebate

program.  It also threatens Mallinckrodt with extensive financial liability in the hundreds of

millions of dollars.  Declaration of Kathleen Schaefer ¶ 14.

    *Factor Five*:  CMS has no legitimate interest in applying this new rule retroactively.

Indeed, it was the *agency* that originally took the position that Acthar is eligible for a new base

date AMP because it was "approved under" a new NDA.  Exhibits 3 and 4.  To this date, CMS

has failed to identify any policy that would support a reversal of that decision, let alone a reason

that the new policy should be applied retroactively.  Exhibits 7 through 12.

---

[43] *Northeast Hospital* was decided under retroactivity principles in the rulemaking context, rather than in an adjudication.  Nonetheless, the concerns underlying the principle that retroactive rulemaking is *per se* impermissible unless authorized by statute apply with equal persuasive force here, where for years Mallinckrodt relied in good faith on a clear agency pronouncement. That is precisely why the *Retail Union* line of cases exists.

All of the equities here line up in favor of Mallinckrodt.  An agency's word must have some value; regulated entities are entitled to rely on express agency statements at the time they act.  "When a government agency officially and expressly tells you that you are legally allowed to do something, but later tells you 'just kidding' and enforces the law retroactively against you and sanctions you for actions you took in reliance on the government's assurances, that amounts to a serious due process violation."  *PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 47–49 (D.C. Cir. 2016), *reh'g en banc granted, order vacated* (Feb. 16, 2017), *reinstated in relevant part on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018).[44]  As then-Judge Kavanaugh put it:

> Put aside all the legalese for a moment.  Imagine that a police officer tells a pedestrian that the pedestrian can lawfully cross the street at a certain place.  The pedestrian carefully and precisely follows the officer's direction.  After the pedestrian arrives at the other side of the street, however, the officer hands the pedestrian a $1,000 jaywalking ticket.  No one would seriously contend that the officer had acted fairly or in a manner consistent with basic due process in that situation.

*Id.* at 49.  So too here.  It would work a manifest injustice if CMS were permitted to force Mallinckrodt to pay rebate adjustments dating back to 2013, notwithstanding the agency's own previous express assurances that Acthar was eligible for a distinct base date AMP.  That is "Rule of Law 101."  *Id.* at 48.  *See also id.* at 113 (Tatel, J., concurring, joined by Millett and Pillard, JJ.) ("For substantially the reasons given by the panel, I agree that the Bureau ran afoul of the due process clause by failing to give PHH adequate notice in advance of imposing penalties for past conduct.").

---

[44] This case has a bit of a tortured history.  On granting en banc review, the D.C. Circuit reversed the panel decision.  But then the en banc D.C. Circuit subsequently reinstated the panel opinion "insofar as it related to the interpretation of RESPA and its application to PHH and Atrium in this case."  *PHH Corp.*, 881 F.3d at 83.

36

## II.    MALLINCKRODT WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF.

Absent preliminary relief, Mallinckrodt will suffer severe and irreparable harm. CMS has threatened to declare Mallinckrodt "out of compliance" in the DDR system on May 24, 2019. Exhibit 12. CMS has also threatened to refer Mallinckrodt to the Department of Justice and/or U.S. Department of Health and Human Services-Office of Inspector General for further review and investigation. *Id.*

The agency has spelled out the consequences of being labeled "out of compliance": "When [a drug product] is identified as out of compliance, the submission of pricing records or updates to product data will not be allowed online or via file transfer." Exhibit 9. In other words, as of May 24, 2019, Mallinckrodt will be unable to report or revise drug pricing data for Acthar in the DDR system. Mallinckrodt also could be subject to civil monetary penalties (CMPs) for being out of compliance. 42 U.S.C. § 1396r-8(b)(3)(C)(i). In addition, under the Medicaid drug rebate statute, when a manufacturer fails to report pricing data within ninety days of a deadline, its National Drug Rebate Agreement (NDRA) is suspended for a period of at least thirty days. 42 U.S.C. § 1396r-8(b)(3)(C)(i). And because it is the NDRA that is the condition precedent to states' obligation to cover a manufacturer's covered outpatient drugs, if Mallinckrodt's NDRA is suspended, states will no longer be required to cover Mallinckrodt's covered outpatient drugs, including Acthar. *See* 42 U.S.C. § 1396r-8(d). In plain English: absent judicial intervention, Mallinckrodt will face CMPs and the prospect of not having its products covered under the Medicaid program by August 28, 2019.

