**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MALLINCKRODT ARD LLC., <br><br> Plaintiffs, <br><br> v. <br><br> SEEMA VERMA, in her official capacity as ADMINISTRATOR, CENTERS FOR MEDICARE & MEDICAID SERVICES, and ALEX M. AZAR II, in his official capacity as SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> Defendants. | Civil Docket No. 1:19-cv-1471-ABJ |

## REDACTED STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 3

I.      Manufacturers May Participate in the Medicaid Program if They Enter into a
        Medicaid Drug Rebate Agreement with CMS.................................................... 3

II.     The FDA Approves New Drugs and Requests to Supplement Previously
        Approved Drug Applications.............................................................................. 5

III.    Factual and Procedural Background .................................................................... 7

        A.  The FDA Approved Adding a New Indication to the Labeling of a Decades-
            Old Drug. ................................................................................................. 7

        B.  Questcor Raises Acthar's Price and Seeks to Avoid Accounting for that
            Increase in its Rebate. .............................................................................. 9

        C.  CMS Has Repeatedly Asked Mallinckrodt to Correct Acthar's Base Date
            AMP......................................................................................................... 12

STANDARD OF REVIEW .............................................................................................. 16

ARGUMENT.................................................................................................................... 17

I.      CMS's Determination That Mallinckrodt Is Using an Incorrect Base Date AMP Is
        not Arbitrary or Capricious or Contrary to Law. ............................................... 17

        A.  CMS Correctly Determined that Acthar's Base Date AMP Needs to Be
            Revised, and Mallinckrodt's Cramped Reading of the Law Does Not Show
            Otherwise. ................................................................................................ 17

        1.  *A Straightforward Application of the Statute Shows that CMS Correctly Told
            Mallinckrodt to Fix Acthar's Base Date AMP.*............................................ 17

        2.  *Mallinckrodt's Argument to the Contrary Is Not Supported by the Definition
            of the "Single Source Drug" or the Rest of the Statute.* ............................ 18

        B.  CMS Clearly Explained to Mallinckrodt Why the Company Has Failed to
            Comply With the Statute in Calculating Rebates. .................................... 23

        C.  No Equitable Principle Excuses Mallinckrodt's Obligation to Remedy Its
            Underpayment of Rebates.......................................................................... 29

i

1.   *Mallinckrodt Cannot Invoke the "Fair Notice" Doctrine Because the Money Belongs to the Medicaid Program.* ........................................................................... 31

2.   *Retroactivity Principles Do Not Apply Here, and Even if they Did, Mallinckrodt Cannot Use Them to Avoid its Agreed-Upon Obligation to Correct Underpayments.* ........................................................................... 33

CONCLUSION ........................................................................................................................... 36

## TABLE OF AUTHORITIES

**CASES**

*Am. Tel. & Tel. Co. v. FCC,*
  454 F.3d 329 (D.C. Cir. 2006) .......................................................................................... 34, 35

*Am. Wildlands v. Kempthorne,*
  530 F.3d 991 (D.C. Cir. 2008) .................................................................................................. 16

*Ark. Dep't of Human Servs. v. Sebelius,*
  818 F. Supp. 2d 107 (D.D.C. 2011) ......................................................................................... 31

*Auto. Club of Michigan v. Comm'r of Internal Revenue,*
  353 U.S. 180 (1957) .................................................................................................................. 30

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) .................................................................................................................. 28

*Catholic Health Initiatives Iowa Corp. v. Sebelius,*
  718 F.3d 914 (D.C. Cir. 2013) .................................................................................................. 34

*Christopher v. SmithKline Beecham Corp.,*
  567 U.S. 142 (2012) .................................................................................................................. 32

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) .................................................................................................................. 16

*Cookeville Reg'l Med. Ctr. v. Leavitt,*
  531 F.3d 844 (D.C. Cir. 2008) .................................................................................................... 3

*Cooper Hosp. / Univ. Med. Ctr. v. Burwell,*
  179 F. Supp. 3d 31 (D.D.C. 2016) ........................................................................................... 35

*Fla. Mun. Power Agency v. F.E.R.C.,*
  315 F.3d 362 (D.C. Cir. 2003) .................................................................................................. 16

*Frew ex rel. Frew v. Hawkins,*
  540 U.S. 431 (2004) .................................................................................................................... 3

*Gen. Am. Transp. Corp. v. I.C.C.,*
  872 F.2d 1048 (D.C. Cir. 1989) ................................................................................................ 35

*General Electric Co. v. U.S. E.P.A.,*
  53 F.3d 1324 (D.C. Cir. 1995) ............................................................................................ 32, 33

*Health Ins. Ass'n of Am., Inc. v. Shalala,*
  23 F.3d 412 (D.C. Cir. 1994) ................................................................................................ 34

*\*Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.,*
  467 U.S. 51 (1984) ..................................................................................................... *passim*

*Iowa Dep't of Human Servs. v. CMS,*
  576 F.3d 885 (8th Cir. 2009) ............................................................................................... 22

*Kaseman v. D.C.,*
  444 F.3d 637 (D.C. Cir. 2006) ............................................................................................ 23

*Keating v. FERC,*
  569 F.3d 427 (D.C. Cir. 2009) ............................................................................................ 30

*Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.,*
  476 F.3d 946 (D.C. Cir. 2007) ............................................................................................ 28

*Lozowski v. Mineta,*
  292 F.3d 840 (D.C. Cir. 2002) ............................................................................................ 16

*New York State Dept. of Social Servs. v. Dublino,*
  413 U.S. 405 (1973) ............................................................................................................ 22

*Nyeholt v. Sec'y Of Veterans Affairs,*
  298 F.3d 1350 (Fed. Cir. 2002) ........................................................................................... 32

*\*Office of Pers. Mgmt. v. Richmond,*
  496 U.S. 414 (1990) ..................................................................................................... 30, 31

*Palisades Gen. Hosp. Inc. v. Leavitt,*
  426 F.3d 400 (D.C. Cir. 2005) ............................................................................................ 36

*PHH Corp. v. Consumer Financial Protection Bureau,*
  389 F.3d 1 (D.C. Cir. 2016) ................................................................................................ 34

*Qwest Servs. Corp. v. F.C.C.,*
  509 F.3d 531 (D.C. Cir. 2007) ............................................................................................ 35

*Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.,*
  130 F. Supp. 3d 81 (D.D.C. 2015) ...................................................................................... 16

*Retail, Wholesale and Dep't Store Union, AFL–CIO v. NLRB,*
  466 F.2d 380 (D.C. Cir. 1972) ............................................................................................ 34

*Satellite Broad. Co. v. FCC,*
  824 F.2d 1 (D.C. Cir. 1987) ........................................................................................... 31

*SNR Wireless License Co v. FCC,*
  868 F.3d 1021 (D.C. Cir. 2017) .................................................................................... 32

*Springfield, Inc. v. Buckles,*
  292 F.3d 813 (D.C. Cir. 2002) ...................................................................................... 26

*St. Luke's Hosp. v. Sebelius,*
  611 F.3d 900 (D.C. Cir. 2010) ...................................................................................... 34

*Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.,*
  783 F. Supp. 1426 (D.D.C. 1992) .................................................................................. 25

*Town of Castle Rock v. Gonzales,*
  545 U.S. 748 (2005) ...................................................................................................... 31

*United Source One, Inc. v. U.S. Dep't of Agric., Food Safety & Inspection Serv.,*
  865 F.3d 710 (D.C. Cir. 2017) ...................................................................................... 25

*United States ex rel. Landis v. Tailwind Sports Corp.,*
  308 F.R.D. 1 (D.D.C. 2015) .......................................................................................... 30

*United States v. Chrysler Corp.,*
  158 F.3d 1350 (D.C. Cir. 1990) .................................................................................... 32

*United States v. Reorganized CF & I Fabricators of Utah, Inc.,*
  518 U.S. 213 (1996) ...................................................................................................... 31

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .......................................................................................................... 36

## STATUTES

5 U.S.C. § 706 ................................................................................................................... 16

21 U.S.C. § 355 .................................................................................................................... 5

42 U.S.C. § 1396, *et seq.* ..................................................................................................... 3

42 U.S.C. § 1396a ............................................................................................................... 3

42 U.S.C. § 1396b ............................................................................................................... 4

42 U.S.C. § 1396d ............................................................................................................... 4

*42 U.S.C. § 1396r-8 ............................................................................................................... *passim*

Omnibus Budget Reconciliation Act of 1990,
   Pub. L. No. 101-508, 104 Stat. 1388, *codified as amended* at 42 U.S.C. § 1396r-8 .................. 4

**RULES**

Fed. R. Civ. P. 56 .................................................................................................................... 16

**REGULATIONS**

21 C.F.R. §§ 314.70–71 ............................................................................................................ 6

42 C.F.R. § 447.502 ....................................................................................................... 7, 19, 23

42 C.F.R. § 447.509 ................................................................................................................... 4

42 C.F.R. § 447.511 ................................................................................................................... 5

*Medicaid Program; Covered Outpatient Drugs*,
   81 Fed. Reg. 5170-01 (Feb. 1, 2016) .......................................................................................... 9

**OTHER AUTHORITIES**

U.S. Food & Drug Admin., *Nat'l Drug Code Directory*
   https://www.fda.gov/drugs/drug-approvals-and-databases/national-drug-code-directory ....... 22

U.S. Food & Drug Admin., *Drugs@FDA Glossary of Terms*
   https://www.fda.gov/drugs/informationondrugs/ucm079436.htm ............................................. 6

