## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MALLINCKRODT ARD LLC, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>SEEMA VERMA,<br>in her official capacity as<br>ADMINISTRATOR, CENTERS FOR<br>MEDICARE & MEDICAID SERVICES, )<br><br>and )<br><br>ALEX M. AZAR II,<br>in his official capacity as SECRETARY,<br>UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES, )<br><br>*Defendants*. ) | Civil Action No. 1:19-cv-1471 |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### AND

### IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Catherine E. Stetson (D.C. Bar No. 453221)
Susan M. Cook (D.C. Bar No. 462978)
Kyle M. Druding (D.C. Bar No. 1044631)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Phone: (202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Mallinckrodt ARD LLC*

Dated:  July 15, 2019

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION .............................................................................................1

ARGUMENT ..................................................................................................4

    I.     ACTHAR IS ELIGIBLE FOR A NEW BASE DATE AMP ..............................4

          A.    CMS's Determination That Acthar Is Not A "Single Source Drug" Cannot Be Reconciled With The Medicaid Drug Rebate Statute .....................................................................................4

          B.    CMS's Determination Violates The Agency's Own Regulations .................................................................................9

          C.    CMS's Determination Is Arbitrary And Capricious Because The Agency Failed To Explain Its Change In Position ...............................11

          D.    CMS's Determination Violates Principles Of Fair Notice And Retroactivity..............................................................................17

              1.   CMS Deprived Mallinckrodt Of Fair Notice ....................................18

              2.   CMS's Decision Is Impermissibly Retroactive .................................22

    II.    INJUNCTIVE RELIEF IS AN APPROPRIATE REMEDY.................................23

CONCLUSION................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arkansas Dep't of Human Servs. v. Sebelius*,
818 F. Supp. 2d 107 (D.D.C. 2011) ................................................................19

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ......................................................................................5

*Camp v. Pitts*,
411 U.S. 138 (1973) ....................................................................................16

*Children's Hosp. Ass'n of Tex. v. Azar*,
300 F. Supp. 3d 190 (D.D.C. 2018) ..............................................................23

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ...............................................................................11, 18

*City of Kansas City, Mo. v. HUD*,
923 F.2d 188 (D.C. Cir. 1991) .....................................................................14

* *Clark-Cowlitz Joint Operating Agency v. FERC*,
826 F.2d 1074 (D.C. Cir. 1987) (en banc) ....................................................17

*Committee For Fairness v. Kemp*,
791 F. Supp. 888 (D.D.C. 1992) ...................................................................24

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ....................................................................................15

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ....................................................................................20

*Florida Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ....................................................................................23

*General Elec. Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995) ................................................................17, 18

*Heckler v. Community Health Servs. of Crawford Cty., Inc.*,
467 U.S. 51 (1984) ......................................................................................15

*Hospital of Univ. of Pa. v. Sebelius*,
847 F. Supp. 2d 125 (D.D.C. 2012) ..............................................................20

*King v. Burwell,*
   135 S. Ct. 2480 (2015) ...................................................................................6

*Kisor v. Wilkie,*
   139 S. Ct. 2400 (2019) .............................................................................10, 11

*Martin v. Occupational Safety & Health Review Comm'n,*
   499 U.S. 144 (1991)..................................................................................6, 10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983).........................................................................................14

*National Ass'n of Mfrs. v. DOD,*
   138 S. Ct. 617 (2018) .....................................................................................5

*Neustar, Inc. v. FCC,*
   857 F.3d 886 (D.C. Cir. 2017) ........................................................................6

*Office of Personnel Mgmt. v. Richmond,*
   496 U.S. 414 (1990)........................................................................................19

* *PHH Corp. v. CFPB,*
   839 F.3d 1 (D.C. Cir. 2016), *reh'g en banc granted, order vacated* (Feb. 16,
   2017), *reinstated in relevant part on reh'g en banc,* 881 F.3d 75 (D.C. Cir.
   2018) ...............................................................................................22, 23

*PMD Produce Brokerage Corp. v. USDA,*
   234 F.3d 48 (D.C. Cir. 2000) ........................................................................20

*Radio Athens, Inc. v. FCC,*
   401 F.2d 398 (D.C. Cir. 1968) ......................................................................20

* *Retail Wholesale & Dep't Store Union v. NLRB,*
   466 F.2d 380 (D.C. Cir. 1972) ......................................................................22

*Reuters Ltd. v. FCC,*
   781 F.2d 946 (D.C. Cir. 1986) ......................................................................10

*Satellite Broad. Co., Inc. v. FCC,*
   824 F.2d 1 (D.C. Cir. 1987)...........................................................................20

*SNR Wireless License Co., LLC v. FCC,*
   868 F.3d 1021 (D.C. Cir. 2017).....................................................................20

*Spectrum Pharm., Inc. v. Burwell,*
   824 F.3d 1062 (D.C. Cir. 2016)........................................................................8

*State of N.M. v. Watkins,*
  969 F.2d 1122 (D.C. Cir. 1992) ...........................................................................24

*Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.,*
  783 F. Supp. 1426 (D.D.C. 1992) .........................................................................12

*Town of Castle Rock, Colorado v. Gonzales,*
  545 U.S. 748 (2005) ..............................................................................................19

*Trinity Broad. of Fla., Inc. v. FCC,*
  211 F.3d 618 (D.C. Cir. 2000) .............................................................................20

* *United States v. Chrysler Corp.,*
  158 F.3d 1350 (D.C. Cir. 1998) ......................................................................19, 20

*United States v. Reorganized CF & I Fabricators of Utah, Inc.,*
  518 U.S. 213 (1996) ..............................................................................................19

*United Source One, Inc. v. U.S. Dep't of Agric., Food Safety & Inspection Servs.,*
  865 F.3d 710 (D.C. Cir. 2017) .........................................................................11, 12

*Util. Air Regulatory Grp. v. EPA,*
  134 S. Ct. 2427 (2014) ...........................................................................................8

*Water Quality Ins. Syndicate v. United States,*
  522 F. Supp. 2d 220 (D.D.C. 2007) ......................................................................15

