**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MALLINCKRODT ARD LLC,

Plaintiff,

v.

SEEMA VERMA, in her official capacity as
ADMINISTRATOR, CENTERS FOR
MEDICARE & MEDICAID SERVICES, and
ALEX M. AZAR II, in his official capacity as
SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

Defendants.

Civil Docket No. 1:19-cv-1471-TFH

**REDACTED COMBINED REPLY IN SUPPORT OF DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 3

I.    CMS Requested that Mallinckrodt Correct Acthar's Information to Comply with
the Law............................................................................................................. 3

    A.    The Medicaid Drug Rebate Statute Requires Acthar's Base Date AMP be
Tied to the Drug's 1990 Price. ............................................................... 4

    B.    Mallinckrodt Cannot Show that Acthar's Labeling Change Created a
Distinct Single Source Drug. .................................................................. 6

II.    CMS Clearly Explained Why Mallinckrodt Needed to Correct Acthar's Base Date
AMP................................................................................................................. 12

    A.    CMS Consistently Applied the Medicaid Drug Rebate Statute, and In Any
Event the Agency Adequately Explained to Mallinckrodt Why the
Company Could Not Rely on CMS's 2012 View................................... 12

    B.    The Administrative Record Supports CMS's Explanation. ................... 15

III.    No Equitable Principles Excuse Mallinckrodt from Paying the Rebates that it
Owes the Medicaid Program............................................................................ 19

    A.    The "Fair Notice" Doctrine Does Not Allow Mallinckrodt to Keep Money
that Belongs to the Medicaid Program................................................... 21

    B.    No Retroactivity Principle Applies Here. .............................................. 23

CONCLUSION........................................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**

*Ark. Dep't of Human Servs. v. Sebelius,*
  818 F. Supp. 2d 107 (D.D.C. 2011) ................................................................... 21, 22

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) ....................................................................................... 14

*Camp v. Pitts,*
  411 U.S. 138 (1973) ....................................................................................... 15

*Clark-Cowlitz Joint Operating Agency v. F.E.R.C.,*
  826 F.2d 1074 (D.C. Cir. 1987) ........................................................................ 20

*Comm. for Fairness v. Kemp,*
  791 F. Supp. 888 (D.D.C. 1992) ....................................................................... 23

*F.T.C. v. Bisaro,*
  757 F. Supp. 2d 1 (D.D.C. 2010) ...................................................................... 20

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) ....................................................................................... 25

*Gen. Elec. Co. v. US EPA.,*
  53 F.3d 1324 (D.C. Cir. 1995) ..................................................................... 20, 23

*Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.,*
  467 U.S. 51 (1984) .................................................................................... 16, 20

*Indep. Equip. Dealers Ass'n v. EPA,*
  372 F.3d 420 (D.C. Cir. 2004) ................................................................ 15, 17, 18

*Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.,*
  476 F.3d 946 (D.C. Cir. 2007) ........................................................................ 14

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019) .................................................................................... 11

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ....................................................................................... 25

*Office of Personnel Mgmt. v. Richmond,*
  496 U.S. 414 (1990) ................................................................................ 18, 19, 22

*Palisades Gen. Hosp. Inc. v. Leavitt,*
  426 F.3d 400 (D.C. Cir. 2005) ......................................................................... 25

*PHH Corp v. CFPB*,
   839 F.3d 1 (D.C. Cir. 2016) ................................................................................ 24

*Retail Wholesale & Department Store Union v. NLRB*,
   466 F.2d 380 (D.C. Cir. 1972) ............................................................................ 23

*Robinson v. Nat'l Transp. Safety Bd.*,
   28 F.3d 210 (D.C. Cir. 1994) ................................................................................ 7

*Soundboard Ass'n v. Fed. Trade Comm'n*,
   888 F.3d 1261 (D.C. Cir. 2018) .......................................................................... 17

*Springfield, Inc. v. Buckles*,
   292 F.3d 813 (D.C. Cir. 2002) ............................................................................ 14

*Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*,
   783 F. Supp. 1426 (D.D.C. 1992) ....................................................................... 13

*United Source One, Inc. v. U.S. Dep't of Agric., Food Safety & Inspection Serv.*,
   865 F.3d 710 (D.C. Cir. 2017) ............................................................................ 13

*United States ex rel. Landis v. Tailwind Sports Corp.*,
   308 F.R.D. 1 (D.D.C. 2015) ................................................................................ 20

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................ 25

**STATUTES**

21 U.S.C. § 355 ............................................................................................................ 4

42 U.S.C. § 1396-1 ..................................................................................................... 19

42 U.S.C. § 1396b ...................................................................................................... 19

*42 U.S.C. § 1396r-8 ............................................................................................ *passim*

**REGULATIONS**

21 C.F.R. § 314.81 ..................................................................................................... 10

42 C.F.R. § 447.502 ..................................................................................................... 6

*Medicaide Program: Covered Outpatient Drugs*,
   81 Fed. Reg. 5170-01 (Feb. 1, 2016 ..................................................................... 8

**OTHER AUTHORITIES**

Bureau of Labor Statistics, Historical Consumer Price Index for All Urban Consumers,
https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-201901.pdf ........................ 1

Medicaid.gov, *Product Data for Drugs in the Medicaid Drug Rebate Program*,
https://www.medicaid.gov/medicaid/prescription-drugs/medicaid-drug-rebate-
program/data/index.html ...................................................................................................... 18

U.S. Food & Drug Admin., *Drugs@FDA Frequently Asked Questions*,
https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=faq.page ........................ 8, 9

U.S. Food & Drug Admin., *Drugs@FDA Glossary of Terms*,
https://www.fda.gov/drugs/informationondrugs/ucm079436.htm ............................................. 5

U.S. Food & Drug Admin., *Orange Book Preface*,
https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface ....... 7, 8

## INTRODUCTION

Mallinckrodt ARD LLC ("Mallinckrodt") seeks not only to keep hundreds of millions of dollars it wrongly withheld from Medicaid, but also asks this Court to bless its scheme to continue to underpay its rebate obligations. Those obligations depend on whether Mallinckrodt's average manufacturer price ("AMP") for its drug H.P. Acthar Gel ("Acthar") has increased since 1990 at a rate greater than inflation. It has. In 1990, Acthar's AMP was roughly $▮ In 2013, its AMP increased to approximately $▮, an increase of $▮ for each unit sold to Medicaid beneficiaries, and it has increased further by about $▮ from 2013 to 2019. Mallinckrodt's claim to this extraordinary windfall depends on its assertion that it is not obligated to pay statutorily-prescribed rebates to cover H.P. Acthar Gel's ("Acthar") astonishing price increases. And Mallinckrodt makes that assertion in the face of a statutory scheme designed to protect the federal government's insurance program for the poor from price hikes that outstrip inflation—such as Acthar's approximately ▮% price increase, which is many orders of magnitude greater than the roughly 75% rate of inflation during that period.[1] Mallinckrodt's arguments fail and its claims, if accepted, would do tremendous damage to Medicaid. The Court should reject them.