All of this will have drastic consequences for Mallinckrodt. First and foremost, the financial harm alone to the company will be significant, totaling over one hundred million dollars a year. Declaration of Kathleen Schaefer ¶ 6. If allowed retroactive effect (back to

2013), the company will also lose an additional hundreds of millions of dollars.  *Id.* ¶ 14.  That financial loss will affect the company's ability to continue the current pace of investment in clinical programs for Acthar Gel, one of which is for a new indication for ALS.  *Id.* ¶ 6.  In addition, the losses will affect Mallinckrodt's ability to continue its current pace of investment in clinical programs designed to launch new drugs and therapies for conditions in which there are currently no treatments.  *Id.*

Monetary losses such as these can constitute irreparable harm when they are "certain, imminent, and unrecoverable."  *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014) (quoting *National Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011)).  This is particularly true in APA cases.  "While plaintiffs are entitled to injunctive relief, they are plainly not entitled to money damages from the agency based on its violation of the APA."  *Iyengar v. Barnhart*, 233 F. Supp. 2d 5, 15 (D.D.C. 2002).  For this reason, courts have repeatedly recognized that substantial and imminent financial harms to regulated entities based on unlawful agency action—particularly involving Medicaid and Medicare payments—are irreparable.  *See, e.g.*, *Texas Children's Hosp.*, 76 F. Supp. 3d at 242 (finding irreparable harm where enforcement of CMS policy would lead to "unrecoverable" losses); *California Pharmacists Ass'n v. Maxwell-Jolly*, No. CV-09-8200 CAS, 2010 WL 11507584, at *10 (C.D. Cal. May 5, 2010) (finding irreparable harm where state Medicaid agency's reduction in pharmacist reimbursements caused monetary losses); *Nat'l Med. Care, Inc. v. Shalala*, No. 95-0860 (WBB), 1995 WL 465650, at *3 (D.D.C. June 6, 1995) (finding irreparable harm based on administrative costs associated with "immediate and massive re-billing efforts" required by compliance with Medicare payment-obligation rule).

In addition to the potential for civil monetary penalties and other monetary losses, Mallinckrodt faces imminent and irremediable harm to its reputation, goodwill, and market standing as a result of being publicly deemed "out of compliance."  Declaration of Kathleen Schaefer ¶ 10.  Indeed, the day after announcing CMS's decision, Mallinckrodt's stock price dropped 24 percent and its credit ratings were downgraded by Moody's.  *Id.* ¶¶ 8–9.  Once lost, the reputation Mallinckrodt has garnered cannot be recovered after the fact in litigation.  These harms are more than sufficient to justify a preliminary injunction.  *See, e.g.*, *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("Plaintiffs' reputation will be damaged by HUD's characterization of them in the March 17 letter as 'enticing' senior citizens into meetings, and 'pressuring' them to obtain reverse mortgages 'under the guise of sound estate planning.'"); *see also Atlas Air, Inc. v. International Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103–104 (D.D.C. 2017) (finding reputational harms associated with air-traffic delays to be irreparable to plaintiff's express cargo delivery service).

The only way that Mallinckrodt could avoid this fate would be to comply with CMS's demand that it update the base date AMP for Acthar in the DDR.  But updating the base date AMP would require Mallinckrodt to provide false information to CMS, which would present its own risks and liabilities.  CMS therefore has put Mallinckrodt between the proverbial rock and a hard place.  That, too, constitutes sufficient irreparable harm to justify a preliminary injunction.

Finally, CMS's threatened enforcement action violates due process principles by depriving Mallinckrodt of fair notice for conduct taken in good-faith reliance on the agency's prior position.  That constitutional deprivation is per se irreparable.  *See, e.g.*, *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

## III.   GRANTING PRELIMINARY INJUNCTIVE RELIEF WOULD ADVANCE THE PUBLIC INTEREST.

The public interest also favors a preliminary injunction, as it will ultimately be the public that pays the price of CMS's error.  Absent judicial intervention, once Mallinckrodt is declared out of compliance, Mallinckrodt's NDRA will automatically be suspended 90 days after the next reporting deadline.  42 U.S.C. § 1396r-8(b)(3)(C)(i).  That in turn will mean that states will no longer be required to cover Acthar.  Verified Complaint ¶ 87.  Medicaid patients, by definition among the poorest of Americans, with serious medical conditions—including multiple sclerosis, nephrotic syndrome, and allergic and inflammatory ophthalmic processes—could lose critical access to Acthar.  *Id.* ¶ 88.  Even a temporary interruption of access to the drug could exacerbate some of these diseases.  For example, patients suffering from Systematic Lupus Erythematosus face serious adverse consequences, including a significantly increased rate of flare-ups with the disease, when their Acthar treatment is interrupted.  Declaration of Kathleen Schaefer ¶ 12. Moreover, these patients may also face a higher incidence of baseline rate of disease activity.  *Id.*