Mallinckrodt plc April 7, 2014 Form 8-K
   https://www.sec.gov/Archives/edgar/data/1567892/000119312514132587/d708301d8k.htm .. 7

Ex. 99-1 to Mallinckrodt plc Sept. 9, 2015 Form 8-K
   https://www.sec.gov/Archives/edgar/data/1567892/000119312515315236/d51024dex991.htm
   ................................................................................................................................................. 7

Mallinckrodt plc Form 10-K (February 26, 2019), *available at*
   https://www.sec.gov/ix?doc=/Archives/edgar/data/1567892/000156789219000009/mnk10-
   k122818.htm ................................................................................................................... 18, 33

*Medicaid.gov, Medicaid Drug Rebate Program*,
   https://www.medicaid.gov/medicaid/prescription-drugs/medicaid-drug-rebate-
   program/index.html ..................................................................................................................... 5

*Medicaid.gov, Product Data for Drugs in the Medicaid Drug Rebate Program,*
    https://www.medicaid.gov/medicaid/prescription-drugs/medicaid-drug-rebate-
    program/data/index.html ........................................................................................................... 12

U.S. Food & Drug Admin., *Orange Book Preface,*
    https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface ........... 9

## INTRODUCTION

Medicaid is a vital program that provides health insurance to the poorest Americans and the vitality of that program depends on drug companies following the rules. One of those rules is that drug makers who sell outpatient drugs to Medicaid beneficiaries must participate in the Medicaid Drug Rebate Program on terms that do not allow them to unduly profit from Medicaid. The Program thus requires manufacturers to rebate to States the amount of price increases since 1990 except as necessary to account for inflation. This case is about that requirement.

Mallinckrodt ARD LLC ("Mallinckrodt") sells a drug called H.P. Acthar Gel ("Acthar") to Medicaid beneficiaries, the price of which has skyrocketed from an average manufacturer price of approximately ▮▮ in 1990 to ▮▮ in 2013 (to ▮▮ in 2019).[1] But instead of paying higher rebates to account for that massive price hike, Mallinckrodt has been using Acthar's average manufacturer price from 2013 (not 1990) to calculate its rebates. That means Mallinckrodt has been paying roughly ▮▮ less in rebate than the statute requires for each unit sold to a Medicaid beneficiary and has thus shortchanged Medicaid hundreds of millions of dollars to date—a cost this vital public insurance program has to bear.

Mallinckrodt maintains that a 2012 letter from the Centers for Medicare & Medicaid Services ("CMS") specifically authorized it to calculate its rebates this way, but that is simply incorrect. CMS's letter was expressly "based on the facts and information [Questcor] presented to [CMS]" at that time—which effectively showed that the U.S. Food and Drug Administration ("FDA") recently had approved Acthar as an entirely new drug. But the FDA did no such thing; rather, it approved adding a new "indication" (or approved use) to the (old) drug's labeling. While the FDA did use an administrative "new drug application" number in that approval

---

[1] Mallinckrodt is formerly known as Questcor Pharmaceuticals ("Questcor").

process, that number was for the FDA's internal administrative purposes only and did not somehow convert FDA's approval of use for a new indication into an entirely new approval of a drug that had been on the market for decades. Indeed, the FDA explicitly told Questcor as much, including by instructing the company not to use that number after approval. And of course, as the company that manufactured Acthar, Questcor was quite plainly aware that Acthar remained the same drug as it was when first approved in 1952, as well as that under the rebate statute, the original approval date for calculating rebates is not reset each time an already-approved drug is merely approved for a new indication. CMS later discovered that its 2012 views were based on a faulty factual premise, and since 2016 has repeatedly directed Mallinckrodt to correct its rebate calculation, which the company has steadfastly refused to do.

Rather than begin providing the rebates to Medicaid it is obligated to provide, Mallinckrodt has sued under the Administrative Procedure Act ("APA"), seeking to codify its ongoing underpayments to Medicaid. The essence of Mallinckrodt's theory is remarkable: The company argues it is entitled to a windfall of hundreds of millions of dollars from the federal government's public-insurance program for the poor—a windfall that will apparently last in perpetuity—simply because CMS mistakenly believed that the FDA had approved the decades-old Acthar as a new drug, a belief predicated on Questcor's failure to disclose all relevant facts. The Court should reject that theory. Despite Mallinckrodt's contorted interpretation of the relevant statutes and regulations, its case ultimately hinges on a false assertion—that "[t]here are two Acthars in this case," Mem. Points & Auths. Supp. Pl.'s Mot. Prelim. Inj. ("Br.") at 1, n.1, ECF No. 4-1. There are not.

Mallinckrodt's APA claims fail as a matter of law. First, CMS's position is not contrary to either the governing statute or its regulations. Mallinckrodt's insistence that there are two

2

distinct drugs is factually false, conflicts with the law's plain text, and negates the purpose of the

statutory rebate, which is keyed to the approval of new drugs for marketing, not simply

regulatory approval of old drugs for a new indication.  Nor has CMS failed to provide a reasoned

analysis for why Mallinckrodt must use the drug's 1990 price to calculate the rebate.  To the

contrary, as CMS has repeatedly explained in writing, Mallinckrodt's attempt to cling to CMS's

2012 view fails because that view was based only on the incomplete facts the company presented

to CMS.  Finally, Mallinckrodt cannot resort to equitable "fair notice" and "retroactivity"

principles to shirk its obligation to remedy its ongoing underpayment of rebates.  "A for-profit

corporation could hardly base an estoppel on the fact that the Government wrongfully allowed it

the interest-free use of taxpayers' money . . . ."  *Heckler v. Cmty. Health Servs. of Crawford Cty.,*

*Inc.*, 467 U.S. 51, 62 (1984).  Yet, that is effectively what Mallinckrodt seeks to do here with the

"hundreds of millions of dollars," *see* Br. at 37-38, underpayment it owes the Medicaid program,

and has agreed to pay in signing its rebate agreement with CMS.  The Court should reject these

arguments and require that the company honor statutory obligations essential to protecting the

Medicaid program.

## BACKGROUND

I.     **Manufacturers May Participate in the Medicaid Program if They Enter into a
       Medicaid Drug Rebate Agreement with CMS.**

The Medicaid Program is a "cooperative federal-state program that provides federal

funding for state medical services to the poor."  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433

(2004); *see* 42 U.S.C. § 1396, *et seq*.  To participate, a state must have a plan for medical

assistance that has been approved by CMS.  42 U.S.C. § 1396a.  "The federal government shares

the cost of providing assistance if the state Medicaid plan meets the regulations set out in

subchapter XIX of the Social Security Act."  *Cookeville Reg'l Med. Ctr. v. Leavitt*, 531 F.3d 844,

845 (D.C. Cir. 2008).  As part of its Medicaid plan, a state may offer outpatient prescription drug coverage.  42 U.S.C. § 1396d(a)(12).  In order to receive Medicaid payment for covered outpatient drugs, the Social Security Act requires drug manufacturers to participate in the Medicaid Drug Rebate Program and to enter into rebate agreements with CMS.  *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, §4401, 104 Stat. 1388, *codified as amended* at 42 U.S.C. § 1396r-8; *see also* 42 U.S.C. § 1396b(i)(10).

The terms of the rebate agreement are set by statute, 42 U.S.C. § 1396r-8(b), and obligate participating manufacturers to pay specified rebates to the states, as determined by a formula set forth in section 1396r-8(c).  The rebate consists of two parts: a "basic rebate" and an "additional rebate."  *Id.* § 1396r-8(c)(1)–(3).  Both are calculated based in part on the "average manufacturer price," or "AMP," of the drug, which is defined as the average price that the manufacturer is paid by wholesalers and retail community pharmacies for the drug.  *Id.* § 1396r-8(k)(1).  The "basic rebate" for "single source drugs" (which, along with "innovator multiple-source drugs," are commonly known as brand-name drugs) is the number of units of the drug paid for under the State plan during the rebate period multiplied by the greater of (1) 23.1 percent of the average manufacturer price and (2) the difference between the average manufacturer price and the "best price" (which is akin to the lowest price offered) of the drug during the prior quarter.  *Id.* § 1396r-8(c)(1).

The "additional rebate" for single source drugs—the statutory requirement that is most relevant here—is calculated, in relevant part, by subtracting the inflation-adjusted average manufacturer price of the drug during the quarter when it was first sold (the "base-date average manufacturer price" or "base-date AMP") from the average manufacturer price for the drug during the quarter for which the rebate is being calculated.  *Id.* § 1396r-8(c)(2)(A)(ii), (B); 42

C.F.R. § 447.509(a)(2).  For drugs approved and marketed prior to the 1990 effective date of the

Program, the statute treats the drug as first marketed during the quarter beginning on July 1,

1990.  42 U.S.C. § 1396r-8(c)(2)(A), (B).  The "additional rebate" is the product of that

calculation and the number of units sold during the rebate period.  *Id.* § 1396r-8(c)(2)(A).  Put

plainly, the "additional rebate" requires manufacturers to rebate the amount that the

manufacturer has increased its drug price beyond the amount necessary to account for inflation.

*See id.* § 1396r-8(c)(2).  A manufacturer must calculate the total rebate (including both the basic

and additional rebate) for each dosage form and strength of a covered outpatient drug paid for

under the state Medicaid plan.  For rebate periods beginning after December 31, 2009, the total

rebate for a single source drug cannot exceed 100% of the drug's average manufacturer price.

*Id.* § 1396r-8(c)(2)(D).