*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC,*
  475 F.3d 319 (D.C. Cir. 2006) .............................................................................14

**Statutes and Regulations**

21 U.S.C. § 321(p) .....................................................................................................5

21 U.S.C. § 355(a) ..................................................................................................5, 8

42 U.S.C. § 1396r-8(b)(3)(C)(i) ...............................................................................21

42 U.S.C. § 1396r-8(d) .............................................................................................21

* 42 U.S.C. § 1396r-8(k)(7)(A)(iv) ........................................................................4, 5

* 42 C.F.R. § 447.502 ............................................................................................9, 10

# INTRODUCTION

Administrative agencies do not have unfettered authority.  An agency must comply with its enabling statute.  It must stay within the bounds of its own rules and regulations.  It must give an adequate explanation for a change in position.  And an agency cannot fault a regulated entity for failing to meet an unknown standard, or surprise it with a new position applied retroactively.  These are the key legal principles that govern the present dispute.

Rather than tackling them head-on, the Government spends much of its brief litigating who is to blame for the purported "mistake" it now argues the Centers for Medicare & Medicaid Services (CMS) made when it expressly informed Mallinckrodt in 2012—twice—that Acthar[1] was entitled to a new base date AMP.  That factual disagreement is not relevant to any of the legal issues before the Court; CMS's "mistake" was only a mistake if the Government is right on the law.  But because the Government has focused so much of its brief on that side skirmish, let's set the record straight before turning to the issues that *are* legally relevant—the statute, the regulation, and basic principles of APA law.

Here is what we know about the facts, including some new revelations from the recently produced administrative record:

---

[1]  Although the Government suggests otherwise, Gov. Br. 2, there literally *are* two Acthars in this case.  If you go to Drugs@FDA, https://www.accessdata.fda.gov/scripts/cder/daf/, and type in "Acthar," and then click on "H.P. Acthar Gel," there are two entries.  One is for the drug approved under NDA 008372 in 1952, which is listed in the database as "H.P. ACTHAR GEL (CORTICOTROPIN)"; the other is for the drug approved under NDA 022432 in 2010, which is listed in the database as "H.P. ACTHAR GEL (REPOSITORY CORTICOTROPIN)."  (The names of both drugs have more recently been updated, but these are the names under which the drugs were approved.)  There is also a third Acthar, approved in 1950, listed in Drugs@FDA, but it is no longer marketed and is not relevant here.  For the sake of clarity (and the Court's sanity), we refer to the 2010 Acthar as "Acthar" and the 1952 Acthar as "H.P. Acthar Gel."

1

We know that Questcor—losing money on Acthar under the Medicaid Drug Rebate Program—approached CMS in 2012 to ask whether Acthar was eligible for a new base date AMP.  AR619.

We know that Questcor proffered two alternative legal theories in support of its request for a new base date AMP—neither of which was tied to the statutory standard now in dispute. AR623–624.

We know that Questcor explained to CMS that, unless the base date AMP were changed, its continued participation in the Medicaid Drug Rebate Program would be in jeopardy.  AR620; *see also* AR627 (noting Medicaid "[r]ebate at 100%+ of Medicaid revenue").

We also know that, in that same letter, Questcor specifically disclosed to CMS that "Acthar's original NDA is number 08-372, and the FDA has informed Questcor that the agency intends to revise its record so that the approval for infantile spasms is reflected as part of the product's original NDA, No. 08-372."  AR621 n.4.

We know that CMS rejected both of Questcor's suggested legal pathways for a new base date AMP and reached its own, unprompted conclusion:  Because Acthar was "approved under a different ND[A] from the original product," the agency determined that "Questcor may set a new base date AMP for this drug."  AR617, AR169 (correcting typo).  *See also* Gov. Br. 11 ("On August 6, 2012, CMS responded without adopting either [of Questcor's] rationale.").

We know that the FDA approval documents for Acthar are publicly available online. Gov. Br. 20; *see also* AR708. [2]

---

[2] *See also*
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432_hp_acthar_gel_toc.cfm.

2

And whether or not CMS also consulted its sister agency at the time, we *now* know, thanks to the full administrative record, that a research analyst specifically raised with CMS *in September 2012* the fact that Acthar was approved under a so-called "administrative" Type 6 NDA, and provided CMS with key documents from the FDA approval process, including the 2010 approval letter that the Government now asserts was crucial to the agency's change of heart.  AR170–616.

We know that, even after receiving those materials in September 2012, CMS twice reiterated its position that Acthar was eligible for a new base date AMP—once to Questcor about a week later, and once to the Ohio Department of Medicaid in December 2013.  AR169, AR161.

We also *now* know, again from the full administrative record, that several years later, in 2015, CMS repeatedly asked FDA to opine on whether Acthar was "marketed under" NDA 008372 rather than the later Type 6 NDA (022432)—and FDA repeatedly refused to answer the question, instead telling CMS that it was still considering how to treat Type 6 NDAs on Drugs@FDA.  AR159, AR154–156.

In the face of all of these undisputed facts, here is what CMS says it didn't know back in 2012:  It purportedly didn't know that Acthar was not "an entirely new drug" when it was approved for treatment of infantile spasms (IS) under NDA 022432 in 2010.  Gov. Br 1; *see also id.* at 2.  That is not right.  Questcor repeatedly told the agency that the drug was first approved in 1952 and received a new indication for infantile spasms in 2010.  *See, e.g.*, AR621, AR622, AR632.  CMS plainly understood as much.  AR617 (August 6, 2012 CMS letter to Questcor noting that the FDA "recently approved Acthar Gel for use in treating infantile spasms").  CMS told Questcor that it could use a new base date AMP anyway, based on the fact that the drug was "approved under a new NDA."  AR169; *see also* AR617.

And although the Government now claims in its litigation brief that CMS's 2012 letters—plus a third letter that the administrative record now reveals CMS sent to the Ohio Department of Medicaid in 2013, AR161—were "based on a faulty factual premise," Gov. Br. 2, *that explanation appears nowhere in the administrative record*—not in the April 2016 letter that purportedly constitutes the agency's "final decision," AR151, and not after that.