Mallinckrodt does not dispute that Acthar's price has skyrocketed, but claims it is entitled to charge Medicaid this massive price for two reasons. First, the company claims that the statute contains a loophole allowing Mallinckrodt to increase prices without offsetting rebates. In particular, Mallinckrodt argues that because the U.S. Food and Drug Administration ("FDA") used a new drug application ("NDA") when approving a labeling change in 2010—adding an indication for infantile spasms to the eighteen indications already approved since 1952—and this new NDA

---

[1] *See* Bureau of Labor Statistics, Historical Consumer Price Index for All Urban Consumers https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-201901.pdf (last visited July 24, 2019) (listing September 1990 CPI-U at 132.7 and March 2013 at 232.773); *compare* Administrative Record at 1086 (2013 AMP), *with id.* at 1087 (1990 AMP).

supposedly authorized the company to calculate Acthar's rebate using a new baseline. Thus, according to Mallinckrodt, despite the fact that the statute requires a manufacturer to use the 1990 price to calculate the Medicaid rebate if the drug was first approved for marketing before 1990, it could use the drug's 2013 price instead to calculate Acthar's rebates.

But as Defendants have previously demonstrated, Mallinckrodt's case hinges on the false assertion that the 2010 labeling change created a drug distinct from the one that was approved in 1952. In reality, the NDA Mallinckrodt invokes was created only for the FDA's own administrative convenience, a point Mallinckrodt's latest filing does not dispute. *See* Pl.'s Mem. of Points & Auths., ECF Nos. 21, 22-1 ("Br."). The FDA closed that NDA after the labeling change and told the manufacturer not to use it again. It is thus not the NDA under which Acthar is marketed—a key determination under the rebate statute. And once the Centers for Medicare & Medicaid Services ("CMS") discovered what Mallinckrodt was doing, it repeatedly directed the company to take corrective action. Rather than do so, Mallinckrodt filed this Administrative Procedure Act ("APA") suit seeking to both shield its past improper profits and preserve its ability to continue reaping them.

Second, Mallinckrodt argues that the company is entitled to use the new baseline to calculate Acthar's rebates because CMS purportedly allowed this deviation from the rebate statute in 2012. But Mallinckrodt cannot hide behind CMS's 2012 letter purportedly granting the company (then known as Questcor Pharmaceuticals) an accommodation. *First*, Mallinckrodt's request for an accommodation from CMS in 2012 shows it knew that FDA's 2010 approval of a labeling change did not automatically entitle the company to set a new baseline for calculating rebates. *Second*, the letter was expressly predicated on the faulty factual premise—which Questcor supplied—that FDA had effectively approved Acthar as a brand-new drug. It had not. *Third*, the

2

letter was otherwise a straightforward application of the rebate statute, and CMS's interpretation of that statute has not changed.  CMS's request that Mallinckrodt correct its rebate calculation is not arbitrary or capricious because the record shows that in 2016, CMS simply applied the same statute in the same manner to the correct facts, while fully explaining its reasoning in doing so. Mallinckrodt invokes "fair notice" and "retroactivity" arguments based on the 2012 CMS letter, but fails to marshal any case applying those principles in analogous circumstances.  In fact, the relevant equitable principle would be the doctrine of equitable estoppel, but Mallinckrodt comes nowhere close to meeting the exacting standard for estoppel against the Government.   The company's arguments thus uniformly fail.

In sum, Mallinckrodt's insistence that there are "two Acthars" such that it can drastically lower its rebate payments is clearly precluded by the Medicaid drug rebate statute, CMS's regulation, and the administrative record.  And there is simply no basis to allow Mallinckrodt to keep hundreds of millions of dollars it received from Medicaid in direct contravention of the statutory scheme, nor to continue collecting those improper profits in the future.  This Court should reject the company's arguments to the contrary and enter summary judgment for the Government.

## ARGUMENT

### I.   CMS Requested that Mallinckrodt Correct Acthar's Information to Comply with the Law.

In response to Defendants' showing that there is only one Acthar, Mallinckrodt again tries to spin Acthar's labeling change in 2010 as creating a "single source drug" that is distinct from the drug first approved in 1952.  But Mallinckrodt's analysis is untethered from the Medicaid drug rebate statute and contorts what is abundantly clear from the administrative record—that the FDA closed the administrative NDA upon approval and that Acthar is marketed under the only NDA that is active, which is the one from 1952.

### A. The Medicaid Drug Rebate Statute Requires Acthar's Base Date AMP be Tied to the Drug's 1990 Price.

Mallinckrodt argues that "because it is the FDA approval that authorizes the marketing in the first place, 21 U.S.C. § 355(a), a drug is necessarily 'marketed under' the NDA under which it was approved." Br. at 8. But that argument confuses the Federal Food, Drug, and Cosmetics Act ("FDCA")—which regulates drug safety and effectiveness—with the Medicaid drug rebate statute, the relevant statute for Medicaid rebates. Although Mallinckrodt needed the FDA's approval under the FDCA to market Acthar with the infantile spasms indication on its labeling, that approval does not determine Acthar's base date AMP under the Medicaid drug rebate statute.

The Medicaid drug rebate statute defines a drug's base date AMP "with respect to each dosage form and strength of a single source drug," 42 U.S.C. § 1396r-8(c)(2)(A)—not with respect to each FDA-approved indication. Here, Acthar was approved by the FDA decades ago, and there is currently only one dosage form and strength. The statute thus assigns the drug a single base date AMP. *Id.* And because the drug was approved and "first marketed" before "the calendar quarter beginning July 1, 1990," the drug's base date AMP is the average manufacturer price from that quarter. *See* 42 U.S.C. § 1396r-8(c)(2)(A), (B); Defs.' Stmt Points & Auths., ECF Nos. 18-20 ("Opening Br.") at 17-18. Changes to an existing product like Acthar qualify for a new base date AMP only if those changes result in a new drug being marketed under a new NDA or with a new dosage form or strength. The FDA's approval of the infantile spasms indication for the same, long-in-use drug did not result in either. *See* Opening Br. at 18.