Medicaid patients thus will benefit from a preliminary injunction maintaining the status quo and ensuring continued access to Mallinckrodt's covered outpatient drugs, including Acthar. "Courts have frequently found that it is in the public interest to issue an injunction in connection with the Medicaid Act."  *Texas Children's Hosp.,* 76 F. Supp. 3d at 246.  *See also Independent Living Ctr. v. Maxwell–Jolly,* 572 F.3d 644, 659 (9th Cir. 2009) ("there is a robust public interest in safeguarding access to health care for those eligible for Medicaid, whom Congress has recognized as the most needy in the country.");  *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 470 (5th Cir. 2017) (preliminarily enjoining state agency from decertifying certain healthcare providers so as to deny patients the ability "to obtain medical care from the Medicaid provider of their choice");  *Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir. 2013) (preliminarily

enjoining state agency from enforcing policy change that would deny certain previously eligible patients from receiving in-home personal care services under Medicaid); *Bontrager v. Indiana Family & Soc. Servs. Admin.*, 697 F.3d 604, 611 (7th Cir. 2012) (preliminarily enjoining state agency from enforcing cap on Medicaid-funded dental services regardless of medical necessity of the underlying procedure); *Libbie Rehab. Ctr., Inc. v. Shalala*, 26 F. Supp. 2d 128, 132 (D.D.C. 1998) (preliminarily enjoining HHS from terminating rehabilitation facility's participation in Medicaid and Medicare programs when patients would have been transferred from the facility).

More generally, the public interest also favors faithful compliance with the law.  "There is generally no public interest in the perpetuation of unlawful agency action.  To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted).  *See also N. Mariana Islands v. United States,* 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA."); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (highlighting "the public's interest in the 'faithful application of the laws'").  Accordingly, this factor weighs in favor of granting a preliminary injunction.

## IV.    THE BALANCE OF THE EQUITIES FAVORS PRELIMINARY INJUNCTIVE RELIEF.

The balance of the equities tips in favor of an injunction to preserve the status quo. Mallinckrodt's side of the ledger is straightforward:  Absent injunctive relief, Mallinckrodt will suffer imminent and enormous harms that cannot be recouped at the end of these proceedings,

and patients may lose access to the drug product.  By contrast, CMS and State Medicaid agencies face *no* harm from having to operate under the status quo.

Unlike the severe and irreparable harm facing Mallinckrodt, a preliminary injunction here would merely permit Mallinckrodt to continue reporting in DDR under the old base date AMP and temporarily bar enforcement of CMS's newfound policy regarding Acthar's base date AMP. *See Nat'l Med. Care, Inc. v. Shalala*, No. 95-0860 (WBB), 1995 WL 465650, at *4 (D.D.C. June 6, 1995).  That is, if ordered to "await a full consideration of the merits" before taking necessarily backwards-looking enforcement action, CMS "will only have implemented its retroactive policies . . . at a later date." *Id.*  The only loss the agency faces is delay.  And because this is an APA case raising purely legal questions reviewed on the basis of the administrative record, the length of such delay would be minimal, especially if this Court were to combine its resolution of this motion with a final merits ruling.  *See FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 129 (D.D.C. 2015) (concluding that delay of enforcement action was "especially" unlikely to harm the government's asserted national-security interests because of expedited briefing schedule).

## CONCLUSION

For these reasons, Mallinckrodt's motion for a preliminary injunction should be granted; this Court should bar Defendants and all others in active concert or participation with them (including other branches of the federal government) from suspending Mallinckrodt's participation in the Medicaid Drug Rebate Program and/or taking any further action based on CMS's determination that Acthar is not entitled to a distinct base date AMP pending a final resolution on the merits.

Respectfully submitted,

/s/ Catherine E. Stetson
Catherine E. Stetson (D.C. Bar No. 453221)
Susan M. Cook (D.C. Bar No. 462978)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Phone:  (202) 637-5491
Fax: (202) 637-5910
cate.stetson@hoganlovells.com

*Counsel for Mallinckrodt ARD LLC*

Dated:  May 22, 2019