  A manufacturer reports drug information to CMS through the Drug Data Reporting for

Medicaid ("DDR") system managed by CMS, and CMS uses that information to calculate a total

per-unit rebate to share with states.  *See* Medicaid.Gov, Medicaid Drug Rebate Program.[2]  States

use that information to prepare invoices for manufacturers, which must then pay the state within

thirty days.  *See* 42 U.S.C. §§ 1396r-8(b)(1)(A), (b)(2)(A); 42 C.F.R. § 447.511

## II. The FDA Approves New Drugs and Requests to Supplement Previously Approved Drug Applications.

  Under the statute, the rebate must be calculated for "each dosage form and strength" of

each "covered outpatient drug" of a manufacturer that is dispensed and paid for under the state

plan.  42 U.S.C. § 1396r-8(c)(2)(A); *see also id.* § 1396r-8(c)(1).  As relevant here, the Social

Security Act defines a "covered outpatient drug" as a drug approved for safety and effectiveness

---

[2] https://www.medicaid.gov/medicaid/prescription-drugs/medicaid-drug-rebate-program/index.html (last visited July 5, 2019).

under section 505 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(b).  42 U.S.C. § 1396r-8(k)(2).  When a manufacturer submits a new drug application ("NDA") for approval to market a new drug, the FDA assigns that drug a unique six-digit NDA number.  U.S. Food & Drug Admin., *Drugs@FDA Glossary of Terms*.[3]  Following approval, the FDA permits manufacturers to make iterative changes to the drug or its labeling through the supplemental new-drug-application ("sNDA") process.  *See* 21 C.F.R. §§ 314.70–71.  One such change is the addition of a new "indication"—an FDA-approved use that permits a manufacturer to market the drug as safe and effective for treating that condition, but the drug product itself remains the same.  The FDA has explained that after an NDA is approved "[a] request for approval of a new indication, or a modification of a previously approved indication, should be submitted individually in a separate supplement to an approved original application."  Administrative Record ("A.R.") at 906.  Similarly, a change to the strength or concentration of an approved product or the addition of a new strength or concentration generally can be submitted as a supplement to an approved NDA.  A.R. 905.  Each supplement is sequentially numbered (*e.g.* 001, 002, 003), but the drug retains the same six-digit NDA number.  U.S. Food & Drug Admin., *Drugs@FDA Glossary of Terms*.[4]  Generally, a new dosage form of an approved product cannot be submitted in a supplement and requires a separate NDA.  A.R. 903.

Prior to July 27, 2009, when a new indication in a supplemental application needed to be reviewed by an FDA division other than the one responsible for the original NDA, the FDA created a "Type 6 NDA," with an associated NDA number, to "ensure that all of the documents submitted for review in support of a new indication would be sent to the appropriate [d]ivision."

---

[3] https://www.fda.gov/drugs/informationondrugs/ucm079436.htm (last visited July 3, 2019).
[4] https://www.fda.gov/drugs/informationondrugs/ucm079436.htm (last visited July 5, 2019).

6

A.R. 157; *see also* A.R. 940 (Type 6 NDA is assigned when a drug product "duplicates a drug product already approved or marketed in the United States by the same applicant, except that it is intended for a new indication or claim"). Not surprisingly, given their administrative function, such NDAs "are administratively closed upon approval." A.R. 157; *see also* A.R. 81.

A drug approved under a single NDA may be assigned several different national drug code ("NDC") numbers. The NDC number is typically an eleven-digit code that contains the manufacturer's labeler code, the product code, and the package code. *See* 42 C.F.R. § 447.502. Having multiple NDCs, therefore, does not mean that the drug's composition has changed.

### III.   Factual and Procedural Background

#### A. The FDA Approved Adding a New Indication to the Labeling of a Decades-Old Drug.

Acthar is an injection that contains a naturally occurring hormone. Compl. ¶ 27, ECF No. 1. It was first approved in 1952 under NDA 008372. Since then, that NDA has been supplemented more than two dozen times, *see* A.R. 719-27, and Acthar's labeling today has nineteen indications, *see* A.R. 51, 649-664. Acthar has been manufactured by Questcor since 2001. A.R. 51. In 2014, Questcor became a wholly owned subsidiary of Mallinckrodt plc and continued to be known as Questcor Pharmaceuticals until its name was changed first to Mallinckrodt ARD, Inc., and then to Mallinckrodt ARD LLC. *See* Ex. 99-1 to Mallinckrodt plc Sept. 9, 2015 Form 8-K at 1[5]; Mallinckrodt plc April 7, 2014 Form 8-K at 2.[6] This suit is brought by Mallinckrodt ARD LLC, namely Questcor. This brief will refer to Questcor when it was known as Questcor, and to Mallinckrodt after the name change.

---

[5] https://www.sec.gov/Archives/edgar/data/1567892/000119312515315236/d51024dex991.htm (last visited July 3, 2019).
[6] https://www.sec.gov/Archives/edgar/data/1567892/000119312514132587/d708301d8k.htm (last visited July 5, 2019).

In 2006, Questcor submitted a supplemental application, identified as "sNDA 08-372/S-039," seeking to supplement NDA 008372 with an indication for infantile spasms, a seizure disorder that occurs in young children.[7] AR. 52, 609; Compl. ¶ 29. After the FDA started processing the supplemental application, it informed Questcor "that we have created a separate NDA number for your infantile spasm submission for administrative purposes. The new number is NDA 22-432." A.R. 708. Administrative NDA 22-432 was a "Type 6 NDA" because an FDA division other than the one responsible for the parent NDA needed to review the infantile spasms indication. *Id.* at 157, 609.

As explained *supra*, Type 6 NDAs are "administratively closed upon approval." A.R. 81, 157. Therefore, when the FDA approved the infantile spasms indication in 2010, its approval letter explained that all future reports, supplements, and other submissions "should be addressed to the original **NDA 008372** for this drug product, not to this NDA [NDA 22-432]," A.R. 706 (emphasis in original), with the exception of the final printed labeling. As the FDA instructed, "except for the final printed labeling," "[i]n the future, do not make submissions to this NDA." A.R. 706. Also at this time, a number of indications were removed from Acthar's labeling. When Acthar was first approved for use in 1952, the FDA reviewed drugs only for safety but not effectiveness, and at one point the labeling included more than 50 indications. *See* A.R. 355, 509-10. The drug's labeling was therefore revised, although there was no change to the drug's dosage form, strength, composition, or administration.

Upon the 2010 approval, the FDA requested that Questcor "submit a labeling supplement to the parent NDA [008372] for administrative purposes to update the labeling under the parent NDA." A.R. 157. Questcor did so in May 2011, in its own words, "[i]n order for the approval of

---

[7] Previously, Acthar had been used "off-label" to treat infantile spasms. A.R. 170, 621.

the indication for the Treatment of Infantile Spasms to be associated with the parent NDA

number, 08-372, since the tracking NDA number will no longer be used." A.R. 694; *see also id.*

at 700 (submitting final printed carton and container labels as well as package insert and

medication guide to NDA 008372 that were submitted under NDA 022432). The FDA approved

that supplemental application in March 2015, providing "for the indication for the treatment of

infantile spasms to be associated with the parent NDA number 008372, since the tracking NDA

number 022432 will no longer be used." A.R. 688.

     Both before and after the FDA approved adding the infantile spasms indication, Acthar

was marketed under NDA 008372. Consistent with the FDA's directions to not submit anything

further to administrative NDA 022432, which would be closed, Mallinckrodt has regularly

supplemented NDA 008372, most recently in March 2019. A.R. 723. And the FDA's Orange

Book—which "identifies drug products approved" by the FDA,[8] and to which manufacturers

refer to assure the accuracy of their reporting on a drug, *see* A.R. 910, A.R. 961[9]—lists Acthar as

associated with NDA 008372 today (as it did in 2011), and no drug is listed as associated with

administrative NDA 022432. A.R. 713-18.

    **B. Questcor Raises Acthar's Price and Seeks to Avoid Accounting for that Increase
in its Rebate.**

---

[8] U.S. Food & Drug Admin., *Orange Book Preface*, https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface ("The publication, *Approved Drug Products With Therapeutic Equivalence Evaluations* (the List, commonly known as the Orange Book) . . . ").
[9] *Accord* 42 U.S.C. § 1396r-8(k)(7)(A)(i)(I) (defining "multiple source drug" as one where another drug product "is rated as therapeutically equivalent (under [the FDA's] most recent publication of "'Approved Drug Products with Therapeutic Equivalence Evaluations'"); *Medicaid Program; Covered Outpatient Drugs*, 81 Fed. Reg. 5170-01, 5191, 5297 (Feb. 1, 2016).

Meanwhile, Questcor raised the price of the decades-old drug dramatically.  In 2007, Questcor increased the price from $1,650 per unit to $23,269 per unit, a roughly 1300 percent increase.  *See* A.R. 51.  But Congress intended the Medicaid Drug Rebate Program to be insulated from such price hikes—the statutorily-prescribed "additional rebate" requires a manufacturer to pay the difference between the drug's new price and the drug's base date AMP, which in this instance is the inflation-adjusted price of Acthar in 1990, roughly ▮▮▮  *See* 42 U.S.C. § 1396r-8(c)(2)(A); *see* A.R. 1089.