Now to the law. CMS's new position conflicts with the plain language of the Medicaid drug rebate statute, because the approval of Acthar for IS under NDA 022432 qualifies Acthar for treatment as a distinct "single source drug." It violates CMS's binding regulations, for the same reason. And it deviates from the agency's 2012 express statements to Questcor (and the newly revealed December 2013 letter to the Ohio Department of Medicaid) without adequate explanation—or really *any* explanation, setting aside the Government's current litigation position. Finally, because the agency is seeking retroactive application of its policy—not just back to 2016, when CMS first began to question its own 2012 pronouncements, but all the way back to 2013, when CMS was actively encouraging Questcor to use the new base date AMP—its decision also violates basic principles of fair notice and retroactive rulemaking.

## ARGUMENT

### I.   ACTHAR IS ELIGIBLE FOR A NEW BASE DATE AMP.

#### A.  CMS's Determination That Acthar Is Not A "Single Source Drug" Cannot Be Reconciled With The Medicaid Drug Rebate Statute.

Mallinckrodt's statutory argument turns on whether FDA's approval of NDA 022432 entitles Acthar to be treated as a distinct "single source drug" under the Medicaid drug rebate statute. It does, for the reasons Mallinckrodt has explained. MNK Br. 21–26. Because Acthar was approved and therefore is being marketed under a distinct NDA (022432), Acthar is a "single source drug" under the statute's plain language. *See* 42 U.S.C. § 1396r-8(k)(7)(A)(iv).

The inquiry thus "begins with the statutory text, and ends there as well." *National Ass'n of Mfrs. v. DOD*, 138 S. Ct. 617, 631 (2018) (citation omitted).

In its litigation brief, the Government appears to advance a new test to determine what constitutes a distinct "single source drug" under the statute:  the drug's "composition" must change such that it is an "entirely new drug."  Gov. Br. 18, 1.  That test appears nowhere in the statute, the agency's implementing regulations, or in any of the agency's various rationales given to date.  Litigation counsel's interpretation carries no water.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

Mallinckrodt's statutory argument is thus essentially undefended.  But it still falls to this Court to determine what the statute says.  Breaking it down:

Until April 18, 2019, the statute defined "single source drug" to mean "a covered outpatient drug which is *produced or distributed under an original new drug application* approved by the Food and Drug Administration."  42 U.S.C. § 1396r-8(k)(7)(A)(iv) (Nov. 5, 1990) (emphasis added).  In April, Congress deleted the word "original."  *See* 42 U.S.C. § 1396r-8(k)(7)(A)(iv) (Apr. 18, 2019).  Now, the statute says that a drug product that is "produced or distributed" under an NDA is a distinct single source drug, unless the drug product falls within a "narrow exception" not relevant here.  *Id.; see also infra* at 9–11.

Acthar is a "new drug" that could not have been lawfully marketed for treatment of IS without FDA approval.  21 U.S.C. § 355(a), 21 U.S.C. § 321(p); *see* MNK Br. 5–6 (explaining that a new drug may be "an approved product with a change, such as a new intended use or indication, or a different strength or dosage form").  That approval was obtained via NDA 022432.  But no need to take our word for it:  In determining that Acthar was eligible for a

distinct base date AMP in 2012, CMS indicated that the inquiry of whether a drug is "produced or distributed" under an NDA is effectively coterminous with the inquiry of whether it was "approved under" that NDA. AR617, AR169 (concluding that "because Acthar was *approved under* a new NDA, Questcor may set a new base date AMP") (emphasis added).[3]

The Government does not dispute that NDA 022432 is an "original NDA," and that Acthar was approved under it. Gov. Br. 17–23; *see also* AR81 ("We understand and agree that the new indication for Acthar was approved under NDA 022432"). Instead, the Government now argues something different: that even though Acthar was *approved* under NDA 022432, it must be "produced or distributed" (which the Government recasts as "marketed") under NDA 008372 because NDA 022432 "existed solely for FDA's administrative purposes and was closed upon approval." Gov. Br. 19. Not so. FDA may have stopped accepting certain regulatory submissions to NDA 022432, but that does not answer the question whether Acthar is or has been marketed under that NDA.

The agency equipped to answer that question is not CMS, but FDA, which oversees both the approval and marketing of drugs. *See, e.g.*, *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015); *see also Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 151–153 (1991) (courts presume "that Congress intended to invest interpretive power in the administrative actor in the best position to develop these attributes"). No doubt for that reason, CMS specifically *asked* FDA in 2015—not once, but twice—whether the fact that NDA 022432 would

---

[3] It is telling that the Government declines to seek any level of deference for its interpretation of the statute. Indeed, the Government declines to cite *Chevron* at all. As a result, the Government "has forfeited any claims to *Chevron* deference." *See Neustar, Inc. v. FCC*, 857 F.3d 886, 893–894 (D.C. Cir. 2017) (agency's failure to raise *Chevron* deference in connection with rulemaking argument meant that it "forfeited any claims to *Chevron* deference").

no longer be used for regulatory filings means that Acthar is now "marketed under" NDA

008372.  In October 2015, CMS asked FDA:

> When searching under the drug name, on drugs@fda, two different NDA numbers
> are referenced—008372 and 022432.  However, when we look further into
> information on the page associated with 022432, we find a supplement approval
> letter, 008392/S-044, which indicates that NDA number 022432 will no longer be
> used.  *Does that mean that the only NDA number currently used for the marketing
> of Acthar HP gel is 008372*?

AR159–160 (emphasis added).  And in December 2015, CMS again asked FDA:  "Drugs@FDA

is still showing that the NDA number for HP Acthar Gel is 022432.  *Can you tell me if that is*

*going to be updated to reflect that the drug is marketed under NDA 008372*, and when that

update would be made?"  AR154–155 (emphasis added).

FDA declined to answer both point-blank questions about the marketing of the drug.