Mallinckrodt claims that in 2012 "CMS indicated that the inquiry of whether a drug is 'produced or distributed' under an NDA is effectively coterminous with the inquiry of whether it was 'approved under' that NDA," Br. at 5-6 (citations omitted), but that is simply incorrect. To the contrary, the agency's August 2012 letter was a straightforward application of the statute that

was expressly "limited to and based on the facts and information presented to us"—*i.e.*, the company's implication that Acthar had been approved under a new NDA and thus would be marketed under a new NDA (as opposed to an old drug being approved for a new indication marketed under the original NDA). Administrative Record ("A.R.") at 617; *see also infra* Part II.A. Questcor failed to disclose that the FDA did not approve Acthar as a new drug that would be marketed under a new NDA; that the new NDA number 022432 was "for administrative purposes"; that the administrative NDA was a "tracking NDA number" that would be administratively closed and "no longer be used"; that the FDA directed the company to make future submissions under the original NDA 008372; and that the only active NDA for Acthar is now, as it has long been, 008372. A.R. 694, 706, 708; *see infra* Part II. Without these material facts, CMS had no reason to doubt that Acthar would be marketed under the new NDA number that Questcor cited in its 2012 request, particularly given that NDA numbers are often "assigned by FDA staff to each application for approval to market a new drug in the United States." U.S. Food & Drug Admin., *Drugs@FDA Glossary of Terms.*[2] CMS thus had no reason to opine on the drug's marketing status and certainly did not take the position that it could commit Medicaid to massively overpaying for Acthar in direct violation of the applicable statute. Indeed, the reason the Government does not seek any *Chevron* deference (as Mallinckrodt notes, *see* Br. at 6 n.3) is because the statute is clear and controlling. And lest there be any doubt, CMS's 2012 letter explicitly states that it was not a release from statutory liability. *See* A.R. 617.

Mallinckrodt is similarly wrong to suggest that the Government's opening brief "advanced a new test"—that "the drug's 'composition' must change such that it is an 'entirely new drug'"—to be eligible for a new base date AMP. Br. at 5 (citing Opening Br. at 1, 18). Mallinckrodt does

---

[2] https://www.fda.gov/drugs/informationondrugs/ucm079436.htm (last visited July 17, 2019).

not dispute that Acthar's composition remains the same as it was when the drug was first approved in 1952, yet maintains that there are two Acthars. There are not, and the Government's discussion of the drug's composition sought to further clarify that point. In any event, Defendants clearly explained why Mallinckrodt was wrong as a matter of law. *See, e.g.*, Opening Br. at 18 (explaining that "[c]hanges to an existing product result in a new base date AMP only if those changes result in a new drug being marketed under a new NDA or the changes are to dosage form or strength.").

### B.  Mallinckrodt Cannot Show that Acthar's Labeling Change Created a Distinct Single Source Drug.

Unable to evade the Medicaid drug rebate statute, Mallinckrodt insists it can show that the 2010 approval of the infantile spasms indication created a distinct single source drug because Acthar is "produced or distributed" under the administrative NDA. *See* 42 U.S.C. § 1396r-8(k)(7)(A)(iv); 42 C.F.R. § 447.502. But that is incorrect, as Acthar has always been produced or distributed under NDA 008372, which is the original NDA—not the much-later one Mallinckrodt attempts to invoke here. *See* Opening Br. at 18-23. Mallinckrodt cites nothing in the record that shows otherwise. And the record further forecloses Mallinckrodt's argument that the FDA has not definitively resolved which NDA is used for marketing. *See* Br. at 6-7.

Mallinckrodt points to an October 2015 email exchange between CMS and FDA, where CMS pointed out that the Drugs@FDA website listed both NDA numbers for Acthar and asked whether "the only NDA number currently used for the marketing of Acthar HP gel is 008372." A.R. 160. In response, the FDA "confirmed that the only active NDA for HP Acthar Gel is 008372." A.R. 159. Because Acthar had only one "active NDA," the drug was necessarily marketed under that NDA and that NDA controls for Medicaid rebate purposes. Mallinckrodt offers no explanation to the contrary. *Cf. Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 215

(D.C. Cir. 1994) (substantial evidence test requires "only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted).

The FDA further confirmed as much the next month. CMS wrote to the FDA indicating that it came across an FDA letter "stating that the NDA number 022432 . . . is no longer being used" and thus asked FDA about "the effective date" and "basis for th[at] decision." A.R. 158. The FDA made clear in its response that NDA 022432 was a Type 6 NDA that "was created for administrative purposes," as well as that such Type 6 "NDAs are administratively closed upon approval." A.R. 157. Mallinckrodt obviously could not have been marketed under an "administrative" NDA that was "closed upon approval," as that NDA is no longer in effect. Mallinckrodt tries to cast doubt on this straightforward conclusion by pointing to CMS's December 2015 exchange with FDA, which again concerned the listing of Acthar on the website Drugs@FDA, but that discussion was simply a follow up to FDA's confirmation that NDA 008372 was the "only active NDA" rather than a statement about which NDA the drug was marketed under. *See* A.R. 154-55 (CMS asking whether Drugs@FDA "is going to be updated to reflect that the drug is marketed under NDA 008372," and FDA responding that "[b]oth NDAs are currently listed in Drugs@FDA," that NDA 022432 was a "Type 6" NDA, and that "the policy on how to list these Type 6 approvals is still being deliberated.").

The FDA's Orange Book—formally entitled "Approved Drug Products with Therapeutic Equivalence Evaluations"[3]—likewise demonstrates that Acthar is not marketed under the closed, administrative NDA. That book lists all marketed drug products that are FDA approved under

---

[3] *See* U.S. Food & Drug Admin., *Orange Book Preface*.

section 505 of the FDCA.  U.S. Food & Drug Admin., *Orange Book Preface*.[4]  Manufacturers

know to consult that book in reviewing a drug's status, as even Mallinckrodt acknowledges.  *See*

Br. at 7-8 (describing Orange Book as "one of the two official sources that should be used by

manufacturers to determine a drug's application number"); *see also* A.R. 910, 961 (CMS directing

manufacturers to Orange Book).[5]  Congress also relies on the Orange Book in implementing the

Medicaid drug rebate program.  *See* 42 U.S.C. § 1396r-8(k)(7)(A)(i)(I) (defining "multiple source

drug" as one where another drug product "is rated as therapeutically equivalent (under [the FDA's]

most   recent   publication   of   'Approved   Drug   Products   with   Therapeutic   Equivalence

Evaluations'").  In the Orange Book, the FDA lists Acthar as associated with only NDA 008372;

it lists no drug as associated with NDA 022432.  A.R. 713-18.  Mallinckrodt simply ignores that

listing.  *See* Opening Br. at 9, 21.