In May 2012, Questcor approached CMS to try to reset Acthar's base date AMP based on the FDA's 2010 approval of "Acthar for use in treating the orphan condition of infantile spasms" and the "significant revisions to the Acthar label."  A.R. 619.  Questcor failed to disclose to CMS that Acthar was not approved as a new drug to be marketed under a new NDA, that the new NDA number was "for administrative purposes," A.R. 708, and that such "tracking NDA number" would "no longer be used," A.R. 694.  Nor did Questcor explain that the FDA's 2010 approval of the infantile spasms indication directed the company to use the original NDA for future submissions.  *See* A.R. 706.  Instead, and without providing any context, Questcor's letter included a footnote stating that "the FDA has informed Questcor that the agency intends to revise its record so that the approval for infantile spasms is reflected as part of the product's original NDA, No. 08-372.  That has not yet occurred."  A.R. 621.  Notwithstanding its omissions, Questcor proposed two options for resetting the base date AMP:  first, to reset Acthar's base date AMP upon issuance of a proposed rule that would permit manufacturers to restate the base date AMP under certain circumstances, and second, to reset the base date AMP based on the assignment of a new National Drug Code, which in turn was based on "the recent FDA approval and label revision."  A.R. 624.

On August 6, 2012, CMS responded without adopting either option's rationale. It specifically rejected the reasoning underlying Questcor's second option, explaining that under 42 U.S.C. § 1396r-8(c)(2)(A), the base date AMP is "calculated based on the new drug application which is approved by the FDA, not the national drug code (NDC)." A.R. 617. Nevertheless, CMS stated that Questcor could set a new base date AMP "in accordance with" section 1396r-8(c)(2)(A) because "the recently approved Acthar Gel was approved under a different ND[A] [*sic*] from the original product."[10] *Id.* CMS made clear, however, that its view was "limited to and based on the facts and information presented to us," "has no applicability to a different set of facts even if such facts appear similar in nature or in scope," and is not a "release of liability." *Id.*

Questcor then began to report in the Drug Data Reporting for Medicaid ("DDR") system that Acthar was approved in 2010 and first marketed in 2013.[11] A.R. 1083. The financial advantage to Questcor is extraordinary. As explained above, the "additional rebate" requires a manufacturer to rebate the amount it increased a drug's prices since 1990 beyond the amount needed to account for inflation. *See* 42 U.S.C. § 1396r-8(c)(2)(A) ("additional rebate" is the difference between the AMP for the relevant quarter and the base date AMP as adjusted by an inflation factor). By using the average price paid for the drug from 2013, which is approximately

---

[10] The phrase initially read: "the recently approved Acthar Gel was approved under a different NDC from the original product." A.R. 617. CMS later wrote Questcor to correct the typo, explaining that the term "NDC" in the sentence should have been "NDA." A.R. 169. Mallinckrodt's brief repeatedly cites this letter as if CMS had considered the issue twice, *e.g.*, Br. at 28, when the letter was merely correcting a typo in the August 6, 2012 letter. *But see* Br. at 14 n. 27 ("While the agency referred to an 'NDC' here, instead of an 'NDA,' that was a scrivener's error, as its subsequent letter (Exhibit 4) confirmed.").

[11] Not surprisingly given this reporting and the information that Questcor failed to disclose in 2012, when a state Medicaid employee asked CMS in 2013 why Acthar had a different base date AMP, the agency responded that "[t]he new Acthar H.P. NDC is being marketed pursuant to a new NDA, and therefore the product has a different base AMP quarter." A.R. 161.

████ as opposed to the price paid from 1990, which is approximately ████ to calculate its base date AMP, Questcor has effectively avoided paying rebates on the drug's dramatic price increases, clearly in contravention of the statutory design. *See* A.R. 1083, 1089.[12]

In 2015, CMS noticed a discrepancy as to Acthar's NDA numbers. It asked the FDA "about the NDA number under which Acthar Gel is being marketed." A.R. 159-60. The FDA responded that " the only active NDA for HP Acthar Gel is 008372." A.R. 159. The FDA later also explained that administrative NDA number 022432 was no longer being used because it was a Type 6 NDA "created for administrative purposes" and "administratively closed upon approval." A.R. 157.

### C. CMS Has Repeatedly Asked Mallinckrodt to Correct Acthar's Base Date AMP.

On April 13, 2016, CMS wrote Mallinckrodt that it "ha[d] recently come to" the agency's attention that Acthar "is marketed under NDA 008372 not NDA 022432," and as such, Mallinckrodt must correct Acthar's NDA number in the DDR system. A.R. 151. And because the base date AMP is tied to the NDA number, as illustrated in Manufacturer Release 90, *see* A.R. 915-16, CMS told Mallinckrodt that it must also change the base date AMP to the one associated with NDA 008372. A.R. 151. Mallinckrodt responded by providing CMS with its 2012 correspondence with CMS, A.R. 84-85, to which CMS explained in June that it was aware of such correspondence but "the baseline data of a purchased product should be the same as the

---

[12] In the DDR system, Acthar's base AMP is reported per milliliter, *see* Medicaid.gov, *Product Data for Drugs in the Medicaid Drug Rebate Program*, https://www.medicaid.gov/medicaid/prescription-drugs/medicaid-drug-rebate-program/data/index.html (last visited July 5, 2019) ("data definitions" link identifying a milliliter as an acceptable unit type, and defining units per package size as "[t]he total number of units in the smallest dispensable amount for the 11-digit NDC."), and the drug is produced and distributed in 5 milliliter vials, A.R. 649. The average manufacturer price for the first quarter of 2019 was listed as ████ per milliliter. A.R. 1086.

baseline data of a product marketed previously under the same NDA." A.R. 83-84.  CMS again

requested Mallinckrodt to correct the baseline information so that it matches what "was

originally used for marketing the product."  *Id.*

In July, seizing on CMS's reference to Acthar as a "purchased product," Mallinckrodt

responded that its "purchase of Acthar from Questcor in August 2014 was not the basis of

CMS'[s]" August 6, 2012 letter.  A.R. 83.  Mallinckrodt further insisted that it was correctly

using "NDA 022432 as its FDA application number."  *Id.*  "We have gone back and confirmed,"

Mallinckrodt said, "that this was, in fact, the correct FDA assigned application number for the

approval of the product that was discussed" in CMS's August 2012 letter.  *Id.*  Still failing to

make the necessary correction as requested by CMS in its April 13, 2016 letter, Mallinckrodt

wrote CMS later in July that it had "clarified the pre-existing FDA Online Label Repository

listing to list NDA 022432, consistent with CMS'[s] letter and analysis" *from August 2012.*  A.R.

82.

In March 2017, CMS responded that while it "agree[d] that the new indication for Acthar

was approved under NDA 022432," the FDA had confirmed that "NDA 022432, a type-6 NDA,

was created for administrative purposes" because the application for the new indication was

reviewed by a different FDA division than the one responsible for the original NDA, and that

such "type-6 NDAs are administratively closed upon approval."  A.R. 81; *see also, e.g.*, A.R.

708 (Questcor told by the FDA that NDA 022432 was "for administrative purposes"); A.R. 891.

Therefore, CMS further explained, it "underst[ood] that the marketing of the drug has always

been under the auspices of NDA 008372, regardless of the administratively assigned NDA

022432, which was only for the purpose of FDA approval of the new indication, but not for the

approval and marketing of the drug itself."  A.R. 81; *see also, e.g.*, A.R. 694 (Questcor seeks to

13

supplement "the parent NDA number, 08-372, since the tracking NDA number [would] no longer be used."). Because Acthar was approved in 1952 under NDA 008372, the agency concluded that under section 1927 of the Social Security Act "the baseline data for the drug that is marketed under that NDA would be based on data from 9/30/1990 as the approval of NDA 022432 in 2010 was not for approval of a new drug." A.R. 81.

Mallinckrodt still refused to take corrective action. Instead, it wrote back that "CMS' confirmation that 'the new indication for Acthar was approved under NDA 022432" was "significant[] because it confirms the basis CMS gave in its August 6, 2012 communication to Questcor." A.R. 80. Mallinckrodt stated that it "believe[d] the agency's conclusion was correct in 2012 and remains correct now," and that "NDA 022432 represented a very significant set of events" because of changes to the drug's label and completion of certain FDA requirements during the approval of the new indication. *Id.* As for the fact that administrative NDA 022432 was a Type 6 NDA, Mallinckrodt insisted that the "statute speaks directly to the importance of an approval of an NDA; it is irrelevant under the statute whether an NDA was a 'type 6'." *Id.* Mallinckrodt did not address CMS's explanation that the drug was marketed under NDA 008372.

On November 6, 2018, after Mallinckrodt had still not taken corrective action, CMS sent the company yet another letter, requesting Mallinckrodt to do so within 30 days or Acthar would be identified "as 'out of compliance' in the DDR system." A.R. 106. CMS also indicated that it may consider referring Mallinckrodt to the Department of Justice and/or the Office of the Inspector General of the U.S. Department of Health and Human Services ("HHS-OIG"). *Id.*

CMS nevertheless continued to try to work cooperatively with Mallinckrodt. At a meeting with CMS in March 2019, *see* A.R. 24, Mallinckrodt claimed that the FDA approved

Acthar "under an original NDA both in fact and as a matter of law," and that "Acthar with the [infantile spasms] indication is in fact a new product," *id.* at 27 (emphasis removed)—a clear departure from the predicate of the two "options" Questor presented to CMS in 2012 to reset the base date AMP, which did not claim that the FDA approved a new drug. Thereafter, CMS wrote Mallinckrodt to reiterate that Acthar's base date AMP "should reflect the base date AMP for the drug that was first produced or distributed under [NDA] 008372." A.R. 13. Again, "[b]ecause H.P. Acthar Gel is currently, and always has been, produced or distributed under NDA 008372," CMS explained, "the base date AMP Mallinckrodt is reporting to the [DDR] system does not reflect the appropriate base date AMP, and Mallinckrodt has been underpaying Medicaid rebates for H.P. Acthar Gel." *Id.*

After Mallinckrodt still did not correct its information, CMS sent another letter on May 10, 2019, reaffirming that the agency's April 13, 2016 letter "constituted the agency's final decision on this issue" and requesting that Mallinckrodt correct Acthar's base date AMP "within 14 days of receiving this notice." A.R. 2. Otherwise, the agency warned that it would identify Acthar "as 'out of compliance' in the DDR system," which means that "the submission of pricing records or updates to product data [would] not be allowed online or via file transfer." CMS also indicated that it may also refer the matter to the Department of Justice or HHS-OIG for further review and investigation. *Id.*

Rather than correct Acthar's information, Mallinckrodt brought this suit along with a motion for a preliminary injunction. The Court "consolidate[d] the motion for a preliminary injunction ("PI") with the merits." May 24, 2019 Order. In order to provide the Court with sufficient time to adjudicate the case, Defendants agreed to refrain from locking Mallinckrodt out of the DDR system during the pendency of district court litigation. *See* June 7, 2019 Order; ECF

No. 13 at 3-4. The Court further ordered on June 7 that CMS not lock Mallinckrodt out of the DDR until three days after the Court's ruling. June 7, 2019 Order.