Although it acknowledged that NDA 022432 had been "administratively closed" for purposes of

accepting new filings, it declined to say whether that meant that Acthar is "marketed under"

NDA 008372.  AR157.  When specifically pressed on the marketing point, FDA answered:

"Both NDAs are currently listed in Drugs@FDA. . . . I was informed that the policy on how to

list these Type 6 approvals is still being deliberated and a decision has not been made.  Feel free

to check back in a few months or periodically at the NDA listings for further updates."  AR154.

That is where the record ends.  There is no indication that FDA ever determined that

Type 6 approvals should be removed from Drugs@FDA, and Acthar's 2010 approval is still

listed under NDA 022432 on Drugs@FDA.  That is important, because CMS's own guidance

documents advise manufacturers that Drugs@FDA is one of the two official sources that should

be used by manufacturers to determine a drug's application number.  AR961 ("The FDA's

Application Number for a drug can be found at Drugs@FDA at xx or the Orange Book at xx.");
*see also* CMS, Mfr. Release Nos. 80, 82.[4]

For its part, the Government now argues that the listing for NDA 22432 on Drugs@FDA appears inactive because it has no supplemental history.  Gov. Br. 21.  That is because FDA asked Questcor to submit most future regulatory filings to NDA 008372.  But again, that says nothing about the NDA under which the drug is *marketed*, as FDA itself has confirmed.  AR154. And because it is the FDA approval that authorizes the marketing in the first place, 21 U.S.C. § 355(a), a drug is necessarily "marketed under" the NDA under which it was approved.  That was certainly the view that formed the basis for CMS's statements in 2012.  AR617, AR169. And it explains why Questcor received seven years of *marketing exclusivity* for Acthar Gel upon its approval for infantile spasms in 2010.  AR691; *see also Spectrum Pharm., Inc. v. Burwell*, 824 F.3d 1062, 1064 (D.C. Cir. 2016) (explaining that the Orphan Drug Act is "intended to increase incentives for companies to develop new orphan drugs," such that manufacturers "receive[ ] exclusive marketing rights . . . for seven years").

Missing a textual hook in the statute, the Government turns to freewheeling policy considerations.  Citing Congress's purpose of "further reduc[ing] Medicaid spending," the Government broadly argues that adhering to the 1990 base date AMP necessarily advances that goal.  Gov. Br. 22.  But no agency is permitted to pursue its goals at all costs; it still has to stay within the lines drawn for it.  *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2445 (2014).  The Government's argument also overlooks another equally critical goal of the Medicaid Drug Rebate Program:  to ensure continued manufacturer participation.  *See* AR620

---

[4] *Available at* https://www.medicaid.gov/medicaid/prescription-drugs/program-releases/index.html.

(noting that Questcor's continued participation in the MDRP was in jeopardy without a base date AMP adjustment). That, in turn, requires that the agency apply the statute as written, and the statute permits program participants to update the base date AMP when their product is approved under a distinct NDA.

One final note: The Government's concern about the implications for other drug products (Gov. Br. 23) is overblown. The factual circumstances presented here are rare. FDA stopped using Type 6 NDAs in 2009, replacing them with Type 9 and Type 10 NDAs. AR940. And with respect to those, FDA provides clear guidance about how to determine under which NDA the associated product is marketed. *See* AR941–942 (products approved pursuant to Type 9 NDAs are marketed under the *earlier* NDA, while products approved pursuant to Type 10 NDAs are marketed under *that* NDA); *compare id.* (failing to address the issue for Type 6 NDAs); *see also supra* at 3 (noting that FDA declined to address this issue for Type 6 NDAs).

## B. CMS's Determination Violates The Agency's Own Regulations.

Even assuming that the Medicaid drug rebate statute did not squarely foreclose the Government's reading of "single source drug," CMS's own regulations do. As Mallinckrodt explained in its opening brief, CMS's regulations make clear that a "single source drug" is "a covered outpatient drug that is produced or distributed under an original NDA approved by FDA and has an approved NDA number issued by FDA." MNK Br. 7, 26–28 (citing 42 C.F.R. § 447.502). They also make clear that "an original NDA means an NDA, other than an ANDA, approved by the FDA for marketing, unless CMS determines that a narrow exception applies." *Id.* Acthar hits all those marks. The "narrow exception" does not apply here, and the Government does not argue otherwise. Gov. Br. 23. Accordingly, Acthar is a "single source drug" under CMS's regulations, too. And as Mallinckrodt explained in its opening brief, an

9

agency is bound by its own regulations.  *Reuters Ltd. v. FCC*, 781 F.2d 946, 947 (D.C. Cir.

1986) ("A precept which lies at the foundation of the modern administrative state is that agencies

must abide by their rules and regulations.").

     The Government does not appear to disagree with this analysis.  Rather, in a cryptic short

paragraph, the Government asserts that CMS's regulation defining "single source drug" and

"original NDA" is "irrelevant" because it "has nothing to do with whether one covered outpatient

drug could be considered two distinct drugs such that it could have two different base date

AMPs."  Gov. Br. 23.  To the extent that means to suggest that the regulation is somehow limited

to defining these terms only for other purposes, the regulation itself answers the charge.  It says

that the definition of "original NDA" expressly applies "[f]or purposes of this definition [of

single source drug] and the [Medicaid Drug Rebate Program] itself."  *See* 42 C.F.R. § 447.502.

     Finally, although the Government did not purport to seek deference in interpreting its

regulations, the Supreme Court's recent decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019),

provides helpful guidance on this point.  *Kisor* reiterates that an "agency's interpretation must in

some way implicate its substantive expertise" to warrant deference, and when Congress

"divide[s] regulatory power between two entities" courts presume " 'Congress intended to invest

interpretive power' in whichever actor was 'best position[ed] to develop' expertise about the

given problem."  *Id.* at 2417 (quoting *Martin*, 499 U.S. at 151).  *Kisor* further explains that "a

new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to

regulated parties" similarly fails to warrant deference.  *Id.* at 2418.  Because a "disruption of

expectations may occur when an agency substitutes one view of a rule for another," an "agency

construction 'conflict[ing] with a prior' one" will only rarely prove deference-worthy.  *Id.*

(citation omitted).  And because the "upending of reliance may happen without such an explicit

interpretive change," "the lack of 'fair warning' " will likewise render suspect agency interpretations. *Id.* (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–156 (2012)).  All of these principles stand squarely in the way of offering any deference to CMS on the interpretation of its own regulation in the circumstances presented here.