　　　　Rather than grapple with that authoritative listing, Mallinckrodt points to the administrative

NDA's listing on Drugs@FDA, but that listing shows only that the infantile spasms indication was

approved under an administrative NDA.  Drugs@FDA is simply a repository of information about

certain  drug  and  biologics  applications  approved  by  the  FDA;  the  fact  that  some  approved

applications were administrative ones (such as Type-6 NDAs) in no way suggests that a drug can

be marketed under an inactive administrative NDA that was closed upon approval.  *See* U.S. Food

& Drug Admin., *Drugs@FDA Frequently Asked Questions* (explaining that information on

Drugs@FDA "comes from" the "*Orange Book*" and "Document Archiving, Reporting, and

_____

[4] *See* https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface
("The Hatch-Waxman Amendments required the Agency to begin publishing an up-to-date list of
all marketed drug products . . . ").
[5] *Accord Medicaid Program; Covered Outpatient Drugs*, 81 Fed. Reg. 5170-01, 5191, 5297
(Feb. 1, 2016).

Regulatory Tracking System used by FDA staff to track information . . . .").[6]  Indeed, FDA's

website states that while Drugs@FDA lists "'Type 6' approvals," the website "is not intended to

replace the *Orange Book*."  *Id*.  And again, the listing in Drugs@FDA actually undermines

Mallinckrodt's argument because it shows Questcor (not Mallinckrodt) as the drug's manufacturer

and has no supplemental history unlike the listing for NDA 008372.  *See* Opening Br. at 21.

Mallinckrodt claims that the lack of supplemental history and FDA's closure of NDA

022432 are irrelevant because, in the company's view, the NDA was only "'administratively

closed' for purposes of accepting new filings," which supposedly "says nothing about the NDA

under which the drug is *marketed*."  Br. at 7-8 (citing A.R. 157, Drugs@FDA).  But Mallinckrodt

offers no explanation as to why one NDA would be used for the drug's "regulatory filings," Br. at

8, while another NDA created solely for "administrative purposes" would nevertheless be used for

"marketing."  A.R. 708.  And the FDA made no such distinction—the Orange Book associates

Acthar with only the original NDA 008372.  Further, the FDA confirmed NDA 008372 is the "only

active NDA," A.R. 159, and explained that the administrative NDA was "administratively closed

upon approval," *see* A.R. 157.  Acthar plainly is not (and could not be) marketed under the closed,

administrative NDA.

The rest of the record confirms as much.  Upon approval of the infantile spasms indication,

the FDA expressly directed the manufacturer to address all future reports "supplements, and other

submissions" to NDA 008372.  A.R. 706.  If Mallinckrodt wished to market Acthar for another

indication, it would need to "supplement" NDA 008372, just like it did with the infantile spasms

indication.  *See* A.R. 719-727 (regular supplements of NDA 008372 by Mallinckrodt, most

---

[6] https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=faq.page (last visited July 24, 2019).

recently in March 2019).  The FDA nowhere limited NDA 008372 to "regulatory filings," nor can its instruction that the administrative NDA would be closed be construed to nonetheless allow Mallinckrodt to continue marketing the drug under the closed NDA.   Questcor already acknowledged as much when, pursuant to the FDA's directions, *see* A.R. 157, it submitted a supplemental new drug application to NDA 008372 for Acthar's labeling, explaining that the submission was "[i]n order for the approval of the indication for the Treatment of Infantile Spasms to be associated with the parent NDA number, 08-372, since the tracking NDA number will no longer be used," A.R. 694.  Moreover, Mallinckrodt's "regulatory filings" are not even divorced from marketing—the company must submit annual reports to NDA 008372 with "[i]nformation about the quantity of the drug product distributed under the approved application," 21 C.F.R. § 314.81(b)(2)(ii), as well as "[c]urrently used professional labeling," and "patient brochures," *id.* § 314.81(b)(2)(iii).   Though the company again points to the FDA's approval of orphan drug exclusivity for infantile spasms, in which the FDA cited NDA 022432, Br. at 8 (citing A.R. 691), the cited letter simply shows that the FDA tied the seven-year exclusivity period to the date of the indication's approval, which made sense because the exclusivity was for that indication.  *See* Opening Br. at 21.  In short, the 2010 labeling change did not create a single source drug distinct from the one approved in 1952, and thus the plain text of 42 U.S.C. § 1396r-8(c)(2)(A), (B) ties Acthar's base date AMP to its 1990 price. *See supra* Part I.A; Opening Br. at 17-18.

Mallinckrodt's assorted policy arguments fail too.  Remarkably the company does not even dispute that its interpretation negates the purpose of the "additional rebate" under the Medicaid drug rebate statute, which is designed to protect the Medicaid program from drug manufacturers' greater-than-inflation price hikes. *See* Opening Br. at 22-23.  Instead, it argues that rejecting its proffered interpretation could imperil "another equally critical goal of the Medicaid Drug Rebate

Program: to ensure continued manufacturer participation." Br. at 8-9. But the statute has already resolved this policy issue—balancing manufacturer participation in government-funded healthcare for the poor against the need to conserve scarce public funds—and resolved it against Mallinckrodt's threat to participate only if it can profiteer. That threat provides no basis for twisting the applicable statutory text. Although Mallinckrodt thinks that the precise scenario presented here is unlikely to recur because the FDA stopped using Type 6 NDAs in 2009, *see* Br. at 9, that does not speak to the number of Type 6 NDAs approved before 2009. It also does not address the broader point that Congress already determined that limiting resets of base date AMPs to actual new drugs is necessary to protect the Medicaid program.