## STANDARD OF REVIEW

Summary judgment must be granted to a party who has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the APA context, the district court's function is generally to determine whether the evidence in the certified administrative record permitted the agency to make the decision it did. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, 130 F. Supp. 3d 81, 89 (D.D.C. 2015).

Under the APA, a court may only set aside a final agency action if it is "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or unsupported by substantial evidence." *Lozowski v. Mineta*, 292 F.3d 840, 845 (D.C. Cir. 2002) (citing 5 U.S.C. § 706). This standard of review is narrow, as the court "is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). "The question [a court] must answer . . . is not whether record evidence supports [a plaintiff's] version of events, but whether it supports [the agency's]." *Fla. Mun. Power Agency v. F.E.R.C.*, 315 F.3d 362, 368 (D.C. Cir. 2003).

## ARGUMENT

### I.     CMS's Determination That Mallinckrodt Is Using an Incorrect Base Date AMP is not Arbitrary or Capricious or Contrary to Law.

Mallinckrodt cannot show that CMS acted arbitrarily, capriciously, or contrary to law. Acthar remains the same drug today as it was before the infantile spasms indication was added to its labeling. CMS simply requests that Mallinckrodt use the same baseline information to calculate the drug's rebate as had been used since the Medicaid Drug Rebate Program started in 1990. For three years, CMS also repeatedly explained why Mallinckrodt must do so to comply with the statute. Mallinckrodt nevertheless argues that CMS's position conflicts with the law and is not adequately explained, and that the government is essentially estopped from requiring Mallinckrodt to remit the significant underpayment it owes Medicaid. Each point fails.

### A.  CMS Correctly Determined that Acthar's Base Date AMP Needs to Be Revised, and Mallinckrodt's Cramped Reading of the Law Does Not Show Otherwise.

#### 1.  A Straightforward Application of the Statute Shows that CMS Correctly Told Mallinckrodt to Fix Acthar's Base Date AMP.

CMS has correctly interpreted the relevant statutory provisions to conclude that Mallinckrodt needs to revise Acthar's base date AMP. Specifically, the statute requires that a manufacturer pay, "with respect to each dosage form and strength of a single source drug," the difference between the current average manufacturer price and the base date AMP, as adjusted for inflation. 42 U.S.C. § 1396r-8(c)(2)(A). If the drug was approved by the FDA before October 1, 1990, the base date AMP is the average manufacturer price "for the calendar quarter beginning July 1, 1990," but if the drug was approved and "first marketed" after October 1, 1990, the statute sets the base date AMP as the average manufacturer price in "the first full calendar quarter after the day on which the drug was first marketed." *Id.* § 1396r-8(c)(2)(A), (B). Thus, the statute sets the base date AMP for each dosage form and strength of a single

17

source drug, such as Acthar, by reference to the FDA's approval of a NDA under which the drug

is marketed.  Changes to an existing product result in a new base date AMP only if those changes

result in a new drug being marketed under a new NDA or the changes are to dosage form or

strength.

Here, Acthar was approved in 1952 under NDA 008372 and is marketed under that NDA.

*See supra* III.A; *see infra* Part I.A.2.  Although an infantile spasms indication was added to the

drug's labeling in 2010, there was no change to the drug "dosage form and strength," as required

by the statute to warrant a new base date AMP.[13]  And the 2010 labeling change did not create a

new drug; rather, the drug's composition remained the same and the drug has been marketed

only under the original FDA approval from 1952, NDA 008372.  *See supra* Part. III.A; *see infra*

Part I.A.2.  Thus, under the rebate statute, the base date AMP for Acthar is the average

manufacturer price "for the calendar quarter beginning July 1, 1990."  *See* A.R. 151; 42 U.S.C.

§ 1396r-8(c)(2)(A)(ii)(II).

    *2.  Mallinckrodt's Argument to the Contrary Is Not Supported by the Definition of the "Single Source Drug" or the Rest of the Statute.*

Seeking to avoid this straightforward conclusion and without relying on the above-

discussed provisions governing a drug's base date AMP, 42 U.S.C. § 1396r-8(c)(2)(A) and (B),

Mallinckrodt singularly focuses on the statutory and regulatory provisions that define a "single

source drug" to mean "a covered outpatient drug . . . which is produced or distributed under a

---

[13] Even as late as February 2019, Mallinckrodt plc has explained that Acthar "was originally approved by the FDA in 1952," and that "in connection with the [the FDA's] review of a supplemental NDA," the drug's label changed by adding the infantile spasms indication and removing others.  *See* Mallinckrodt plc Form 10-K (February 26, 2019) at 32, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1567892/000156789219000009/mnk10-k122818.htm (last visited July 3, 2019).

18

new drug application approved by the [FDA]." 42 U.S.C. § 1396r-8(k)(7)(A)(iv)[14]; 42 C.F.R. § 447.502 ("Single source drug means a covered outpatient drug that is produced or distributed under an original NDA approved by FDA and has an approved NDA number issued by FDA . . ."). Because those provisions reference new drug applications approved by the FDA, Mallinckrodt argues that the FDA's approval of the infantile spasms indication under a "Type 6" NDA in 2010 means a new "single source drug" was approved in 2010, such that "[t]here are two Acthars," justifying a new base date AMP. Br. at 1 n.1, 21-23.

Mallinckrodt's contorted reading is meritless. The FDA's approval of administrative NDA 022432 did not create a new "single source drug" distinct from the original product. That term is defined to require that the drug be "produced or distributed" under an NDA, and that NDA has always been 008372.[15] Put differently, Acthar has never been produced or distributed under NDA 022432 because that number existed solely for the FDA's administrative purposes and was closed upon approval. Even Mallinckrodt must acknowledge that the manufacturer initially sought to add the infantile spasms indication by supplementing the original NDA 008372. *See* Compl. ¶ 29; Br. at 10. As a matter of agency practice and convenience, the FDA converted that supplemental application into a "Type 6" NDA because the indication was to be reviewed by a division other than the one responsible for the original NDA, and the

---

[14] Mallinckrodt is mistaken that the "agency does not appear to have endorsed any single interpretation" of the phrase "single source drug." Br. at 25. The statute identifies each single source drug based on the "new drug application approved by the Food and Drug Administration" under which it is "produced or distributed." 42 U.S.C. § 1396r-8(k)(7)(A)(iv). And CMS has interpreted that definition to equate "produced or distributed" with "market[ed]." 42 C.F.R. § 447.502.

[15] The definitional provision appears in Section 1396r-8(k)(7), which is concerned with differentiating between categories of drugs—"single source drug," "innovator multiple source drug," and "noninnovator multiple source drug." Indeed, rebates are calculated differently depending on a drug's category. *See id.* § 1396r-8(c)(1)-(2) (rebates for single source drugs and innovator multiple source drugs); § 1396r-8(c)(3) (rebates other drugs).

administrative Type 6 NDA designation helped "ensure that all of the documents submitted for review in support of [the] new indication would be sent to the appropriate [d]ivision." A.R. 157.

Questcor knew all along that this conversion would not impact the NDA under which the drug was marketed—the FDA expressly informed the company in 2008 that the creation of NDA 022432 was for "administrative purposes," A.R. 708, and a publicly-available FDA memorandum from that time explained that the Type 6 NDA was created because a different division was reviewing the infantile spasms indication, *see* A.R. 891. And when the FDA approved the infantile spams indication in 2010, the FDA expressly directed the manufacturer that all future reports, "supplements, and other submissions *should be addressed to the original NDA 008372 for this drug product, not to this NDA [NDA 022432]*." A.R. 706 (emphasis added). The FDA also instructed that "[i]n the future, do not make submissions to this NDA except for the final printed labeling" that it had directed Mallinckrodt to promptly provide. *Id.*

Questcor even acknowledged NDA 022432's administrative function after the approval of the infantile spasms indication. In May 2011, after the approval of the infantile spasms indication, the manufacturer sought to supplement NDA 008372 with Acthar's approved package insert and medication guide, as well as the final printed carton and container label. Questcor explained that this supplemental new drug application was "[i]n order for the approval of the indication for the Treatment of Infantile Spasms to be associated with the parent NDA number, 08-372, since the tracking NDA number will no longer be used." A.R. 694; *see also id.* at 700 (submitting final printed carton and container labels as well as package insert and medication guide to NDA 008372 that were submitted under NDA 022432). The FDA approved that supplemental application to provide "for the indication for the treatment of infantile spasms to be

20

associated with the parent NDA number 008372, since the tracking NDA number 022432 [would] no longer be used." A.R. 688.