## C. CMS's Determination Is Arbitrary And Capricious Because The Agency Failed To Explain Its Change In Position.

In 2012, CMS expressly told Questcor—twice—that Acthar was eligible for a new base date AMP because it was "*approved* under a new NDA." AR617, AR169 (emphasis added). Now, CMS says the opposite.  AR137.  As Mallinckrodt has explained, and as the administrative record now confirms, the record is devoid of any explanation—let alone an adequate one—for that complete reversal.  MNK Br. 28–29.

The Government argues in its brief that CMS did not, in fact, change its position; all that changed was the facts.  Gov. Br. 24.  To hear the Government tell it, CMS purportedly made a "mistake" when it told Questcor that Acthar was eligible for a new base date AMP in 2012, and that "its 2012 views were based on a faulty factual premise."  Gov. Br. 26, 2.

But in 2012, CMS twice told Questcor that what mattered was whether a drug product was "approved under a new NDA," AR617, AR169, which CMS to this day agrees Acthar was. *See* AR115.  CMS made no mention of its current legal position, which is that a drug might in theory be "marketed" under an NDA that differs from the one under which it was "approved." That is a change in position, and it is one that must be adequately explained.

The authorities cited by the Government, Gov. Br. 25, are not to the contrary.  *United Source One, Inc. v. United States Department of Agriculture, Food Safety & Inspection Services*, merely rejected the argument that an "apparently isolated" failure to take an enforcement action despite years of inspections "without complaint" constituted a change in "agency precedent"

because agency "non-enforcement" did not establish a policy or standard.  865 F.3d 710, 717 (D.C. Cir. 2017).  The same is true of *Texas Rural Legal Aid, Inc. v. Legal Services Corp.*, which concluded that an agency's "prior inaction" does not "comprise an official or affirmative decision."  783 F. Supp. 1426, 1427 (D.D.C. 1992).  Here, by contrast, there is no agency inaction; CMS affirmatively took a position on a directly presented legal question that the agency later affirmatively abandoned.

In any event, the administrative record makes clear that all of the facts that CMS now purports not to have known at the time it made its initial decision—that the 2010 approval was not of an "entirely new drug" but simply added IS to the labeling; that NDA 22432 was a "tracking NDA number" that would "no longer be used" after approval; and that future regulatory submissions should be made to NDA 008372, *see* Gov. Br. 1, 24—were all well-known to the agency back in 2012.

*First*, Questcor itself expressly told CMS in 2012 that FDA would be associating its approval of the new indication with the original NDA.  AR621 ("Acthar's original NDA is number 08-372, and the FDA has informed Questcor that the agency intends to revise its record so that the approval for infantile spasms is reflected as part of the product's original NDA, No. 08-372.").  That explanation was sufficient to put CMS on notice of (what CMS now says are) the key facts.  And given that Questcor was not at the time even advocating for the statutory standard now before the Court—remember:  CMS later came up with this argument on its own, Gov. Br. 11—Questcor can hardly be faulted for not providing still more details to support a theory Questcor had not put forward.

*Second*, as the Government admits in its brief, the FDA approval documents for Acthar were publicly available.  Gov. Br. 20; *see also* AR708.[5]  And CMS certainly knew how to solicit information from FDA when necessary.  AR154–160.

But *finally*, lest there be any doubt about what CMS knew when, the administrative record makes clear that on September 6, 2012—*between* CMS's two letters to Questcor—a research analyst submitted to CMS a large cache of FDA approval documents for Acthar, including a copy of the FDA approval letter that CMS now relies upon as critical to its change in position.  AR170, AR308.  That submission expressly notified the agency of all the key facts that the Government now argues were unavailable to CMS at the time it made its initial decision:

(i) that the 2010 Acthar application "was converted from an sNDA to a Type 6 NDA," AR170;

(ii) that a Type 6 NDA is "assigned a new NDA number for administrative purposes," AR172; and

(iii) that FDA had informed Questcor in 2010 that specified future regulatory submissions should be "addressed to the original NDA 008372 for this drug product, not to this NDA." AR312.

CMS had all of this information in its possession when it confirmed to Questcor nearly two weeks later—on September 19, 2012—that "because Acthar was approved under a new NDA, Questcor may set a new base date AMP."  AR169.  CMS also had all of this information in its possession in December 2013, when it told the Ohio Department of Medicaid that "[t]he

---

[5] *See also*
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022432_hp_acthar_gel_toc.cfm.

new Acthar H.P. NDC is being marketed pursuant to a new NDA, and therefore the product has a different base date AMP quarter."  AR161.

The administrative record simply does not support the Government's current argument that CMS was "mistaken" or that its 2012 decision was based on a "faulty factual premise." Gov. Br. 26, 2.  That is fatal to CMS's position.  "Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard."  *City of Kansas City, Mo. v. HUD*, 923 F.2d 188, 194 (D.C. Cir. 1991).

Equally fatal to CMS's position:  the Government's proffered explanation that CMS's position in 2012 was simply a "mistake" appears *nowhere* in the administrative record.  An agency is, of course, entitled to make mistakes, and to correct those mistakes by changing its position prospectively, particularly where its prior action (as here) engendered reliance interests. *See infra* at 17–23.  But for that to happen, the agency must *admit* that it actually made a mistake, and it must do so on the record.  "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).  As the D.C. Circuit has noted: "Arbitrary and capricious review strictly prohibits us from upholding agency action based only on our best guess as to what reasoning truly motivated it."  *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 328–329 (D.C. Cir. 2006).  And federal courts may not supply an explanation that the agency itself failed to give.  *Id.* at 329 ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."); *see also City of Kansas City*, 923 F.2d at 194 ("We cannot accept as evidence of reasoned decsionmaking

14

a post-hoc rationalization for agency action."); *Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 227 (D.D.C. 2007) ("Under established law, the Court may review only the reasons articulated in the agency decision itself.").