In sum, Mallinckrodt cannot show a "single source drug" distinct from the one with the base date AMP set at the inflation-adjusted 1990 average manufacturer price. *See* 42 U.S.C. § 1396r-8(c)(2)(A), (B); *supra* Part I.A; Opening Br. at 17-18. Mallinckrodt cannot escape this conclusion by pointing to CMS's regulation defining the term "single source drug." It asserts that the "[t]he Government does not appear to disagree with [its] analysis" of the regulation beyond a "cryptic short paragraph." Br. at 10. But the Government made clear that both the statute and regulation defined "single source drug" to require the drug be "produced or distributed" under an NDA; here, that NDA has always been and remains 008372, with the 2010 infantile spasms indication not creating a new, distinct single source drug. Opening Br. at 18-23. And as Defendants have also explained, Mallinckrodt's belabored argument regarding the regulation's exception to "single source drugs" was irrelevant because the 2010 approval did not create such a drug in the first place. Opening Br. at 23.[7]

---

[7] Similarly, Mallinckrodt's discussion of *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019), which concerns whether agencies are entitled to deference as to their "reasonable readings of genuinely ambiguous regulations," is entirely beside the point. The Government did not claim such

## II.     CMS Clearly Explained Why Mallinckrodt Needed to Correct Acthar's Base Date AMP.

Mallinckrodt's latest filing also fails to show that the agency acted arbitrarily and capriciously when it explained Mallinckrodt's need to correct Acthar's base date AMP.   The company insists that CMS changed its position from 2012 without adequately explaining itself, and that the record does not support the agency's explanations.   Both points are mistaken.

### A.    CMS Consistently Applied the Medicaid Drug Rebate Statute, and In Any Event the Agency Adequately Explained to Mallinckrodt Why the Company Could Not Rely on CMS's 2012 View.

Mallinckrodt distorts CMS's actions in 2012 and 2016, insisting that CMS changed its position because the 2012 letter cited the approval of the administrative NDA in 2012 and "made no mention of [CMS's] current legal position," which, according to Mallinckrodt, is that "a drug might in theory be 'marketed' under an NDA that differs from the one under which it was 'approved.'"   Br. at 11.   And Mallinckrodt likewise argues that it could not have "anticipate[d]" what the agency "may later claim the law to be following a reversal in policy."   *Id.* at 16.   But the record shows neither a new "legal position" nor a "reversal in policy."   To the contrary, the record shows that CMS acted consistently both in 2012 and 2016 by applying the same statutory provision to determine Acthar's base date AMP.   The outcome changed simply because the 2012 letter was based on the incomplete facts that Questcor presented.

As Defendants explained in their opening brief, CMS's August 2012 letter clearly indicated that the agency was applying Section 1927(c)(2)(A) of the Social Security Act, codified at 42 U.S.C. § 1396r-8(c)(2)(A).   It first set forth the provision and then explained that, "[i]n accordance with that provision," "Acthar Gel is eligible for a new base date AMP" because "the recently

---

deference here, a point that Mallinckrodt acknowledges, because both the statute and the regulation are clear.   Br. at 10.

approved Acthar Gel was approved under a different ND[A] from the original product." A.R. 617. CMS specifically explained that its views were "limited to and based on the facts and information presented to us," "ha[d] no applicability to a different set of facts even if such facts appear similar in nature or in scope," and was not a "release of liability." *Id.*

But as already explained, Questcor failed to disclose key facts in 2012, *see supra* Part I.A— specifically the essential fact that Acthar was not being marketed under a new NDA but rather had a new NDA number solely for administrative purposes. The fact that CMS's 2012 letter did not discuss which NDA would be used to market the drug, *see* Br. at 11, simply confirms that the agency had no inkling that the new NDA number was anything other than the operative number going forward. *See supra* Part I.A. And because CMS was plainly operating under that misimpression, it never "affirmatively took a position on a directly presented legal question." *See* Br. at 12. The fact that CMS did not independently verify Questcor's representations with the FDA—but chose instead to limit its view "based on the facts and information presented to us" by the company—does not somehow convert its 2012 letter into a precedent contrary to the agency's correct 2016 position. *See United Source One, Inc. v. U.S. Dep't of Agric., Food Safety & Inspection Serv.*, 865 F.3d 710, 717 (D.C. Cir. 2017); *cf. Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 783 F. Supp. 1426, 1427 (D.D.C. 1992).

Nor is there any legal inconsistency between CMS's letters. CMS's 2016 letter informed Mallinckrodt that it had recently learned of a factual discrepancy in Acthar's listed NDA, that it accordingly "reviewed the approval status" of Acthar (the basis for its 2012 view), and that it discovered in doing so that Acthar is actually marketed under NDA 008372 (rather than the administrative NDA the company cited in its 2012 letter). A.R. 151. And because baseline data follows the NDA, CMS explained, the company must revise Acthar's base date AMP. *Id.*; *see*

*also* Opening Br. at 26. That "reasoned analysis" makes clear that CMS's 2012 view was "deliberately changed, not casually ignored." *See Springfield, Inc. v. Buckles*, 292 F.3d 813, 819 (D.C. Cir. 2002).

Mallinckrodt accuses the Government of inventing a new rationale for CMS's 2012 decision in litigation, *see* Br. at 14, but the Government's brief merely explained that CMS's 2012 view hinged on a faulty factual premise. *See* Opening Br. at 2, 26, 28. That explanation accurately describes what the record reflects: CMS's 2012 letter was limited to the factual submission Questcor presented and the agency subsequently learned of additional facts that called into doubt Questcor's prior submission. A.R. 617. While the specific phrases "mistaken" or "faulty factual premise" are not in the administrative record, *see* Br. at 14, the "standard of review under the arbitrary and capricious test is only reasonableness, not perfection," *Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007), and CMS's 2016 explanation more than adequately explained why it abandoned the misinformed view it expressed in 2012. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). Nor is Mallinckrodt's claim of ignorance credible. If the company thought it was automatically entitled to a new base date AMP under the statute, it would not have approached CMS in 2012 to seek an accommodation. CMS's 2016 explanation that Acthar had not actually been approved for marketing under a new NDA and thus was not entitled to a new base date AMP was, in reality, simply confirmation of what the company knew all along.

And besides, CMS's April 2016 explanation was just the first of many explanations to Mallinckrodt regarding why the company could not rely on the agency's 2012 letter and why Acthar's base date AMP needed to be corrected. Mallinckrodt labels these communications

"legally irrelevant," Br. at 16, but the only case that it cites for that position proves otherwise, as these conversations are in the "administrative record already in existence," which is "the focal point for judicial review" as opposed to "some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Rather than 2016, the relevant date for purposes of final agency action is May 2019 when the agency threatened to find Mallinckrodt out of compliance in the drug data reporting system. Indeed, if discussions post-dating April 2016 were off limits, this Court would need to dismiss this case because the April 2016 letter alone is not reviewable final agency action. *See, e.g.*, *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (courts "lack[] authority to review claims where an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party") (citation omitted).