It is beyond dispute that throughout the entire history of Acthar's inclusion in the Medicaid Drug Rebate Programs, Acthar has remained the same covered outpatient drug that is produced and distributed under the same NDA that dates back to 1952, not the administrative NDA 022432. The manufacturer has regularly supplemented NDA 008372 since 1952. A.R. 719-27. Mallinckrodt did so as recently as March 2019. A.R. 723. Moreover, the FDA's Orange Book lists Acthar as associated with NDA 008372, and no drug is associated with administrative NDA 022432. A.R. 713-18. The FDA has also "confirmed that the only active NDA for HP Acthar Gel is 008372." A.R. 155.

Mallinckrodt's attempts to resuscitate administrative NDA 022432 fail. Mallinckrodt argues that Acthar is listed under 022432 on Drugs@FDA. Br. at 23. But that listing plainly shows that the administrative NDA was closed after approval—it has *no* supplemental history (unlike NDA 008372's listing) and states that *Questcor* (not Mallinckrodt) is the drug's manufacturer. Thus, the website reflects no more than the undisputed fact that Acthar was approved for the infantile spasms indication under NDA 022432; it does not cast doubt on the fact that Acthar has always been produced or distributed under the original NDA. The same is true with respect to the FDA's letter approving orphan drug exclusivity for infantile spasms, upon which Mallinckrodt also relies. *See* Ex. 1 to Compl, ECF No. 1-6. The FDA simply tied the seven-year exclusivity for infantile spasms to the date of the approval of the indication under administrative NDA 22432. *Id.* And though Mallinckrodt points to the NDC Directory's listing of Acthar under 022432, the information in that directory is *provided by manufacturers*, and the FDA has made clear that "[i]nclusion of [the] information in the NDC Directory does not

21

indicate that [the] FDA has verified the information provided." U.S. Food & Drug Admin., *Nat'l Drug Code Directory.*[16] Mallinckrodt's decision to incorrectly associate Acthar with administrative NDA 022432—like it apparently does in importing an ingredient, Br. at 23—in no way revives the administrative NDA number that was closed upon approval.

Not only is Mallinckrodt's argument foreclosed by the definition of "single source drug," its interpretation negates the purpose of the Medicaid Drug Rebate Program. *See New York State Dept. of Social Servs. v. Dublino,* 413 U.S. 405, 419-20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes."). "Congress established the Medicaid Drug Rebate Program to further reduce Medicaid spending," *see Iowa Dep't of Human Servs. v. CMS,* 576 F.3d 885, 886 (8th Cir. 2009), and the "additional rebate" required by the statute safeguards the program against dramatic drug price increases, such as Acthar's. It requires manufacturers to increase their rebate by the same amount that they increase their drug's price beyond the amount required to account for inflation. Acthar's dramatic price hike illustrates the importance of such safeguards for the Medicaid program. Yet Mallinckrodt's interpretation would frustrate entirely the purpose of that safeguard and allow the company to reap "hundreds of millions of dollars" at the expense of the Medicaid program, *see* Br. at 37-38.

Moreover, Mallinckrodt's interpretation would set a new base date AMP for the drug even when it is used by patients for one of the drug's *eighteen* other indications, despite the fact that those indications all predate the FDA's use of the administrative NDA for infantile spasms, and despite the fact that NDA 008372 remains the only active NDA. *See* A.R. 51, 159, 355. Such an outcome is plainly unwarranted given that Mallinckrodt cannot contend that the drug's

---

[16] *See* https://www.fda.gov/drugs/drug-approvals-and-databases/national-drug-code-directory (last visited July 5, 2019).

composition, dosage form or strength changed in 2010.  *See Kaseman v. D.C.*, 444 F.3d 637, 642

(D.C. Cir. 2006) ("statutes should be interpreted to avoid . . . unreasonable results, or unjust or

absurd consequences.") (citation omitted).  And there is no reason to think that such a loss to the

Medicaid program would be limited to this matter—Mallinckrodt's theory would reset the base

date AMP whenever the manufacturer added a new indication without changing the drug itself,

and the FDA used Type 6 NDAs as a matter of administrative convenience when reviewing

applications to add the indication.  A.R. 157.  Congress clearly intended Medicaid to pay the

same price for the same drug as when the drug was first brought to market or as in 1990,

whichever is later, unless the dosage form or strength has changed or a new drug is approved.

None of those conditions has occurred.

Because Mallinckrodt cannot show that the 2010 approval of the infantile spasms

indication created a new "single source drug," its related argument regarding the "narrow

exception" to 42 C.F.R. § 447.502's definition of that term, Br. at 27-28, is irrelevant.  That

exception applies to drugs that are "produced or distributed" under an NDA but may nevertheless

be excluded from being considered a "single source drug."  42 C.F.R. § 447.502.  The regulation

has nothing to do with whether one covered outpatient drug could be considered two distinct

drugs such that it could have two different base date AMPs, as is the issue here.

In sum, CMS's determination that Mallinckrodt needs to correct Acthar's base date AMP

fully accords with the law.

### B. CMS Clearly Explained to Mallinckrodt Why the Company Has Failed to Comply With the Statute in Calculating Rebates.

Next, Mallinckrodt argues that "CMS has failed to explain its abrupt change in position"

from when CMS said that the manufacturer could set a new base date AMP.  Br. at 29.

The argument fails because there was no "abrupt change in position." CMS's August 6, 2012 letter reflects a straightforward application of the statute, first setting out the statutory standard from Section 1927(c)(2)(A) of the Social Security Act, codified at 42 U.S.C. § 1396r-8(c)(2)(A), and then explaining that "in accordance with that provision," CMS believed that "Acthar Gel is eligible for a new base date AMP" because "the recently approved Acthar Gel was approved under a different ND[A] from the original product." A.R. 617. CMS clearly was not making a policy decision, but was simply construing the statute based on the information it received from Questcor. Indeed, CMS specifically made clear that its decision was "limited to and based on the facts and information presented to us," "ha[d] no applicability to a different set of facts even if such facts appear similar in nature or in scope," and was not a "release of liability." *Id.*

CMS's letter was clear that if Acthar was not "approved under a different ND[A] from the original product," then a new base date AMP could not be set under Section 1927(c)(2)(A). *Id.* That was exactly the case. Questcor did not disclose to CMS the crucial information that the FDA did not in fact approve Acthar as a new drug that would be marketed under a new NDA, but only approved the infantile spasms indication to be added to the labeling; that administrative NDA 022432 was merely a "tracking NDA number" that would be administratively closed and "no longer be used"; that the FDA's 2010 approval letter directed the company to make future submissions under the original NDA 008372; and that the only active NDA for Acthar is 008372. *See* A.R. 619-646. All Questcor disclosed was a vague footnote without context: "the FDA has informed Questcor that the agency intends to revise its record so that the approval for infantile spasms is reflected as part of the product's original NDA, No. 08-372." A.R. 621. That footnote plainly is insufficient to inform CMS of the relevant facts.

24

Not surprisingly then when CMS learned of the relevant facts, it came to a different conclusion, again, based on a straightforward application of the statute.  CMS therefore acted consistently in both 2012 and 2016 by applying the same statutory provision to determine Acthar's base date AMP.  And contrary to Mallinckrodt's assertions, that consistent application to two different sets of facts did not create "conflicting precedent," Br. at 28, simply because it led to two different outcomes.  CMS's 2016 decision was not arbitrary or capricious.  *See United Source One, Inc. v. U.S. Dep't of Agric., Food Safety & Inspection Serv.*, 865 F.3d 710, 717 (D.C. Cir. 2017) (holding that "there was no departure from *precedent*—no prior policies and standards were deliberately changed," where agency corrected inspectors' earlier "failure to verify" that plaintiff correctly branded its product) (internal quotation marks and citation omitted); *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 783 F. Supp. 1426, 1427 (D.D.C. 1992) (holding that even where agency announced a new rule disallowing regulated entities from engaging in a practice the agency had "long condoned," the new rule "was not a reversal of prior agency action" because the "prior inaction" did not comprise any "official or affirmative decision" to allow the practice).

In fact, CMS's August 2012 letter is also clear that the opinion expressed therein was not intended to release Mallinckrodt from any statutory liability.  Congress set the terms of the drug rebate calculation, and the statute does not give CMS the authority to deviate from it.  Indeed, even had CMS tried to deviate from the statute (which it plainly had not), the "the general rule" is "that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law."  *Heckler*, 467 U.S. at 63.

In any event, CMS has also thoroughly explained to Mallinckrodt why its consistent application of the law has led to two different outcomes, and thus CMS readily satisfied the

25

requirement of a "reasoned analysis." *Springfield, Inc. v. Buckles*, 292 F.3d 813, 819 (D.C. Cir. 2002) ("agency views may change," and "courts may require only a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored").