This on-the-record requirement is especially important in the context of an agency change in position. After all, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Nor is this a matter of the agency "releas[ing] Mallinckrodt from any statutory liability." Gov. Br. 25. This is not a situation where the statute imposed a clear obligation and the agency waived it; this is a situation where an agency *purported to interpret and apply* its statute. For that reason, the Government's citation to *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984), is inapposite. In *Heckler*, the Supreme Court rejected a healthcare provider's claim that the Government was estopped from seeking the return of Medicare overpayments claimed in reliance on "oral" advice from a fiscal intermediary, which the provider knew acted solely as "a conduit" and lacked authority to "resolve policy questions," because "the advice" was not "given under circumstances that should have induced respondent's reliance." *Id.* at 64. Mallinckrodt, by contrast, did not rely on "oral" advice given by an "official who was not in the business of making policy," *id.* at 66, or "the conduct of Government agents contrary to law," Gov. Br. 25; it relied on the express written assurances of CMS itself. Those assurances *were* the law. So while the "general rule" may be that "those who deal with the Government are expected to know the law," *Heckler*, 467 U.S. at 63, there is no corollary

principle that regulated entities must be held to anticipate what a future regulator may later claim the law to be following a reversal in policy.

Equally off-base is the Government's argument that Mallinckrodt was "in possession of all the relevant facts necessary to determine whether Acthar was entitled to a new base date AMP in 2012 under the statute." Gov. Br. 28. First of all, as the Government elsewhere acknowledges, Questcor was not the entity that came up with the "produced or distributed under an NDA" framework to justify the new base date AMP; that was CMS. AR619–625, AR617–618; *see* Gov. Br. 11 ("On August 6, 2012, CMS responded without adopting either [Questcor] rationale."). In any event, CMS had access to the same facts as Questcor, and came to a conclusion consistent with (indeed, compelled by) the statute—that Acthar was eligible for a new base date AMP—three times. AR617, AR169, AR161. Indeed, the record makes clear that in December 2015, long after even CMS admits it was aware of all relevant facts, the agency was still asking FDA whether or not Acthar was "marketed under" NDA 022432. AR154–160. It is a bit rich for the Government now to assert that Mallinckrodt was best positioned to know back in 2012 that the agency's own affirmative pronouncements were not reliable.

Finally, the Government provides a lengthy explanation of the agency's statements between 2016 and 2019, purportedly to justify its argument that CMS has been consistent all along in applying the base date AMP statute. Gov. Br. 27–29. To begin with, a number of these documents post-date the agency's asserted "final decision" in April 2016, *see* AR2, and thus are legally irrelevant to the question whether CMS adequately explained its decision on the contemporaneous record. *Cf. Camp v. Pitts*, 411 U.S. 138, 142 (1973) (instructing that the "focal point for judicial review" under the APA "should be the administrative record already in existence"). But more importantly, the agency's 2016–2019 communications speak for

themselves.  And the story they tell is of an agency that is uncertain about the reason for its own

change in position, and unsure how to apply its enabling statute.  MNK Br. 16–20; *see also*

AR1–152.

### D.   CMS's Determination Violates Principles Of Fair Notice And Retroactivity.

In 2012, Questcor was at a crossroads.  It was losing money year after year on Acthar

under the Medicaid Drug Rebate Program, and considering removing the drug from the program.

AR620, AR645.  CMS responded by expressly asserting that Acthar was eligible for a new base

date AMP, AR617, AR169, and Questcor stayed in the program.

CMS has changed its mind.  AR151.  That change—coupled with the agency's demand

that Mallinckrodt pay hundreds of millions of dollars for the intervening years of reliance on the

agency's original assurances or face an enforcement action, including potentially enormous civil

monetary penalties—violates foundational principles of fair notice and retroactivity.  *See* MNK

Br. 29–36.

The Government tries to sidestep this problem by erecting and then proudly dismantling a

straw man:  it re-characterizes Mallinckrodt's arguments as "essentially amount[ing] to a claim

of equitable estoppel against the government," and then explains why that doctrine does not

apply.  Gov. Br. 29.  But Mallinckrodt is not seeking to equitably estop anyone from anything.  It

is seeking to enforce established principles of administrative law that prevent the Government

from springing new positions on regulated entities.  *See, e.g.*, *General Elec. Co. v. EPA*, 53 F.3d

1324, 1329 (D.C. Cir. 1995), *as corrected* (June 19, 1995); *Clark-Cowlitz Joint Operating*

*Agency v. FERC*, 826 F.2d 1074, 1081 (D.C. Cir. 1987) (en banc).  The Government, of all

entities, should know the difference.

### 1.   CMS Deprived Mallinckrodt Of Fair Notice.

Mallinckrodt lacked fair notice of the standard that CMS now seeks to impose retroactively back to 2013.  As Mallinckrodt has explained, CMS failed to provide Mallinckrodt with "ascertainable certainty" regarding the agency's new position.  *General Elec.*, 53 F.3d at 1328–29.  "It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. at 158–159.

The Government all but concedes that this notice was lacking from 2013 to 2016, when CMS had actively encouraged Questcor to use a new base date AMP.  Instead, the Government argues only that Mallinckrodt had notice as of *2016*.  Gov. Br. 31.  This supposed notice comes almost four years too late for Mallinckrodt to withdraw from the Medicaid Drug Rebate Program to avoid losses during the years 2013–2016.[6]

And even to this day, the agency still has not given fair notice of its position.  Although CMS opaquely indicated in communications between April 2016 and April 2019 that it believed that Acthar was not eligible for a distinct base date AMP, it provided vague and inconsistent explanations that do not comport with either the facts or the statutory standard.  AR1–152; *see* MNK Br. 16–20.