### B. The Administrative Record Supports CMS's Explanation.

Unable to show that CMS acted inconsistently or did not explain itself, Mallinckrodt tries to discredit its explanation, arguing that CMS's position "is flatly contradicted" by the record, which purportedly "makes clear that all of the facts" CMS did not take into account in its 2012 decision "were all well-known to the agency" at that time. Br. at 12-14. Mallinckrodt relies on three points to support this assertion. None has any merit.

First, Mallinckrodt argues that CMS had all of the relevant information in 2012. It points to the footnote Questcor included in its 2012 request to CMS where it stated that the FDA "intends to revise its record so that the approval for infantile spasms is reflected as part of the product's original NDA, No. 08-372. That has not yet occurred." A.R. 621. But Mallinckrodt does not explain how this cryptic reference put CMS on notice that Acthar would continue to be marketed under only the original NDA. And because Questcor cited a new NDA number in its letter seeking a new base date AMP without disclosing the relevant facts indicating that the new application

number was assigned only for administrative purposes and that it would not be used for marketing, *see* A.R. 619, 621-22, *see supra* Part I.A., Mallinckrodt is wrong to suggest that the company provided enough information when it said that Acthar was first approved in 1952 and that infantile spasms was a new indication. *See* Br. at 3. Again, changes to an existing product like Acthar can qualify for a new base date AMP only if those changes result in a *new* drug being marketed under a *new* NDA or a *new* dosage form or strength. *See* Opening Br. at 18.

The company also argues that it cannot be faulted for CMS's 2012 position because it did not advocate for the manner in which CMS reached its conclusion. Br. at 12; *see also id.* at 16 (similar). But the statute is clear, *see supra* part I, and the "general rule" is that those "deal[ing] with the Government are expected to know the law," *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 63 (1984). This is particularly the case where, as here, the manufacturer responsible for rebates is a sophisticated pharmaceutical company and longtime participant in the Medicaid Drug Rebate Program. And lest there be any doubt, Questcor had correctly calculated the base date AMP for Acthar before 2012, and approached CMS for an accommodation from that statutory requirement.

Mallinckrodt's argument that it cannot be expected "to anticipate what a future regulator may later claim the law to be following a reversal in policy" thus rings hollow. Br. at 15-16. Again, there was no reversal in policy. CMS consistently applied the statute in accordance with its text to different factual scenarios, and, "[a]s a participant in the Medicare program," Mallinckrodt "had a duty to familiarize itself with" that statute. *Heckler*, 467 U.S. at 64; *see also supra* Part II.A. Its attempt to distinguish the facts of *Heckler* misses the point—CMS's 2012

view was limited to the incomplete facts that Questcor itself presented. *See supra* Part. I.A.  Any

reliance on CMS's 2012 view was no more reasonable than the reliance in *Heckler*.[8]

Mallinckrodt also faults CMS for failing to independently check with FDA in 2012 about

the appropriate NDA for Acthar's marketing.  *See* Br. at 16.  But CMS's 2012 letter was the type

of advice letter that the agency routinely provides to members of the regulated community.  *See*

*Indep. Equip. Dealers Ass'n*, 372 F.3d at 427 (agency's letter was "workaday advice letter that

agencies prepare countless times per year in dealing with the regulated community") (citation

omitted).  CMS is entitled to trust those seeking its advice to present complete and accurate

information that does not require independent verification.  Such a practice is common among

federal agencies.  *See, e.g.*, *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1264-65,

1271 (D.C. Cir. 2018) (companies could not show "significant or reasonable reliance" on opinion

in staff letter that "extended only" to facts "portrayed in . . . letter soliciting the opinion" which

did not disclose disputed practice).  Moreover, CMS explicitly stated that its view "[was] limited

to and based on the facts and information presented to us and has no applicability to a different set

of facts even if such facts appear similar in nature or in scope."  A.R. 617.  Mallinckrodt's latest

brief ignores this important disclaimer.

Mallinckrodt also trumpets CMS's 2013 email to an Ohio Department of Medicaid

employee stating that Acthar "is being marketed pursuant to a new NDA," Br. at 12-13, 16 (citing

A.R. 161), but that email evinces only understandable confusion stemming from Questcor's

submission of incomplete information to CMS.  Indeed, such confusion is understandable given

that the manufacturer ███████████████████████████

---

[8] In any event, *Heckler* also found that the private party could not establish estoppel because it
could not show its reliance led to an adverse change in position, *see* 467 U.S. at 61-63, which
Mallinckrodt does not even claim to establish, *see infra* Part III.



, which was

clearly false. *See supra* Part I; A.R. 1083.

Second, Mallinckrodt points out that certain FDA documents are public and that "CMS certainly knew how to solicit information from FDA when necessary." Br. at 13. But CMS is under no obligation to independently verify that a manufacturer that informally solicits the agency's views has submitted accurate and complete information (and its disclaimer in the 2012 letter made clear that it would not be doing so). To conclude otherwise would discourage communications between CMS and the regulated community, which "are vital to the smooth operation of both government and business." *Indep. Equip. Dealers Ass'n.*, 372 F.3d at 428; *see also Office of Personnel Mgmt. v. Richmond,* 496 U.S. 414, 415-16, 433 (1990) (explaining that a "[a] rule of estoppel" against the Government "might create not more reliable advice, but less advice," and that "[t]he natural consequence" would be "to cut back and impose strict controls upon Government provision of information").

Third, Mallinckrodt points to a September 2012 email from a concerned citizen that spanned nearly 450 pages between its text and the attachments. But that email was sent a month *after* CMS told Questcor in August 2012 that it believed it could set a new base date AMP. Br. at 13. While Mallinckrodt notes that CMS sent another letter to Questcor in September 2012 reiterating the same, that letter was simply to correct a typo, as even Mallinckrodt acknowledges. *See* Pl.'s Prelim. Inj. Br. at 14, ECF No. 4-1 (CMS's September 2012 letter "confirmed" that the

---

[9] *See* Medicaid.gov, *Product Data for Drugs in the Medicaid Drug Rebate Program,* https://www.medicaid.gov/medicaid/prescription-drugs/medicaid-drug-rebate-program/data/index.html (included in the "data definitions" link).

August 2012 letter had a "scrivener's error"); Br. at 2 ("correcting typo"). The letter did not reflect a new, independent assessment confirming the view expressed in the August 2012 letter. And again, CMS's September 2012 letter—like the August 2012 letter—stated the view in that letter was "limited to and based on the facts and information presented to us" by the company A.R. 169.

In sum, Mallinckrodt cannot show that CMS acted arbitrarily and capriciously.