The above discussion makes clear that in 2012, CMS mistakenly understood that the infantile spasms indication was approved under a new NDA number and thus marketed under that number. *Cf.* A.R. 161. In the 2016 letter, CMS explained that, in light of a discrepancy regarding Achtar's listed NDA number, the agency "ha[d] reviewed the approval status of H.P. Acthar Gel" and determined that "H.P. Acthar Gel is marketed under NDA 008372 not NDA 022432." A.R. 151. To support this conclusion, CMS cited the FDA's 2010 approval letter of the infantile spasms indication, noting in particular the FDA's instruction that future submissions concerning Acthar "should be addressed to the original NDA 008372 for this drug product, not to this NDA [022432]." *Id.* CMS also pointed out that the manufacturer itself had listed Acthar as approved under NDA 008372 on the FDA Online Label Repository. *Id.* And because baseline data follows the NDA, CMS directed Mallinckrodt to revise Acthar's base date AMP to accord with the drug's original baseline data. *See id.*

The 2016 letter by itself already amply demonstrates why CMS's 2012 view was based on a false factual premise, and thus, Mallinckrodt is wrong to accuse CMS of not acknowledging the view expressed in the 2012 letter. CMS expressly "reviewed the approval status" of Acthar, which was the *basis* for its 2012 view, and provided a "reasoned analysis" showing that the agency's reliance on that status was "deliberately changed, not casually ignored." *Springfield*, 292 F.3d at 819. And none of this should have surprised Mallinckrodt—CMS's 2012 letter stated that the agency's views expressed therein were limited to the facts presented to it, and

26

Questcor knew, but failed to do disclose, that the FDA's approval of administrative NDA 022432 was not an approval of a new drug distinct from the original product.

Of course, the April 2016 letter was only the first of CMS's repeated explanations to Mallinckrodt regarding why Mallinckrodt could not rely on the agency's 2012 letter and why Acthar's base date AMP needed to be corrected. After Mallinckrodt asked CMS to "[p]lease advise if we are required to make any changes to the DDR," and provided CMS with a copy of Questcor's 2012 correspondence with the agency, A.R. 85, CMS responded that it was "aware of the correspondence" but that Acthar's baseline data should match what it was when the drug was originally marketed under the same NDA. A.R. 83-84.

Then, after Mallinckrodt noted that CMS previously had cited administrative NDA 022432 in agreeing that Acthar could have a new base date AMP, A.R. 82-83, CMS explained what Mallinckrodt already knew, which is that the "FDA . . . confirmed that NDA 022432, a type-6 NDA, was created for administrative purposes"; that such "type-6 NDAs are administratively closed upon approval"; and therefore "that the marketing of the drug has always been under the auspices of NDA 008372, regardless of the administratively assigned NDA 022432, which was only for the purpose of FDA approval of the new indication, but not for the approval and marketing of the drug itself." A.R. 81. And because NDA 008372 for Acthar was approved in 1952, CMS further explained that "the baseline data for the drug that is marketed under that NDA would be based on data from 9/30/1990[,] as the approval of NDA 022432 in 2010 was not for approval of a new drug." *Id.*

Finally, in March 2019, after the parties had a meeting, CMS wrote again to reiterate that Acthar's base date AMP "should reflect the base date AMP for the drug that was first produced or distributed under [NDA] 008372." A.R. 13. CMS explained that "[b]ecause H.P. Acthar Gel

27

is currently, and always has been, produced or distributed under NDA 008372," Mallinckrodt is reporting the wrong base date AMP.  *Id.*

The record thus clearly shows why CMS pivoted from its 2012 view.  The agency's explanations fully satisfy the APA standard here.  *Cf. Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."); *see Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007) ("[O]ur standard of review under the arbitrary and capricious test is only reasonableness, not perfection.").  Mallinckrodt is a sophisticated pharmaceutical company familiar with the FDA drug application process and in possession of all the relevant facts necessary to determine whether Acthar was entitled to a new base date AMP in 2012 under the statute, when there had been no change to the dosage form or strength of the drug.  *See Heckler,* 467 U.S. at 63.  It also knew that CMS's 2012 view was based on a faulty factual premise supplied by Questcor.  Mallinckrodt's claim of ignorance and confusion about why CMS pivoted from its 2012 position therefore is implausible.

Similarly, Mallinckrodt's assertion that CMS provided "ever-shifting" explanations, Br. at 24, is belied by the record.  According to Mallinckrodt, CMS purportedly determined in April 2016 that the base date AMP was incorrect because Mallinckrodt listed the wrong NDA number in the On-Line Label Repository.  *See id.*  That was not CMS's position.  Rather, CMS referenced the online label repository merely to explain why the agency decided to review the approval status of Acthar in the first place; the agency noticed a "discrepancy" between the Repository and Drugs@FDA as to Acthar's NDA number.  A.R. 151.

CMS also did not suggest that the need to correct the base date AMP was triggered by Questcor's merger with Mallinckrodt plc and thus pursuant to Manufacture Release Number 90.

28

*See* Br. at 24. After Mallinckrodt provided the parties' 2012 correspondence to CMS, A.R. 139-49, CMS responded that Acthar's baseline data should match that from when the drug was originally marketed under the same NDA, A.R. 133. CMS referred to Acthar as a "purchased product," which made sense because Mallinckrodt plc had purchased Questcor (and thus Acthar) since the cited correspondence. Further, the principle underlying Manufacturer Release No. 90 applied; the base date AMP of a drug follows the NDA, hence Mallinckrodt's need to correct the base date AMP. *See* A.R. 915-16. And Mallinckrodt's accusation that CMS shifted its explanation when it said that Acthar is "produced or distributed" under NDA 008372 in its March 12, 2019 letter, *see* Br. at 24; A.R. 13, should be dismissed out of hand. The agency was merely responding to Mallinckrodt's new argument that Acthar is entitled to a new base date AMP because it is purportedly produced or distributed under administrative NDA 022432. AR 58; AR 34, 36-37. In any event, the phrase "produced or distributed" is coterminous with the base date AMP provision's use of "marketed."

In sum, the agency clearly explained to Mallinckrodt why it needed to correct the base date AMP notwithstanding the 2012 correspondence.

## C. No Equitable Principle Excuses Mallinckrodt's Obligation to Remedy Its Underpayment of Rebates.

Mallinckrodt attempts to invoke equitable principles to avoid paying the "hundreds of millions of dollars," Br. at 37-38, it owes the Medicaid program. Again seizing on CMS's 2012 communications, Mallinckrodt claims that it lacked "fair notice" of the need to use the 1990 base date AMP, Br. at 32, and that adopting CMS's interpretation of the statute "retroactively back to 2013 would work . . . a manifest injustice," *id.* at 34.

Mallinckrodt's fairness arguments essentially amounts to a claim of equitable estoppel against the government. Mallinckrodt, however, does not expressly invoke the doctrine because

29

it evidently recognizes that it cannot satisfy the doctrine's "exacting" standard. There is a "clear presumption in this Circuit against invoking the doctrine . . . against government actors in any but the most extreme circumstances." *United States ex rel. Landis v. Tailwind Sports Corp.*, 308 F.R.D. 1, 5 (D.D.C. 2015) (citation omitted); *see also, e.g.*, *Office of Pers. Mgmt. v. Richmond,* 496 U.S. 414,415-16 (1990) (holding that "erroneous oral and written advice given by a Government employee to a benefits claimant" does not "give rise to estoppel against the Government and so entitle the claimant to a monetary payment not otherwise permitted by law"); *Auto. Club of Michigan v. Comm'r of Internal Revenue,* 353 U.S. 180, 183 (1957) (holding that "doctrine of equitable estoppel is not a bar to the correction by [an agency] of a mistake of law"). Among other things, a plaintiff must show that the government has engaged in "affirmative misconduct," *Keating v. FERC*, 569 F.3d 427, 434 (D.C. Cir. 2009) (citation omitted) (discussing standard), which Mallinckrodt clearly cannot do.

The preceding discussions already make clear that rather than any affirmative conduct on the part of CMS, it was Questcor's lack of candor that led to CMS's conclusion in 2012. Moreover, Mallinckrodt is "expected to know the law," *Heckler*, 467 U.S. at 63, and its rebate obligations are clearly provided by the statute. The rebate agreements it signed also informed Mallinckrodt that it would need to rectify any past underpayment. A.R. 1023, 1034, 1063, 1077. And since at least 2016, CMS has repeatedly explained to Mallinckrodt its obligation to rectify the underpayment. Thus, Mallinckrodt can hardly be heard to complain that it now needs to pay back the hundreds and millions it owes Medicaid but has been using interest-free at taxpayers' expense.

Against this backdrop, Mallinckrodt's attempt to get around the equitable estoppel doctrine by arguing the lack of "fair notice" or by relying on "retroactivity" principles fails.

*1.  Mallinckrodt Cannot Invoke the "Fair Notice" Doctrine Because the Money Belongs to the Medicaid Program.*

Mallinckrodt has no entitlement to the rebate wrongfully withheld from the Medicaid program, yet it invokes the "fair notice" doctrine, which "has its roots in the Fifth Amendment's Due Process Clause," and is applicable only "when an agency deprives a party of property by imposing civil or criminal liability[ ] or where sanctions are drastic." *Ark. Dep't of Human Servs. v. Sebelius*, 818 F. Supp. 2d 107, 120–21 (D.D.C. 2011) (internal citation omitted). Before an agency can impose such a severe sanction, it must "first provid[e] adequate notice of the substance of the rule" it seeks to enforce. *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987).