The Government argues instead that the fair notice doctrine simply should not apply here, and rather should apply only "when an agency deprives a party of property by imposing civil or

---

[6] The Government also argues that Mallinckrodt had fair notice because its Medicaid drug rebate agreement "informed Mallinckrodt that it would need to rectify any past underpayment."  Gov. Br. 30.  Mallinckrodt doubtless had fair notice of its obligation to rectify an underpayment.  This dispute is over there *was* an underpayment.

criminal liability or where sanctions are drastic."  Gov. Br. 31.  The Government cites four cases in support of this argument.  None supports this stunted view of the fair notice doctrine.  Three of the four are, tellingly, not fair notice cases at all:  *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213 (1996), concerns whether a particular pension-plan requirement constituted a "tax" or a "penalty" for bankruptcy purposes; *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990), involves whether equitable estoppel permits an entitlement-to-benefits claim for funds held by the Federal Treasury that had not been lawfully appropriated; and *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 768 (2005), addresses whether a Colorado woman had a property interest enforceable under the Fifth Amendment in a restraining order against her husband.

The final case the Government cites, *Arkansas Department of Human Services v. Sebelius*, 818 F. Supp. 2d 107 (D.D.C. 2011), is a fair notice case—and it supports Mallinckrodt's position, not the Government's.  The case involved a state agency's challenge to the federal government's disallowance of matching funds under Medicaid.  While the court declined to apply the fair-notice doctrine where a state actor (as opposed to a "private party") stood to miss out on "miniscule" amounts of matching funds, the court specifically acknowledged that the D.C. Circuit has "rejected the argument that the [fair notice] doctrine only applies to 'cases involving explicit penalties or actions that the Court described as punitive in some manner.' "  *Id*. at 121 (citing *United States v. Chrysler Corp*., 158 F.3d 1350 (D.C. Cir. 1998)).  The court also contrasted the state's interest in the matching funds from a situation where, as here, a "private party" is "forced to relinquish massive amounts of its property" or "denied a renewal of a valuable license."  *Id.*

Settled law confirms that an agency's fair notice obligations extend beyond explicit "fines" and "penalties." As noted, the D.C. Circuit in *United States v. Chrysler Corp.* squarely rejected a nearly identical government argument that a recall order "does not raise due process concerns" because such an order does not involve " 'explicit penalties or actions that the Court described as punitive in some manner.' " 158 F.3d at 1354 (quoting Appellee Br. at 57). As the *Chrysler* Court explained, there was "little doubt that a recall," "which entails the expenditure of significant amounts of money," "is a 'sufficiently grave sanction' such that the duty to provide notice is triggered." *Id.* at 1354–55; *see also FCC v. Fox Television Stations, Inc.,* 567 U.S. 239, 255 (2012) (rejecting agency's argument that regulated entities facing "legal consequence[s]" are precluded from challenging agency conduct on fair notice grounds because the agency "did not impose a sanction"); *SNR Wireless License Co., LLC v. FCC*, 868 F.3d 1021, 1045–46 (D.C. Cir. 2017) (applying fair notice requirement to agency's denial of a request for bidding credits); *PMD Produce Brokerage Corp. v. USDA*, 234 F.3d 48, 52 (D.C. Cir. 2000) (rejecting agency's dismissal of an appeal on timeliness grounds because party lacked fair notice of agency's interpretation of the rule); *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628–632 (D.C. Cir. 2000) (applying fair notice requirement when agency denied renewal of an operating license); *Satellite Broad. Co., Inc. v. FCC*, 824 F.2d 1, 2–4 (D.C. Cir. 1987) (overturning agency's dismissal of untimely applications for want of fair notice because the rules addressed filing "in a baffling and inconsistent fashion"); *Radio Athens, Inc. v. FCC*, 401 F.2d 398, 404 (D.C. Cir. 1968) (ordering FCC to accept application previously rejected on basis of unannounced filing rule of which applicant lacked fair notice); *Hosp. of Univ. of Pa. v. Sebelius*, 847 F. Supp. 2d 125, 134 (D.D.C. 2012) (invalidating HHS's denial of payment to hospital when agency failed to provide adequate notice of timing requirements for claims).

But even if all that were not the case, Mallinckrodt faces the types of penalties contemplated by the Government's proffered "fines and penalties" standard.  The Government argues, in circular fashion, that the hundreds of millions of dollars it is seeking from Mallinckrodt in additional rebates "belong[ ] to the Medicaid program, not Mallinckrodt."  Gov. Br. 31.  But if the agency's claim to entitlement were enough to override application of the fair notice doctrine, the fair notice doctrine would never apply; by definition, in fair notice cases the agency is claiming entitlement to whatever amounts or penalties are purportedly due.  In any event, the Government's argument that Mallinckrodt faces no "severe sanction or penalty" sufficient to trigger these basic administrative-law protections, Gov. Br. 31, ignores the enormity of the consequences CMS has threatened once this litigation ends.  In addition to the hundreds of millions of dollars that CMS claims are owed for past rebates, Mallinckrodt also faces the prospect of being deemed "out of compliance" and shut out of CMS's system for reporting drug pricing; having its National Drug Rebate Agreement suspended; and being subjected to civil monetary penalties.  *See* MNK Br. 37–39 (citing 42 U.S.C. § 1396r-8(b)(3)(C)(i), (d)).  Indeed, CMS has repeatedly threatened Mallinckrodt with precisely these consequences.  *See, e.g.*, AR2, AR106.

To the extent the Government is suggesting that fair notice and retroactivity principles are not implicated because Mallinckrodt has not *yet* suffered any penalty, Gov. Br. 32, that is because of the case's procedural posture.  This Court, based on the Government's representations, ordered that CMS "refrain from locking Mallinckrodt out until three business days after the Court has entered judgment on the merits in the case or the matter is otherwise resolved."  *See* Minute Order, No. 19-1471 (D.D.C. June 7, 2019).  Once that order lifts, Mallinckrodt faces these consequences imminently.