### III.   No Equitable Principles Excuse Mallinckrodt from Paying the Rebates that it Owes the Medicaid Program.

As previously explained, Mallinckrodt is effectively arguing that the Government is equitably estopped from any recoupment. *See* Opening Br. at 29-30. Mallinckrodt accuses Defendants of trying "to sidestep" its "fair notice" and "retroactivity" arguments by resorting to the equitable estoppel doctrine. *See* Br. at 17. But that is the appropriate analysis here because Mallinckrodt is seeking to estop the Government from arguing now that Acthar's base date AMP is wrong by relying on CMS's prior advice in the 2012 letter.

The Supreme Court spoke clearly in a similar circumstance in *Office of Personnel Management v. Richmond*. There, an individual tried to equitably estop the Government from denying him disability payments because he received erroneous information from a government employee. In rejecting that claim, the Supreme Court held that the claimant had no "entitle[ment]" to money "not otherwise permitted by law." 496 U.S. at 415-16, 426. Though Mallinckrodt notes that case involved a "claim for funds held by the Federal Treasury that had not been lawfully appropriated," Br. at 19, it does not explain why the distinction would allow estoppel here. And it does not. Congress allocates money for Medicaid to cover prescription drugs in contemplation that manufacturers will offset those costs by paying statutorily-prescribed rebates, *see* 42 U.S.C. §§ 1396-1 (appropriations), 1396b(i)(10) (conditioning CMS payment to states on rebate agreements), and Mallinckrodt's refusal to correct those underpayments requires that CMS pay

more money than Congress intended to offset the amount that Mallinckrodt pockets that is "not otherwise permitted by law."

Indeed, to conclude that Mallinckrodt can proceed with a "fair notice" or "retroactivity" arguments would effectively swallow well-settled equitable estoppel principles. A plaintiff could simply claim that an agency's initial misapplication of the law deprived it of sufficient "fair notice" in the first place, and that a subsequent correction cannot apply "retroactively." Such an outcome would be particularly perverse here, where CMS's initial views stem from the company's own lack of candor. It is therefore not surprising that Mallinckrodt does not identify a single case where a court allowed a party to apply "fair notice" or "retroactivity" arguments to wrongfully retain taxpayer money to which it is not entitled. *See* Br. at 17; *cf. Gen. Elec. Co. v. US EPA.*, 53 F.3d 1324, 1328-30 (D.C. Cir. 1995) ("agency imposed a fine"); *Clark-Cowlitz Joint Operating Agency v. F.E.R.C.*, 826 F.2d 1074, 1076 (D.C. Cir. 1987) (agency changed its interpretation for entities competing for a license).

It is also not surprising that Mallinckrodt does not invoke the equitable estoppel doctrine—it simply cannot meet the "exacting standard," which requires a party to show "that the Government engaged in affirmative misconduct in addition to showing that it made a definite representation that the defendants reasonably relied on in a manner that changed their position for the worse. *United States ex rel. Landis v. Tailwind Sports Corp.*, 308 F.R.D. 1, 5 (D.D.C. 2015) (citation omitted). Plainly, Mallinckrodt cannot show any affirmative misconduct. *E.g., F.T.C. v. Bisaro*, 757 F. Supp. 2d 1, 10 (D.D.C. 2010) ("until evidence appears to the contrary, agencies are entitled to a presumption of regularity and good faith.") (citation omitted). Nor can Mallinckrodt claim that its position changed for the worse; rather, "[i]ts detriment is the inability to retain money that it should never have received in the first place," and a "for-profit corporation could hardly

base an estoppel on the fact that the Government wrongfully allowed it the interest-free use of taxpayers' money . . . ." *Heckler*, 467 U.S. at 61-62. Nor can it show that any reliance on CMS's 2012 view was reasonable because the view was premised on facts Questcor itself presented to the agency, which Questcor knew to be incomplete. Not only that, sophisticated pharmaceutical companies and longtime participants in the Medicaid Drug Rebate Program like Questcor and Mallinckrodt cannot claim ignorance of CMS's express disclaimer in its 2012 letter that the view expressed in the letter "has no applicability to a different set of facts even if such facts appear similar in nature or in scope." A.R. 617; *see also* A.R. 1042-1082 (1991 signed National Drug Rebate Agreements for Questcor and Mallinckrodt). And though Questcor claimed to be at a "crossroads" in 2012 because it was apparently not profiting off of the Medicaid drug rebate program, *see* Br. at 17, that was by congressional design, *see supra* Part I. In any event, CMS directed Mallinckrodt to correct the drug's information in 2016—rendering further unreasonable any reliance on the 2012 letter—and Mallinckrodt nevertheless continued in the program and signed National Drug Rebate Agreements acknowledging the obligation to rectify any underpayments. A.R. 1023, 1034.

Mallinckrodt cannot estop the Government to avoid its statutorily-prescribed rebates.

## A. The "Fair Notice" Doctrine Does Not Allow Mallinckrodt to Keep Money that Belongs to the Medicaid Program.

Even if this case were suited for "fair notice" and "retroactivity" arguments, Mallinckrodt's arguments still fail. As an initial matter, Mallinckrodt wrongly accuses Defendants of taking a "stunted view" as to when the fair notice doctrine applies. Br. at 18-19. The Government's explanation quoted the opinion of another judge in this Court, *see* Opening Br. at 31 (quoting *Ark. Dep't of Human Servs. v. Sebelius*, 818 F. Supp. 2d 107, 120–21 (D.D.C. 2011) (JEB)), and thus Mallinckrodt's quarrel is with the law. Mallinckrodt also devotes significant energy to "confirm[]

that an agency's fair notice obligations extend beyond explicit 'fines' and 'penalties.'" Br. at 20, a proposition that Defendants does not dispute.[10]

To be clear, the doctrine applies "when an agency deprive[s] a party of property by imposing civil or criminal liability[ ] or where sanctions are drastic." *Ark. Dep't of Human Servs.*, 818 F. Supp. 2d at 120–21 (holding CMS's decision to disallow payment of federal matching funds to state did not trigger doctrine) (citations omitted). That has not occurred here. Rather, Mallinckrodt has underpaid its rebates for years amounting to hundreds of millions of dollars, and that money belongs to the Medicaid program. The company cannot show any "entitle[ment]" to that money when its retention was "not otherwise permitted by law." *Office of Pers. Mgmt.*, 496 U.S. at 415-16. And contrary to Mallinckrodt's assertion, *Arkansas Department of Health and Human Services* does not support its position because it is not a state agency disputing a "miniscule" amount of funds. *See* Br. at 19. That court clearly explained that "disallowance of federal matching funds that had been provided . . . is categorically different" from the types of sanctions that trigger the fair notice doctrine, and Mallinckrodt is not "being forced to relinquish massive amounts of *its* property," 818 F. Supp. 2d at 121 (emphasis added).