The doctrine has no applicability here, as Mallinckrodt points to no such "severe sanction" or penalty. *See United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996) ("if the concept of penalty means anything, it means punishment for an unlawful act or omission."). Rather, the company points to the fact that it will be "responsible for making adjustments to account for any underpayments," while the wrong base date AMP was used. Br. at 30. But the "hundreds of millions of dollars," Br. 37-38, that have not been paid as a result of these underpayments belongs to the Medicaid program, not Mallinckrodt. *See, e.g.*, *Office of Pers. Mgmt.*, 496 U.S. at 415-16 (holding that erroneous Government advice to benefits claimant did not "entitle the claimant to a monetary payment not otherwise permitted by law"); *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (requiring that a person "have a legitimate claim of entitlement to [a benefit]" in order to claim a constitutionally protected property interest in that benefit (citation omitted)).  As such, there is no penalty or "severe sanction" that would trigger the "fair notice" doctrine. *See Office of Personnel Mgmt.*, 496 U.S. at 415-16; *Ark. Dep't of Human Servs.*, 818 F. Supp. 2d at 108, 121 (holding CMS's decision to

31

disallow payment of federal matching funds to state did "not rise to the level of the sanctions contemplated by the 'fair notice' doctrine"); *cf. Nyeholt v. Sec'y Of Veterans Affairs*, 298 F.3d 1350, 1357 (Fed. Cir. 2002) ("standards of proof that must be satisfied in order to obtain government benefits are not analogous to standards that inform the public what one can or cannot do without incurring civil and/or criminal penalties").

The cases Mallinckrodt cite are not to the contrary. *General Electric Co. v. U.S. E.P.A.* required sufficient notice "because the agency imposed a fine"—a sanction of "civil or criminal liability." 53 F.3d 1324, 1328-30 (D.C. Cir. 1995). Similarly, *SNR Wireless License Co v. FCC*, involved financial penalties, 868 F.3d 1021, 1029, 1045 (D.C. Cir. 2017), and *United States v. Chrysler Corp.*, entailed a recall order that "deprive[d] Chrysler of property no less than a fine." 158 F.3d 1350, 1354-55 (D.C. Cir. 1990). *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 152, 155 (2012), is even more far afield, as the Court there was merely determining whether to apply *Auer* deference where petitioners argued the company violated the Fair Labor Standards Act, sought back pay and liquidated damages, and their argument would have "impose[d] potentially massive liability on" the company. Here, in contrast, CMS has not imposed any monetary sanction or fine, nor does the statute directly authorize any other liability that could be pursued by private parties.

In any event, Mallinckrodt did have fair notice. Since 2016, CMS repeatedly and unambiguously informed the manufacturer that it needed to correct Acthar's base date AMP and provided the underlying rationale for that requirement. *See* A.R. 151 (baseline data must follow the NDA); A.R. 133 (Acthar's baseline data should match what it was when the drug was originally marketed under the same NDA notwithstanding the 2012 correspondence); A.R. 81 (the drug's baseline data should be "based on data from 9/30/1990"). Moreover, Mallinckrodt

32

signed a National Drug Rebate Agreement *after* CMS had told Mallinckrodt to correct Acthar's

base date AMP on multiple occasions, agreeing that, "[t]o the extent that changes in product,

pricing, or related data cause increases to previously-submitted total rebate amount,"

Mallinckrodt "*will be responsible for timely payment of those increases*." A.R. 1023, 1034

(emphasis added). And this obligation was not new—in 1991, both Mallinckrodt and Questcor

entered into rebate agreements with CMS that similarly made clear that "[a]djustments to Rebate

Payments shall be made if information indicates that either Medicaid utilization Information,

AMP or Best price were greater or less than the amount previously specified." A.R. 1049, 1063,

1077.

   CMS has therefore provided Mallinckrodt with "ascertainable certainty" as to what the

agency expected and as to the company's obligation to pay the Medicaid program the money

owed. *Cf. Gen. Elec.*, 53 F.3d at 1329 ("[I]n many cases[,] the agency's pre-enforcement efforts

to bring about compliance will provide adequate notice."). Thus, not surprisingly, Mallinckrodt

plc has acknowledged in public filings its obligation to rectify rebate underpayments, explaining

that its obligations in the Medicaid rebate program are subject "to review and challenge," and

that "it is possible that such reviews could result in material adjustments to amounts previously

paid." Mallinckrodt plc Form 10-K (February 26, 2019) at 33.[17]

   *2. Retroactivity Principles Do Not Apply Here, and Even if they Did, Mallinckrodt Cannot*
      *Use Them to Avoid its Agreed-Upon Obligation to Correct Underpayments.*

   Mallinckrodt's argument against retroactivity fares no better. Again, CMS simply

applied the well-established law, codified at 42 U.S.C. § 1396r-8(c)(2)(A), to a new factual

scenario that Questcor had not provided in 2012. Even assuming CMS's determination of rebate

---

[17] https://www.sec.gov/ix?doc=/Archives/edgar/data/1567892/000156789219000009/mnk10-
k122818.htm (last visited July 5, 2019).

underpayment constitutes an adjudication as Mallinckrodt argues, *see* Br. at 32-33, "it is black-letter administrative law that adjudications are inherently retroactive," *Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 921 (D.C. Cir. 2013). Given that the agency "generally may lawfully interpret a regulation notwithstanding its retroactive effect," *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 907 (D.C. Cir. 2010), any retroactive effect CMS's 2016 determination had on Mallinckrodt "was completely subsumed in the permissible retroactivity of the agency adjudication," *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 424 (D.C. Cir. 1994); *Am. Tel. & Tel. Co. v. FCC*, 454 F.3d 329, 332 (D.C. Cir. 2006) ("Retroactivity is the norm in agency adjudications no less than in judicial adjudications.").

Mallinckrodt maintains that it fits within the framework that determines "whether to grant or deny retroactive force to *newly adopted administrative rules*." *Retail, Wholesale and Dep't Store Union, AFL-CIO v. NLRB*, 466 F.2d 380, 389 (D.C. Cir. 1972) (emphasis added); Br. at 33.[18] But CMS adopted no such rule. *See supra* Part I.B. (explaining there is no conflicting precedent). Instead, it applied an established statute to a new factual scenario in a manner that is consistent with its prior application in 2012. The outcome is different only because it did not have complete facts in 2012. *See supra*; *see also Catholic Health Initiatives Iowa Corp.*, 718 F.3d at 921 (explaining that a retroactive rule "mean[s] that the rule itself effected *a clear change in the legal landscape* and attached new legal consequences to past actions." (emphasis added)).

---

[18] *PHH Corp. v. Consumer Financial Protection Bureau*, 389 F.3d 1, 43-49 (D.C. Cir. 2016), on which Mallinckrodt heavily relies, *see* Br. at 36, is inapposite. There, the Court rejected the agency's argument that its interpretation of a statutory provision deserved *Chevron* deference, holding that the statute permitted the conduct that the agency's interpretation proscribed. The Court further found that even had the agency permissibly interpreted a vague statutory provision, applying that interpretation retroactively would be inappropriate, as it conflicted with the Government's longstanding prior interpretation allowing the conduct at issue. This case, of course, does not involve any change in CMS's interpretation of the rebate statute; only the factual basis underlying CMS's interpretation has changed.

In any event, retroactivity is barred "only when such application would work a 'manifest injustice,'" *Gen. Am. Transp. Corp. v. I.C.C.*, 872 F.2d 1048, 1061 (D.C. Cir. 1989) (citation omitted), and no "manifest injustice" would arise here. The underpaid rebates stem from Acthar's dramatic price hike and it would be contrary to law and unjust for Mallinckrodt to retain the hundreds of millions of dollars that belong to the Medicaid program—a program that provides for "low-income persons and other individuals who face serious financial burdens in paying for needed medical care." *Cooper Hosp. / Univ. Med. Ctr. v. Burwell*, 179 F. Supp. 3d 31, 37 (D.D.C. 2016) (citation omitted).

Finally, contrary to Mallinckrodt's argument, CMS's determination of underpayment is not an abrupt departure from past practice such that retroactivity would be disfavored. As already fully explained above, CMS's 2012 letter was based on incomplete facts, and the opinion rendered there was expressly "limited to and based on the facts and information presented to us." A.R. 617; *see also Qwest Servs. Corp. v. F.C.C.*, 509 F.3d 531, 540 (D.C. Cir. 2007) ("Clarifying the law and applying that clarification to past behavior are routine functions of adjudication."); *Am. Tel. & Tel. Co. v. FCC*, 454 F.3d 329, 333-334 (D.C. Cir. 2016) (allowing retroactivity where agency's previous rulings "reflect[ed] a highly fact-specific, case-by-case style of adjudication" that did not establish "a clear rule of law exempting" certain conduct). And for three years, CMS has repeatedly explained why Mallinckrodt has been improperly calculating its rebates. And since CMS directed Mallinckrodt to use the correct base date AMP, the company has signed a new National Drug Rebate Agreement that contains the requirement to rectify past underpayments. *See* A.R. 1063, 1077. Mallinckrodt accordingly lacks any justification not to do so now.

In sum, Mallinckrodt's novel "fair notice" and "retroactivity" arguments are baseless.

35

* * *

Because Mallinckrodt's claims fail on the merits, its request for permanent injunctive

relief should be denied. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 32 (2008).

Indeed, the above discussions make it clear that the balance of the equities plainly tips in the

Government's favor. The company's request for a permanent injunction also ignores the proper

role of this Court when reviewing an APA action like this one. *See Palisades Gen. Hosp. Inc. v.

Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (explaining that court "sits as an appellate tribunal,"

and "[t]hus, under settled principles of administrative law, when a court reviewing agency action

determines that an agency made an error of law, the court's inquiry is at an end: the case must be

remanded to the agency for further action consistent with the correct legal standards.") (citation

omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny Mallinckrodt's Motion for a

Preliminary Injunction and enter judgment in favor of Defendants.

Dated:  July 5, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

JEAN LIN
Special Counsel, Federal Programs Branch

/s/ Kevin Snell
KEVIN SNELL
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L St. NW
Washington, D.C. 20005
Telephone:  (202) 305-0924
Fax:  (202) 616-8460
Email:  Kevin.Snell@usdoj.gov

*Counsel for Defendants*

37