### 2.   CMS's Decision Is Impermissibly Retroactive.

The agency's conduct is also impermissibly retroactive.  In order to protect regulated entities from policymaking by surprise, the D.C. Circuit developed a set of five factors to assist courts in deciding whether to grant or deny retroactive force to newly adopted administrative rules.  *See Retail Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380 (D.C. Cir. 1972) (commonly referred to as *Retail Union*).  As applied here, these factors make clear that CMS's new position may not be applied retroactively.  MNK Br. 32–36.

Instead of engaging the five-factor *Retail Union* analysis, the Government simply rehashes its mischaracterization of CMS's reversal as a "mistake."  Gov. Br. 26, 34.  But again, that assertion is unsupported by the record, which makes clear that CMS had all facts available to it at the time it made its decisions in 2012.  AR621 n.4, AR708, AR170–616.  The only thing that has changed in the intervening years is the agency's view regarding the *legal effect* of these facts —which is, of course, a change in policy that necessitates a retroactivity analysis to protect Mallinckrodt's reliance on CMS's earlier, now-reversed position.  *See* MNK Br. 32–36.

The Government also re-argues, briefly and without any case support, that the hundreds of millions of dollars that Mallinckrodt would now be forced to pay "belong to the Medicaid program—a program that provides for 'low-income persons and other individuals who face serious financial burdens in paying for needed medical care.' "  Gov. Br. 35.  There is no exception to the retroactivity doctrine as long as the agency puts the money to noble uses. Regulated entities are entitled to fair treatment by government agencies.  Consider, again, the example of the pedestrian told by a police officer that she "can lawfully cross the street at a certain place" but then later handed "a $1,000 jaywalking ticket."  *PHH Corp. v. CFPB*, 839 F.3d 1, 49 (D.C. Cir. 2016), *reh'g en banc granted, order vacated* (Feb. 16, 2017), *reinstated in*

Case 1:19-cv-01471-ABJ   Document 21   Filed 07/15/19   Page 28 of 30

*relevant part on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018).[7]  "No one would seriously contend

that the officer had acted fairly or in a manner consistent with basic due process in that

situation."  *Id.*  When a regulated entity acts "in reliance upon numerous government

pronouncements authorizing precisely the conduct" later faulted, this basic rule-of-law principle

forbids a contrary interpretation to "be applied retroactively to … conduct that occurred before

that new interpretation."  *Id.* at 49.

At bottom, the Government's brief ignores the fact that CMS induced serious reliance

interests here.  By assuring Questcor that Acthar was eligible for a new base date AMP, the

agency deprived Questcor, and later Mallinckrodt, of the ability to choose to withdraw from the

program rather than paying the higher rebates that CMS now claims are due.  AR625.

## II.    INJUNCTIVE RELIEF IS AN APPROPRIATE REMEDY.

In closing, the Government argues that even if its conduct is found lacking, injunctive

relief is inappropriate in any event.  Gov. Br. 36.  While a remand is often an appropriate remedy

under the APA, *see, e.g., Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985), the

scope of the remedy ultimately depends on the wrong.  Courts can and do grant injunctive relief

in appropriate circumstances.  *See, e.g.*, *Children's Hosp. Ass'n of Tex. v. Azar*, 300 F. Supp. 3d

190, 198 (D.D.C. 2018) (noting that "six federal courts . . . have entered either a preliminary or

permanent injunction prohibiting defendants from reducing a hospital's DSH payment through

---

[7] The Government waves away *PHH Corp.*'s retroactivity analysis and holding as "inapposite."
Gov. Br. 34 n.18.  As the operative portion of that panel opinion makes clear, however, the
retroactivity section represents an "alternative holding[ ] on the question of whether the CFPB
permissibly determined that PHH violated Section 8" and "both holdings constitute binding
precedent of the Court."  *See PHH Corp.*, 839 F. 3d at 49 n.26.  To the extent the Government
tries to distinguish *PHH* on the basis that it involved a later-in-time CFPB interpretation that
"conflicted with the Government's longstanding prior interpretation allowing the conduct at
issue" rather than a change of the "factual basis underlying CMS's interpretation," Gov. Br. 34
n.18, that is, once more, wrong for the reasons discussed above, *supra* at 1–4.

enforcement of [certain] FAQs"); *State of N.M. v. Watkins*, 969 F.2d 1122, 1138 (D.C. Cir. 1992) (affirming an order "permanently enjoining DOE and Interior from proceeding with Public Land Order 6826," which purported to authorize the introduction of transuranic nuclear waste into New Mexico).

There is no alternative interpretation or reasoning the agency could now advance that would resolve the fair notice and retroactivity problems inherent in CMS's backwards-looking demands for the actions Mallinckrodt took in reliance on the agency's 2012 position.  At the very least, then, an injunction is warranted for that portion of the Court's decision.  *See, e.g.*, *Committee For Fairness v. Kemp*, 791 F. Supp. 888, 898 (D.D.C. 1992) (granting summary judgment to public housing authorities challenging purportedly retroactive changes to federal subsidy policies, and in relevant part enjoining HUD "from recapturing any additional funds with respect to the years prior to the adoption of a valid rule pursuant to the investment and recapture programs").

## CONCLUSION

For these reasons, Mallinckrodt's motion for summary judgment should be granted; this Court should declare CMS's decision that Acthar is not eligible for a new base date AMP unlawful; and this Court should bar Defendants and all others in active concert or participation with them (including other branches of the federal government) from suspending Mallinckrodt's participation in the Medicaid Drug Rebate Program and/or taking any further action based on CMS's determination that Acthar is not entitled to a distinct base date AMP.

Respectfully submitted,

/s/ Catherine E. Stetson
Catherine E. Stetson (D.C. Bar No. 453221)
Susan M. Cook (D.C. Bar No. 462978)
Kyle M. Druding (D.C. Bar No. 1044631)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Phone: (202) 637-5491
Fax: (202) 637-5910
cate.stetson@hoganlovells.com

*Counsel for Mallinckrodt ARD LLC*

Dated:  July 15, 2019