Nevertheless, Mallinckrodt insists that it "faces the types of penalties" that trigger the fair notice doctrine. It argues that "if the agency's claim to entitlement were enough to override" the doctrine, then it would "never apply." Br. at 21. But it is Mallinckrodt's burden to establish that this doctrine applies, and in any event, a recoupment of money that by statute belongs to the Government is plainly different from the Government penalizing or otherwise sanctioning a

---

[10] Mallinckrodt's irrelevant string cite in support of this proposition sheds no light as to whether an entity that never had legal entitlement to Government money because it is required by statute to pay that money can invoke fair notice to avoid recoupment of that money.

regulated entity without giving the entity proper prior notice. Mallinckrodt also notes that it "faces the prospect" of losing access to DDR and therefore the suspension of its National Drug Rebate Agreement. *Id.* But any such consequences would flow only following the years of notice CMS has already provided to the company. *See* Opening Br. at 27-29, 32-33. Although Mallinckrodt apparently is worried about potential civil monetary penalties, any such concern is not ripe as the agency has not assessed such a penalty. Thus, regardless of this "case's procedural posture," Br. at 21, these actual or imagined consequences do not trigger the doctrine here.

Even if the doctrine applied, Mallinckrodt plainly received fair notice. For three years, CMS repeatedly explained to the company why it needed to correct Acthar's base date AMP. *See* Opening Br. at 27-29, 32-33. In fact, Mallinckrodt now also expressly concedes that it "doubtless had fair notice of its obligation to rectify an underpayment." Br. at 18 n.6. Even without that express concession, Questcor and Mallinckrodt agreed in their 1991 National Drug Rebate Agreement to be responsible for correcting underpayments. A.R. 1049, 1063, 1077. And in 2018, well after CMS first directed Mallinckrodt to correct Acthar's base date AMP, Mallinckrodt again agreed to comply with that requirement. A.R. 1023, 1034. Thus, Mallinckrodt plainly had adequate notice of its obligation to correct the underpaid rebates. Opening Br. at 32-33.*Cf. Gen. Elec.*, 53 F.3d at 1329 ("[I]n many cases[,] the agency's pre-enforcement efforts to bring about compliance will provide adequate notice.").

## B. No Retroactivity Principle Applies Here.

Mallinckrodt also continues to invoke *Retail Wholesale & Department Store Union v. NLRB*, 466 F.2d 380 (D.C. Cir. 1972), which sets forth the factors for application of the retroactivity principle, to argue that CMS's decision should not apply retroactively. But that case applies to "newly adopted administrative rules," *id.* at 389, and no such rule is at issue here.

Rather, CMS applied well-established law to a new factual scenario that Questor failed to present in 2012. *See* Opening Br. at 32-33; *cf. Comm. for Fairness v. Kemp*, 791 F. Supp. 888, 898 (D.D.C. 1992) (Mallinckrodt's cited case involving lack of notice and comment for changed policy).

Yet even if this Court were inclined to apply *Retail Union*, the outcome remains the same, as there would be no manifest injustice in requiring Mallinckrodt to reimburse Medicaid the hundreds of millions of dollars that Mallinckrodt is statutorily required to rebate to the program. *See* Opening Br. at 35. Moreover, as explained above, Mallinckrodt agreed—*after* CMS directed it to correct Acthar's base date AMP—that "[t]o the extent that changes in product, pricing, or related data cause increases to previously-submitted total rebate amounts," Mallinckrodt "*will be responsible for timely payment of those increases.*" A.R. 1023, 1034 (emphasis added). And though Mallinckrodt recycles its assertion "that CMS had all the facts available to it at the time it made its decisions in 2012," Defendants already explained that was not the case, and in any event, CMS's 2012 letter expressly stated it was not a release from statutory liability. *See supra* Part II.

Last, Mallinckrodt asks this Court to "[c]onsider, again," *PHH Corp v. CFPB*, 839 F.3d 1, 49 (D.C. Cir. 2016). Br. at 22-23. No need—that case has nothing to do with this one. *See* Opening Br. at 34 n.18. *PHH* involved whether "captive reinsurance agreements" were permitted under the Real Estate Settlement Procedures Act. The Court found that the statute permits such agreements, and further held that even if the statute left open the question, the agency could not advance a "retroactive application of [its] interpretations of ambiguous statutes," because the agency reversed its prior interpretation of the statute as set forth in a regulation and elsewhere. 839 F.3d at 41-49. Here, the Medicaid drug rebate statute does not leave open the question as to whether Mallinckrodt can reset the base date AMP; rather, CMS applied the statute consistently to two separate factual scenarios.

\* \* \*

Ignoring this Court's "appellate" role in this APA action, *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005), Mallinckrodt seeks to enjoin "Defendants and others in active concert or participation with them (including other federal actors) . . . from taking any further action based on CMS's determination," Proposed Order, ECF No. 22-2, or "[a]t the very least," an injunction to "resolve the fair notice and retroactivity problems." Br. at 24.  But where a court concludes that "the record before the agency does not support the agency action, [or] if the agency has not considered all relevant factors . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  Should this Court rule against Defendants (and it should not), the "proper course" would be a remand.  Even aside from the well-established administrative law principle of allowing agencies to correct any error in the first instance, an injunction "does not follow from success on the merits as a matter of course," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008), and Mallinckrodt has established no need for one here given that Defendants would conduct any remand in accordance with any judicial guidance.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (plaintiff must demonstrate, *inter alia*, "that remedies available at law . . . are inadequate").  Indeed, Mallinckrodt's expansive request to enjoin the Government "from taking any further action" concerning the agency's view of Mallinckrodt's compliance with the statute, ECF No. 22-2, is plainly inappropriate.

## CONCLUSION

The Court should enter judgment in favor of Defendants and deny Mallinckrodt's motions for a preliminary injunction and summary judgment.

Dated:  July 24, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

JEAN LIN
Special Counsel, Federal Programs Branch

/s/ *Kevin Snell* _____
KEVIN SNELL
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L St. NW
Washington, D.C. 20005
Telephone:  (202) 305-0924
Fax:  (202) 616-8460
Email:  Kevin.Snell@usdoj.gov

*Counsel for Defendants*